IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Crim. No. 19-103-LPS |
| | : | |
| KIMBERLY SPONAUGLE, | : | |
| | : | |
| Defendant. | : | |

David C. Weiss, U.S. Attorney, and Carly A. Hudson and Ruth Mandelbaum, Assistant U.S. Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware

      Attorneys for United States


John S. Malik, LAW OFFICES OF JOHN S. MALIK, Wilmington, Delaware

      Attorney for Defendant


**OPINION**


August 15, 2022
Wilmington, Delaware

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

    A.    AAW And Ms. Sponaugle's Role In The Practice ............................................. 2

    B.    AAW's Culture .................................................................................................. 5

    C.    The Investigation And Prosecution.................................................................... 9

    D.    Trial.................................................................................................................... 13

    E.    Sentencing Proceedings ..................................................................................... 17

III.    NECESSARY IMPLICATIONS OF THE JURY'S GUILTY VERDICT ......................... 31

IV.    OBJECTIONS TO THE PSR ............................................................................... 38

    A.    The Defendant Abused A Position Of Trust...................................................... 38

    B.    The Government Failed To Prove Defendant Perjured Herself.......................... 41

    C.    The Government Failed To Prove The Offense "[R]esulted In Substantial Financial Hardship" To Any Victim........................................................................................ 44

    D.    The Loss Amount Proven By The Government Is Between $40,000 And $95,000......... 50

       1.    Applicable Legal Principles ....................................................................... 51

       2.    The Court Did Not Find Accountant Hoffman's Analysis Persuasive ......................... 51

         a.    Hoffman's analysis was inconsistent, resulting in lower loss amounts each time she obtained more information................................................................................. 51

         b.    Hoffman's analysis was not conservative, as it should have been .......................... 53

         c.    Hoffman relied too heavily on the doctors' views, and gave extra weight to their initial conclusions................................................................................. 56

         d.    Hoffman largely assumed that if a personal transaction was not expressly authorized in writing or by a doctor's specific recollection, it was unauthorized ........... 59

         e.    Exemplary transactions demonstrating flaws in Hoffman's analysis .................... 60

           i.    Gas station expenses ......................................................................... 60

           ii.    BJ's/Target/Walmart ....................................................................... 62

           iii.    Breast cancer walk ........................................................................... 62

           iv.    Gifts from the practice purchased by Sponaugle ................................. 64

           v.    Cigars ............................................................................................. 66

           vi.    Parking ........................................................................................... 67

vii. Home security system ..................................................................... 68

viii. Non-Delaware purchases or deliveries .................................................. 69

ix. Additional unproven categories .......................................................... 70

3. The Government's Showing Is Further Weakened By Its Heavy Reliance On Hearsay 71

4. Ms. Sponaugle *Did* Offer A Conservative Analysis Of Loss ......................................... 72

5. Ms. Sponaugle Reasonably Believed She Was Permitted To Use Her AAW Credit Card For Personal Purchases Of Up To $20,000 Annually – A Total Of $70,000 – After She Stopped Taking Bonuses ...................................................................................... 74

6. The Government Failed To Prove That Any Check Payments Were Unauthorized ..... 80

7. Calculation Of The Loss Amount ..................................................................... 85

   a.   Starting point: Ms. Hoffman's final loss calculation ................................. 85

   b.   Specific adjustments to Ms. Hoffman's analysis ..................................... 86

      i.   Early period: January 2012 through October 2014 ................................. 86

      ii.  Later period: October 2014 through March 2018 ................................. 88

   c.   Total maximum loss amount based on Ms. Hoffman's analysis as a starting point 90

   d.   The Court will reduce the total maximum loss by 25 percent ................................. 90

   e.   Additional evidence corroborates a loss of no more than $95,000 ......................... 92

V.    SENTENCING GUIDELINES COMPUTATION ................................................. 98

VI.   CONCLUSION ........................................................................................... 99

STARK, U.S. Circuit Judge:

## I. INTRODUCTION

The defendant, Kimberly Sponaugle ("Ms. Sponaugle," "Sponaugle," "Defendant," or

"the Defendant"), was indicted by a grand jury sitting in the District of Delaware on one count of

wire fraud, a violation of 18 U.S.C. § 1343. On December 15, 2021, after a seven-day trial, a

jury convicted her. (*See* D.I. 93-99) ("Trial Tr.") Later that month, the Court met with counsel

to discuss issues relating to sentencing. (*See* D.I. 100) After obtaining the parties' preliminary

views on certain likely issues that would need to be resolved in connection with calculating the

applicable United States Sentencing Guidelines ("Sentencing Guidelines," "Guidelines,"

"U.S.S.G.," or "SG"), and after the Court expressed concern as to whether the trial record would

be sufficient to allow it to make the necessary determinations, the Court subsequently presided

over four days of additional proceedings, at which both parties called witnesses to the stand to

provide evidence; presented other testimony from victims of Ms. Sponaugle's crime and from

individuals who could speak to her character; and provided oral argument. (*See* D.I. 119, 122)

("Sent. Tr.")[1]

On March 3, 2022, the United States Probation Office ("Probation Office" or "USPO")

filed a Presentence Investigation Report ("PSR"). (D.I. 109) On April 25, 2022, the Probation

Office submitted a revised PSR, which included the parties' extensive written arguments

regarding the Guidelines calculations. (D.I. 115)

---

[1] There are four sentencing hearing transcripts. (*See* D.I. 119-22) Some of them re-use the same page numbers. Hence, the Court uses the following convention to refer to the sentencing transcripts: March 10, 2022 is volume "A;" March 11, 2022 is "B;" April 4, 2022 is "C;" and April 28, 2022 is "D." Accordingly, citations to the sentencing hearing transcripts are in the following format: "[Witness Last Name] Sent. Tr. [volume letter] at [page number]."

Having considered the now-extensive record created at trial and during the subsequent hearings relating to sentencing, as well as all written submissions made in connection with sentencing (*see, e.g.*, D.I. 105, 106), the Court herein rules on Ms. Sponaugle's objections to the PSR and sets out the Guidelines range it will apply in connection with the forthcoming sentencing. Before doing so, the Court first provides background information, including a discussion of All About Women, PA ("AAW") and Ms. Sponaugle's role in the practice, findings on pertinent aspects of the culture of AAW, and a description of the investigation, trial, and sentencing proceedings to this point. The Court also addresses what is "necessarily implied" by the jury's verdict finding the Defendant guilty and what, therefore, the Court must accept as true for purposes of sentencing.

## II.    BACKGROUND[2]

### A.    AAW And Ms. Sponaugle's Role In The Practice

AAW is an obstetric and gynecological healthcare practice that was founded as a partnership in 2001 by several doctors. (McCracken Trial Tr. at 404, 502)[3] With the doctors focused on providing healthcare to women in the community, AAW needed someone else to handle the business aspects of the practice. (*See* D.I. 73 at 4; McCracken Trial Tr. at 406) Initially, the doctors had assistance from Steve McBride, then-partner Dr. McBride's father, who would write checks and help with the books. (McCracken Trial Tr. at 501-02) At some point, Tom Mazzello served as practice manager; he was terminated after two years, when Mr.

---

[2] All of the factual findings throughout this Opinion are supported by at least a preponderance of the evidence. Fact findings necessarily implied in the jury's guilty verdict are supported by proof beyond a reasonable doubt.

[3] All citations to the trial transcripts (D.I. 93-99) are in the format: "[Witness Last Name] Trial Tr. at [page number]."

McBride caught him allegedly stealing from the practice. (McCullough Trial Tr. at 685-87) After that, Mr. McBride again provided assistance, continuing to do so until Dr. McBride left AAW. (Sponaugle Trial Tr. at 1233-34, 1240)

In 2005, the partners hired Ms. Sponaugle to serve as AAW's practice manager. (*See* D.I. 73 at 4; McCracken Trial Tr. at 408) She was hired as an employee, not a partner, and remained a non-partner employee at all times she was with AAW. (*See* D.I. 73 at 4; McCracken Trial Tr. at 431) Little effort was made to define Ms. Sponaugle's duties at the time of her hiring or thereafter. (McCullough Trial Tr. at 691-92, 697-98)

In 2006, soon after the partners hired Ms. Sponaugle, AAW became a subsidiary of ChristianaCare, a regional healthcare system. (*See* D.I. 73 at 4; McCracken Trial Tr. at 412) As required by ChristianaCare, in this period outside accountants reviewed and audited AAW's financial practices. (McCracken Trial Tr. at 413)

In 2012, AAW separated from ChristianaCare and reverted to being a private practice. (*See* D.I. 73 at 4; McCracken Trial Tr. at 414) From that point on, and for the remainder of Ms. Sponaugle's tenure, there was minimal independent oversight of AAW's finances, although the doctor-partners assumed otherwise. (McCracken Trial Tr. at 415, 418, 505; McCullough Trial Tr. at 684-85)

Ms. Sponaugle's role at AAW expanded significantly over time. Her title evolved from "practice manager" to "director" and eventually "CEO" of the practice. (McCracken Trial Tr. at 410) In time, Ms. Sponaugle was responsible for managing the practice's day-to-day operations, including scheduling, finances, human resources, payroll, overseeing 65 employees, communicating with vendors, and recording and paying bills. (McCracken Trial Tr. at 410; Sponaugle Trial Tr. at 1274-76)

3

Prior to working at AAW, Ms. Sponaugle had earned an MBA with a specialization in healthcare management, but she had no education in or experience with bookkeeping or accounting. (Sponaugle Trial Tr. at 1224-29, 1236)  She was given responsibility for AAW's accounting but received little training in QuickBooks, the program Ms. Sponaugle's predecessors had set up and used to track AAW's receipts and expenditures. (McCullough Trial Tr. at 692-94; Sponaugle Trial Tr. at 1247)  Julie Morgan, an accountant, gave Sponaugle a short introduction to QuickBooks, lasting maybe "five minutes." (Sponaugle Trial Tr. at 1247)  No one at the practice formally defined Ms. Sponaugle's accounting-related duties; the doctors simply assumed she had an adequate background to perform these duties. (McCullough Trial Tr. at 691-95)

As Ms. Sponaugle's role at AAW expanded, her compensation increased.  When she was hired in 2005, her annual salary was $60,000. (McCracken Trial Tr. at 517)  The following year, she was given a raise to $65,000. (*Id.*)  In 2007, she received another raise to $68,000. (*Id.*)  Her next raise came two years later, when her annual salary went up to $78,000. (*Id.*)  Then in 2010, her salary increased yet again to $88,000. (*Id.*)  At the same time, she also started receiving a monthly vehicle allowance of $600, the same amount the doctor-partners received. (*Id.* at 518)

In 2011, Ms. Sponaugle received another raise, making her salary $100,000 a year. (*Id.* at 517-18)  She also became entitled to a quarterly bonus equal to five percent of her base salary ($5,000) each quarter, contingent on AAW's financial performance during that quarter. (*Id.* at 518)  For a few years, Ms. Sponaugle collected these bonuses. (*Id.* at 522-23)  Then, in or around March 2014, when she began the process of separating from and ultimately divorcing her husband, she stopped taking the quarterly cash bonuses, under circumstances – and with resulting consequences – that are discussed thoroughly below. (*Id.* at 521-22; Sponaugle Trial

4

Tr. at 1283; *see also infra* at Part IV.D.5)

## B.     AAW's Culture

Certain features of the culture at AAW are pertinent to understanding how Ms. Sponaugle was able to engage in her fraudulent scheme, how it went undetected for so long, and how the Court is finding that the government failed to prove the extent of the fraud was anywhere near what the government (and AAW) alleged.  The Court believes the characteristics of the culture described in this Opinion are not disputed – although their impact is.[4]  In any event, the Court's findings regarding AAW's culture are strongly supported in the record, by at least a preponderance of the evidence.

Ms. Sponaugle testified, Drs. McCracken and McCullough agreed, and the Court finds that the culture at AAW was "incredibly generous," in the sense of monetary generosity and also in that the doctors, providers, other employees, and Ms. Sponaugle were deeply involved in one another's lives.  (Sponaugle Trial Tr. at 1287-88; *see also* McCullough Trial Tr. at 641-42; McCracken Sent. Tr. A at 205-07)  AAW took special care to celebrate its employees through regular events like spa days, company parties, birthday celebrations, and special recognition weeks, all paid for at the expense of the business itself, and typically planned by Ms. Sponaugle as part of her job duties.  (Sponaugle Trial Tr. at 1288-93; Sponaugle Sent. Tr. B at 192; McCracken Sent. Tr. A at 206-07)  For employees' important life events and milestones, such as retirements, graduations, baby showers, and weddings, AAW often provided gifts, including

---

[4] The government agrees that the culture at AAW is relevant to the issues in dispute in this litigation.  (*See generally* Hoffman Sent. Tr. B at 120 ("[W]e [i.e., the government and FBI] learned a lot about All About Women from the very beginning and the nature or the culture of the practice."); *id.* at 136 (explaining that at start of investigation FBI was "trying to learn the culture of the practice"))

jewelry, as well as refreshments and food. (McCracken Trial Tr. at 604; McCullough Trial Tr. 641-42; Sponaugle Trial Tr. at 1292-93; DX13)[5]

AAW's generosity extended to making contributions to charitable events, such as Toys for Tots and walks to raise awareness of, and funds for, breast cancer research and treatment. (Sponaugle Trial Tr. at 1306-09)  Ms. Sponaugle played a crucial role in these efforts as well. For example, for an annual breast cancer walk in Philadelphia, Ms. Sponaugle was responsible for renting a bus for all of the AAW-related participants, purchasing refreshments to serve on the bus, serving those refreshments, and cleaning up the bus afterwards. (*Id.* at 1306-08; Hoffman Sent. Tr. B at 12)  She also helped the practice make donations, including of toys and clothes, to charities. (Sponaugle Trial Tr. at 1308-09)

The partners also contributed to employees' trips or other personal expenses, like home repairs. (*Id.* at 1288)  On at least one occasion the partners gave $2,000 towards an employee's Disney honeymoon trip. (*Id.* at 1288; McCullough Trial Tr. at 770; McCracken Sent. Tr. A at 188, 205-06; DX24)

The partners and the practice were particularly generous to Ms. Sponaugle, who by all accounts worked extremely hard at her job and whom the partners consistently rated as an outstanding employee. (McCracken Trial Tr. at 522-23; Sponaugle Trial Tr. at 1276)  Examples abound in the record and the Court will list only some.  The doctor-partners bought Ms. Sponaugle Christmas and birthday gifts. (McCracken Sent. Tr. A at 217-18)  In 2009 or 2010, AAW paid for Ms. Sponaugle to take her then-husband and children to DisneyWorld for a week.

---

[5] Citations to Defendant's trial exhibits are in the format "DX[number] at [page number]." Citations to Defendant's sentencing hearing exhibits are in the format "Def. Sent. Ex. [number] at [bates page number]."

(Sponaugle Sent. Tr. B at 225)  In 2012, the practice paid for Ms. Sponaugle to take her family to Great Wolf Lodge, an indoor water park.  (McCullough Trial Tr. 671-72, 676; Sponaugle Trial Tr. at 1383-84; DX23A)  In 2015, the practice paid for Ms. Sponaugle and her then-husband to travel to Mexico, in hopes the getaway would help them reconcile and preserve their struggling marriage.  (McCracken Trial Tr. 450-51; Sponaugle Trial Tr. at 1392; *see also* McCracken Sent. Tr. A at 212-13, 247, 252)  In 2016, the doctors sent Ms. Sponaugle to Canyon Ranch, a spa in Massachusetts, to "refresh" herself after she officially separated from her husband.  (Sponaugle Trial Tr. at 1402; McCracken Sent Tr. A at 142-43)  One of the partners, Dr. McCracken, sent Sponaugle a text message saying "I want you to think of this as an annual ritual," which confirmed Ms. Sponaugle's impression that AAW would pay for an annual trip to a spa (or to Great Wolf Lodge, as a less expensive substitute).  (Def. Sent. Ex. 31; McCracken Sent. Tr. A at 142-43; Sponaugle Sent. Tr. B. at 232)  After her divorce, on at least one occasion, the practice paid for Sponaugle to hire a photographer to take pictures of herself and her children.  (*See* McCracken Sent. Tr. A at 213)

Thanks to AAW's enormously supportive and generous culture, Ms. Sponaugle developed close relationships and friendships with its partners, practitioners, and employees. (*See, e.g.*, McCracken Sent. Tr. A at 242-44; Sponaugle Trial Tr. at 1509; Sponaugle Sent. Tr. B. at 171-76)  On multiple occasions, Dr. McCullough allowed Ms. Sponaugle and her family to use her beach house in Avalon, New Jersey.  (McCullough Trial Tr. at 721-22; Sponaugle Trial Tr. at 1403)  Ms. Sponaugle and some of the partners went together to a Taylor Swift concert in Philadelphia.  (McCracken Trial Tr. at 447)  At other times, Ms. Sponaugle and at least some of the doctors (and often their families) attended an Orioles game, a cookout party, a One Direction concert, a Maroon 5 concert, and a company picnic together.  (*See, e.g.*, Sponaugle Sent. Tr. B.

at 171-76; *see also* Def. Sent. Ex. 28)

Another facet of AAW's culture was that the practice was not particularly careful about having, or following, policies relating to financial expenditures.  In connection with this case, the lack of enforceable controls was most evident in relation to the use of credit cards issued by (and paid for by) AAW to its partners and Ms. Sponaugle.  While there was an employee handbook, AAW lacked clear written policies or guidelines regarding the use of the company credit cards.  (Smith Trial Tr. at 871-73; Sponaugle Trial Tr. at 1249; McCracken Sent. Tr. A. at 44-45, 232)

AAW provided company credit cards primarily for the holders of the cards to use to pay for gas and car maintenance expenses.  (McCracken Trial Tr. at 426-29)  Other business expenses, like supplies or conference fees, could also be put on the card and charged to the practice.  (*Id.* at 427-28)  AAW did not have clear policies as to the amounts that could be charged to employees' AAW credit cards for these types of expenses.  (Smith Trial Tr. at 873; Sponaugle Trial Tr. at 1249-50; McCracken Sent. Tr. A at 44-45)  While AAW permitted its partners and employees who were on call at the hospital to use their company credit cards to pay for car maintenance, that meant only "routine maintenance" or "minor" repairs, but what was "routine" or "minor" was undefined (and largely unenforced).  (McCracken Trial Tr. at 426-29, 559-60; Smith Trial Tr. at 864-65; Hoffman Trial Tr. at 1167-68)  Given the lack of clear policies, as well as the tremendous amount of trust the doctors placed in Ms. Sponaugle, on many occasions when Ms. Sponaugle notified the partners that she put a personal charge on her company credit card, she was told to not worry about it.  (*See, e.g.*, McCracken Trial Tr. at 436; *see also* Sponaugle Trial Tr. at 1538-39)

At its peak, AAW had three offices, in Christiana, Pike Creek, and Glasgow.  (Sponaugle Trial Tr. at 1294-95)  At this time, Ms. Sponaugle was involved in purchasing appliances, décor,

8

and other items needed for remodeling. (*Id.*; McCullough Trial Tr. at 828) Ms. Sponaugle was also expected to purchase supplies for the offices and staff, including keeping the doctors' personal spaces stocked with their preferred snacks, drinks, and paper products. (Sponaugle Trial Tr. at 1295-96) Ms. Sponaugle paid for all these supplies, as well as gifts, celebrations, and furniture, with her company credit card. (*Id.*)

For the undersigned Judge, as a neutral, outside observer who has now had the benefit of observing the testimony of many of the partners and Ms. Sponaugle (at length), it has been difficult – and often impossible – to discern what credit card charges were authorized and what charges were not. The Court suspects that in most employment contexts, this would not be a hard task: if a purchase is for a purely personal non-business-related item, it is not authorized; if a boss told an employee something like "you've been working hard, your marriage is on the rocks, you should take a vacation," the boss would not be thereby offering to pay for the trip. But the record here shows that on many occasions Ms. Sponaugle was expressly permitted to charge personal items to her AAW credit card, and on other occasions the practice paid for Ms. Sponaugle to take vacations and other trips. It also demonstrates a lack of clear, enforceable policies as to what was permitted to be charged on the company credit card. These findings have contributed substantially to the Court's conclusions as provided throughout this Opinion.

## C.   The Investigation And Prosecution

On February 26, 2018, Ms. Sponaugle gave notice to AAW that she was going to be resigning from her position as CEO. (McCracken Trial Tr. at 418; Sponaugle Trial Tr. at 1502; *see also* D.I. 73 at 5 (government pretrial memo suggesting it would prove "the defendant abruptly announced that she was quitting her job at AAW")) By this date, Ms. Sponaugle had accepted a position at another medical practice, located in the same building as AAW's primary

9

office. So Ms. Sponaugle arranged a meeting with the partners to inform them she would be leaving AAW. (Sponaugle Trial Tr. at 1505-06) According to Ms. Sponaugle, the partners' reactions included shock, anger, and sadness. (*Id.* at 1506) Ms. Sponaugle told them that, even after leaving AAW, she would remain available to assist with the transition to a new practice manager over the following three months, including by offering to return to AAW's office to help a new person learn the role. (*Id.* at 1511; *see also* McCracken Sent Tr. A at 188)

Given Ms. Sponaugle's impending departure, the partners realized they would need to cover her responsibilities themselves, at least until they were able to hire a replacement. (McCracken Trial Tr. at 461) Dr. McCracken took on temporary responsibility for handling AAW's finances. (*Id.*) To prepare for this role, Dr. McCracken asked Ms. Sponaugle to provide her access to AAW's credit card statements, bank records, and other financial information. (*Id.* at 458-59) Upon reviewing the statements, Dr. McCracken and the other partners became concerned with many of the charges they saw that Ms. Sponaugle had charged to the practice. (*Id.* at 464) Dr. McCracken and some of her partners consulted with AAW's outside accountants at Stephano Slack LLC regarding what they found in the credit card statements and in QuickBooks. (*Id.* at 464-58) They discovered that Ms. Sponaugle had long been using her AAW credit card to purchase personal items and had apparently hidden these charges by mischaracterizing them in her entries in QuickBooks. (McCracken Sent. Tr. A at 23, 199)

Over the ensuing days, the doctors gathered more information and consulted an attorney. (*Id.* at 199) Then, on March 8, 2018, before her late-February resignation had become effective, AAW terminated Ms. Sponaugle for cause. (McCracken Trial Tr. at 544-45; Sponaugle Trial Tr.

at 1513-14)[6] The termination occurred in a meeting Ms. Sponaugle had been told to attend so

she could explain how to use QuickBooks to Dr. McCracken. (Sponaugle Trial Tr. at 1513)

When Ms. Sponaugle arrived in the conference room, she found not just Dr. McCracken but all

of AAW's partners, along with an attorney she had never met and Ralph Cetrulo, AAW's outside

accountant, with whom Ms. Sponaugle had worked in keeping track of AAW's finances. (*Id.* at

1513-15)

The attorney told Ms. Sponaugle she was being terminated for cause based on her

unlawful use of her AAW credit card. (*Id.* at 1515) Despite having no notice of the true

purposes of this meeting, and with no warning whatsoever that she was suspected of

wrongdoing, Ms. Sponaugle had an immediate explanation for what the attorney was alleging.

She stated she had used her AAW credit card to make personal purchases in lieu of taking cash

bonuses to which she would otherwise have been entitled, as the practice had agreed she could

do (so she said) because of her pending divorce proceedings. (Sponaugle Trial Tr. at 1515;

Termination Video at 3:50-4:43)[7]

The lawyer told Ms. Sponaugle she needed to turn over her cellphone, collect her

personal items from her office, and then leave the premises. (Sponaugle Trial Tr. at 1514;

Termination Video at 3:25-45) Her access to AAW's computer systems was shut off.

(Sponaugle Trial Tr. at 1514) She was promptly escorted to her office to pack her belongings

---

[6] While the Indictment alleges a fraud scheme that ran until on or about March 12, 2018, it
appears that the date of Ms. Sponaugle's termination was March 8, 2018. (*See* Sponaugle Trial
Tr. at 1521; Hoffman Trial Tr. at 1104; McCracken Sent. Tr. A at 197; *see also* Cucuzzella Trial
Tr. at 1207)

[7] The "Termination Video" is a recording made by Dr. Goshow-Harris during the March 2018
termination meeting; the defense played it during the sentencing proceedings. (*See, e.g.*,
Sponaugle Sent. Tr. C at 141-42)

and then a constable walked her out of the building and to her car. (*Id.* at 1515-17)

The AAW partners also filed a police report. (McCracken Trial Tr. at 544-45; *see also* Wilson Trial Tr. at 376, 383)  After an initial investigation by the Delaware State Police, the Federal Bureau of Investigation ("FBI") took over the case in the summer of 2018. (Wilson Trial Tr. at 349; D.I. 73 at 5-6)  Among other investigative tasks, the FBI interviewed the doctors and sought to corroborate what they told the FBI. (Wilson Trial Tr. at 349-51)  Investigators collected information from TD Bank, where AAW had accounts, and from Groupon, Amazon, BJ's Wholesale, and Delmarva Power, and then analyzed the data in an effort to determine which purchases were authorized and which were not. (*Id.* at 354-57, 370)  The FBI conducted interviews and acquired emails, messages, and other forms of communications as further aids to their analysis. (*Id.* at 371)  Eventually, the FBI and United States Attorney's Office held a "reverse proffer" session with Sponaugle and her attorney, at which the government outlined its case and shared some of its evidence; the government did not, however, hear any of Ms. Sponaugle's explanations or her defense before deciding to charge her. (Sponaugle Trial Tr. at 1599-1602)

On August 15, 2019, more than 18 months after she had been terminated, a federal grand jury returned a one-count indictment, charging Ms. Sponaugle with wire fraud under 18 U.S.C. § 1343. (*See generally* D.I. 2; *see also* Sponaugle Trial Tr. at 1521, 1602-03)  The Indictment alleges that Sponaugle devised and engaged in a six-year scheme to defraud AAW.  Specifically, the Indictment alleges that the scheme began on or about January 23, 2012 and continued until approximately March 12, 2018. (*See* D.I. 2 at 2)  The scheme involved Ms. Sponaugle using her AAW credit card to make personal purchases, paying the bills for her AAW credit card with funds from AAW's bank account, and disguising her personal expenditures in AAW's financial

12

accounting system. (*Id.* at 1-2)  The Indictment states that Ms. Sponaugle put over 2,100 unauthorized charges on her AAW credit card, corresponding to total fraudulent expenditures of approximately $322,652. (*See id.* at 2)

## D.    Trial

The Court held a pretrial conference on November 17, 2021.  The government had previously filed a trial memorandum, which outlined the government's theory of the case and previewed the evidence to be presented at trial. (*See generally* D.I. 73)  The government did not identify any particular number of fraudulent transactions, or an amount of fraudulent loss, it intended to prove.[8]

At trial, the government started its opening statement by telling the jury it would prove that Ms. Sponaugle misused her AAW credit card at least 3,000 times. (*See* Trial Tr. at 309; *see also id.* at 310-11, 316, 318-19)  The AUSA said those "3,000 swipes" resulted in "over a quarter of a million dollars" in fraudulent charges on Ms. Sponaugle's AAW credit card. (*Id.* at 309; *see also id.* at 310, 311 ("hundreds of thousands of dollars"), 316, 319)  Defense counsel, in his opening statement, countered that Ms. Sponaugle "believed in good faith that the purchases that she was making" on her AAW credit card were authorized by the practice. (*Id.* at 320)  Defense counsel further explained that Ms. Sponaugle "believed in good faith that she was permitted to recoup the $20- to $30,000 per year that she did not take" – that is, the cash bonuses she had previously received – by making personal expenditures on her AAW credit card. (*Id.*)  He also told the jury that the defense would show that many of the 3,000 swipes referred to by the government were authorized by the AAW partners. (*See id.* at 321)

---

[8] The memorandum states generally that Ms. Sponaugle stole "hundreds of thousands of dollars," without specifying an estimate of loss or particular fraudulent credit card charges. (D.I. 73 at 2)

13

During trial, the government called seven witnesses: FBI Supervisory Special Agent Joshua Wilson, Dr. Alice Diane McCracken, Dr. Helen McCullough, Dr. Regina Smith, Ralph Cetrulo, Kathy Storm, and FBI Forensic Accountant Michelle Hoffman ("Accountant Hoffman," "Ms. Hoffman," or "Hoffman"). Special Agent Wilson and FBI Forensic Accountant Hoffman testified to the FBI's involvement in the investigation and, in particular, how Ms. Hoffman analyzed Ms. Sponaugle's purchases and determined which ones were unauthorized. (*See generally* Trial Tr. at 345-95, 1029-1186) Drs. McCracken, McCullough, and Smith testified about their work at AAW, AAW's culture, and how they discovered and assessed Ms. Sponaugle's personal charges on the company credit card. (*See generally id.* at 404-563, 582-630, 631-854, 855-81) Mr. Cetrulo, who was AAW's tax accountant, and Ms. Storm, another accountant who works with AAW, testified about their understanding of AAW's accounting practices, including the minimal oversight and lack of auditing. (*See generally id.* at 882-971, 971-1028)

The defense put on an extensive case at trial as well. The defense called Dr. Anthony Cucuzzella, Dr. Ann Kim, Dr. Scott Roberts, Carla Sayer, and Diane McWilliams as character witnesses, who testified to Ms. Sponaugle's reputation for being honest, trustworthy, and law-abiding at work and in her community. (*See generally id.* at 1193-1222, 1323-68, 1469-76) The defense also called Michele Allen, an employment attorney who had represented Ms. Sponaugle after her termination from AAW. Ms. Allen described how her office had communicated with AAW's counsel in an attempt to work through the issues that led to Ms. Sponaugle's termination, until she learned that AAW was not interested in negotiating. (*See generally id.* at 1616-23) The core of the defense case was Ms. Sponaugle's testimony on her own behalf, which lasted for more than a full day. (*See generally id.* at 1222-1322, 1370-1454,

14

1477-1614)  Among other things, the Defendant explained her understanding of what she was authorized to purchase and why she used her AAW credit card for personal items in lieu of receiving her bonuses from October 2014 to her termination in March 2018.

After all the evidence had been presented, the Court instructed the jury on the elements of wire fraud.  First, the jury needed to find beyond a reasonable doubt that "Kimberly Sponaugle knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises." (Trial Tr. at 1666)  On this first element, the Court explained that the government was not required to "prove every misrepresentation charged in the indictment," but rather it was "sufficient" if the government proved "one or more of the material misrepresentations." (*Id.* at 1668)  The jury could not convict the Defendant unless all jurors unanimously agreed "as to at least one of the material misrepresentations." (*Id.*)

Second, the jury needed to find beyond a reasonable doubt that "Kimberly Sponaugle acted with the intent to defraud." (*Id.* at 1666)  An "intent to defraud" means "to act knowingly and with the intention or the purpose to deceive or cheat." (*Id.* at 1670)  The Court explained that if Ms. Sponaugle acted in "good faith," that would be "a complete defense" to the charge of wire fraud because it would be "inconsistent with her acting with an intent to defraud." (*Id.* at 1678)  For example, if Ms. Sponaugle "made an honest mistake or had an honest misunderstanding about whether and when she was authorized to put personal purchases on her business credit card, then she did not act with an intent to defraud." (*Id.*)

Third, the jury had to find beyond a reasonable doubt that "in advancing, furthering, or carrying out the scheme, Kimberly Sponaugle transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce . . . ." (*Id.* at 1670)  In connection with this element of the offense, the Court further instructed: "The government and

15

the defendant have agreed that the following fact is true: wire transfers made from All About Women's business checking account to pay off the defendant's All About Women credit card throughout the time period of the Indictment travelled in interstate commerce." (*Id.* at 1670)

Finally, the Court explained that the "loss amount, or the total amount of unauthorized expenses, is not an element of wire fraud," so the jury did "not need to agree on a total loss amount to find the defendant guilty of wire fraud." (*Id.* at 1667)

In its closing argument, the government repeated its assertion that Ms. Sponaugle "made, ultimately, over 3,000 personal purchases, totaling well over a quarter of a million dollars," on her AAW credit card. (Trial Tr. at 1682) The government also reiterated that the jury was not required to "decide exactly how much money the defendant ultimately stole." (*Id.* at 1685) Rather, the government told the jury that it only had to "agree on one time that she acted" to implement her scheme to defraud. (*Id.*)

In his summation, defense counsel argued that Ms. Sponaugle "believed in good faith, based upon her discussion with the physicians, and based upon her tenure at All About Women, that she was permitted and authorized to use her [business] credit card for personal expenditures." (*Id.* at 1703) According to the defense, those expenditures were intended to make up for bonuses averaging about $21,000 a year, which Ms. Sponaugle did not take while she was going through divorce proceedings. (*See, e.g., id.* at 1721-25) In the defense's view, because she did not have an intent to defraud, she could not be guilty of wire fraud. (*See id.* at 1703, 1750-53)

In rebuttal, the government again emphasized that the jury did not "need to decide on a final dollar amount that [Ms. Sponaugle] spent in order to find her guilty." (*Id.* at 1764) The AUSA also repeated that the jury had to agree on "the three elements of the offense" for only

16

"one example of [Ms. Sponaugle] buying something personal and hiding it in QuickBooks." (*Id.* at 1766)

After deliberations, the jury returned a verdict of guilty on the single count of wire fraud. (*See generally* D.I. 89)

**E.   Sentencing Proceedings**

On December 17, 2021, two days after trial concluded, the Court met with counsel in chambers to discuss how to proceed toward sentencing. (*See generally* D.I. 100)  The Court discussed with the parties their "positions on the loss amount that will drive the sentencing guidelines range" and "whether the government intends to seek a sentence that would include imprisonment." (*Id.* at 2)  When it became clear that there were disagreements between the parties on these matters, the Court moved the discussion into the courtroom and put its thoughts on the record. (*See id.*)  Among other things, the Court stated:

> . . . I wanted to have this discussion for my benefit to understand if there was agreement or disagreement on . . . what type of sentence might be appropriate and . . . how to get to determine what the right sentence might be. . . .
>
> . . .
>
> [I]t seems clear to me there is a disagreement. . . .
>
> . . . [I]n terms of loss amount, . . . I think there [are] some complicated possibly legal and certainly I think factual issues about the loss amount. . . .  I recognize the jury found guilt beyond a reasonable doubt, and that the standard of proof at sentencing will be lower, will only be a preponderance of the evidence, but the burden will be on the government to prove by a preponderance of the evidence the loss amount.
>
> . . .
>
> And then we talked about imprisonment.  And I said, this is my view as of today, that I am not at all certain that this is a case

17

> where I will conclude that prison is warranted.
>
> Now, I say that also with the recognition, as I hope i[s]
> clear to counsel, that I will have an open mind.  I don't have all the
> information that I will have after a sentencing hearing.  There may
> be victims who want to be heard.  There may be evidence that is
> relevant conduct that I did not hear at trial.  There may be evidence
> that was presented at trial that didn't necessarily make the impact
> on me that it will when I focus as a fact-finder at a sentencing
> hearing.  And I have no idea what the guidelines are going to be in
> the end after whatever proceedings we have and whatever
> arguments and whatever findings I make.

(*Id.* at 5-6)

On January 24 and February 8, 2022, the parties filed memoranda with their views on

various issues relating to sentencing.  (D.I. 105 & 106)  The Court held a status teleconference

with the parties on February 11, 2022, at which the government agreed that the Court is not

limited to the record created at trial as the basis for making findings of fact related to sentencing.

(*See* Feb. 11, 2022 Tr. at 12-13) ("Feb. 11 Tr.")  Subsequently, the Court held evidentiary

hearings on March 10 and 11 and April 4, 2022.  (D.I. 119, 120, 121)  The parties filed

objections to the Probation Office's PSR and later, on April 25, the Court received another

version of the PSR.  (D.I. 109, 115)  On April 28, 2022, the Court heard victim statements and

character references and then heard oral argument on the objections to the PSR and other legal

issues relating to sentencing.  (D.I. 122)

As part of its sentencing submissions, the government provided detail on allegedly

fraudulent check purchases that, in its view, needed to be included in the total loss amount as

relevant conduct.  (D.I. 105 at 17)  The government had not presented the checks to the jury as a

basis for conviction.  (*See* Feb. 11 Tr. at 28) (AUSA stating: "All the jury heard about those

checks was . . . an example of a check . . .  But we didn't discuss it at length because it's relevant

18

conduct for sentencing.")  In particular, the government pointed to checks Ms. Sponaugle wrote

on the AAW business checking account for allegedly unauthorized personal purchases totaling

$16,145.  (*Id.*; *see also* D.I. 109 at n.1)  The government later updated the amount of

unauthorized check payments to $16,266.  (*See* D.I. 116 Ex. 1)

Over the course of the sentencing proceedings, the government called Dr. McCracken

and FBI Forensic Accountant Hoffman, both of whom took the witness stand, were placed under

oath, and were examined by an AUSA, defense counsel, and the Court.  The Defendant took the

stand again and, likewise, was placed under oath and questioned by her attorney, by the

government, and by the Court.  The defense also called to the witness stand Special Agent

Wilson and private investigator Richard Kilmon.  All of these witnesses provided evidence the

Court relies on in this Opinion in making the necessary factual findings relating to the

Sentencing Guidelines and, ultimately, the appropriate sentence for Ms. Sponaugle.

The Court also heard from numerous victims and character witnesses.  These individuals

were permitted to speak from the podium (not the witness stand) and were not placed under oath

and were not examined by counsel or the Court.[9]  The following victims, all of whom were

associated with AAW, provided statements: Dr. Joanne Goshow, Dr. McCullough, Dr. Natalie

Chavez, Dr. Molly Larkin, and Dr. McCracken.  The following character witnesses provided

statements on behalf of Defendant: Dr. Tony Cucuzzella, Dr. Nancy Kim, Dr. Ann Kim, Dustin

Moore, Carla Sayer, Diane McWilliams, Edward Henderson, and David Byrd.

At the conclusion of the April 28 hearing, the Court advised the parties that it intended to

issue an Opinion addressing the pending objections to the PSR and setting the Guidelines range

---

[9] This is the Court's standard procedure for hearing from victims and character witnesses in
connection with a sentencing.

it would use as the starting point for determining the appropriate sentence for Ms. Sponaugle. (Sent. Tr. D at 182)  This is that Opinion.  In the coming weeks, the parties will submit additional sentencing memoranda.  (*See* D.I. 105, 106, 124)  A sentencing hearing is scheduled for August 31, 2022 at 10:00 a.m.

The Court fully recognizes that the sentencing proceedings in this case were unusual in multiple respects, most prominently in their length.  In no other case has the Court found it necessary to hear more than a few hours of evidence in relation to disputed sentencing issues; four days of sentencing hearings, particularly after a trial (as opposed to a guilty plea), are, for the undersigned Judge, unprecedented.  Yet, under the atypical circumstances presented to the Court – and especially given the way the government chose to charge and litigate this case – these extensive proceedings were necessary.

For reasons unclear to the Court, *the Indictment does not identify even a single credit card purchase transaction as being allegedly fraudulent.*  Instead, in the sole count of the Indictment, the grand jury alleges that the scheme to defraud was executed via the bank transfers Ms. Sponaugle engineered; that is, the draws on AAW's checking account, by which AAW funds were used to pay the AAW credit card bills.  Had the government, instead, included multiple counts of fraud, and in each one identified a specific purchase transaction or category of purchases as fraudulent, the Court (and the parties) would have entered the sentencing phase of the case with a far sounder basis on which to assess the amount of damages.  Charging decisions, of course, are within the broad discretion of the prosecutors, and it is not the Court's role to question the exercise of that discretion.  The point, instead, is that the government's exercise of this discretion can have serious consequences for sentencing, including, as in this case, the

imposition of substantial burdens on the Court, the Defendant, the victims, and even on the government itself.

Due to the choices the government made in litigating this matter, the guilty verdict does not necessarily imply (i) that any specific purchase transaction was found by the jury to be fraudulent; (ii) that any number of purchase transactions, other than one, was found by the jury to be fraudulent; or (iii) any loss amount, other than a nominal amount, due to the Defendant's fraud.[10] As a result, the Court approached sentencing facing the following circumstances:

- Knowing that the Defendant is guilty of a six-year fraud scheme that definitely involved at least one unauthorized credit card purchase and may have involved up to 2100 (or more) fraudulent purchases beyond that, but with no way to know which transaction or transactions the jury found fraudulent;

- Having no help from the jury verdict as to the amount of loss, as the verdict form sought only a general verdict (i.e., a finding of guilty or not guilty) based on instructions that the amount of loss was not an issue the jury need decide;

- Learning that the government's position was that "the loss amount compelled by the jury's verdict included each of the defendant's personal, not specifically authorized, purchases on her business credit card throughout the six-year fraud scheme" (D.I. 113 at 1) – that is, all 2100-plus transactions;

- Learning as well that the government would contend it has and/or could prove a loss amount of approximately $250,000, would advocate for a Guidelines Range of 57-71 months, and would ask the Court to incarcerate the Defendant, perhaps for a long time (D.I. 100 at 2);

- Being made aware that the defense's position was that no more than a single, unidentifiable credit card transaction was all the fraud that was necessarily implied by the verdict (D.I. 106 at 3, 14) and, of course, that the defense would argue for a lower Guidelines range and a sentence of no imprisonment;

- Recognizing that the burden of proof was on the government, to prove the purported fraud loss by a preponderance of the evidence; and

---

[10] The necessary implications of the verdict are discussed at length in the next section. *See infra* Part III.

21

- Concluding, regrettably but unavoidably, that the Court would need a great deal of help from the parties – and, likely, need to hear a great deal of additional evidence – to make findings of fact, including credibility determinations, in order to resolve the multitude of material disputes the parties were presenting with respect to the Sentencing Guidelines and, ultimately, the sentence.

(*See generally* Feb. 11 Tr. at 3) (Court describing difficult situation before it)

Before turning to the resolution of the many challenging legal and factual issues presented by this case, the Court must address a letter it received from the U.S. Attorney's Office during the sentencing proceedings. Both the filing and the contents of the letter are perplexing. Because the letter might be read as suggesting that the Court engaged in unfair, and possibly gender-biased, questioning of the witnesses, and because the victims are entitled to an explanation of what the Court was trying to accomplish with its examination,[11] the Court will respond here to the letter.

Dr. McCracken testified at the first day of the sentencing proceedings (March 10) and was examined by an AUSA, by defense counsel, and by the Court. (*See* McCracken Sent. Tr. A at 8-270) No doctor testimony was provided on the second day (March 11). Before the third day of the proceedings (April 4), the government wrote to advise the Court that the government

---

[11] At least one victim-witness, Dr. McCracken, echoed the government's letter in her April 28 victim impact statement given in open court:

> And I was asked why the partners and I didn't just talk to Kim and work it out. Frankly, as a victim, the questions and the manner in which they were asked were disparaging, and the experience as a whole was infuriating. But I would do it 20 times again if it meant that Kim would never be able to steal from another person.

(McCracken Sent. Tr. D at 42) The Court does not discount these feelings, regrets that Dr. McCracken experienced them, and understands that making the Court's perspective transparent in this Opinion may not help. Nevertheless, the Court is confident that any review of the record will confirm that all the witnesses, including Dr. McCracken, were treated fairly.

would "not call additional victim-witnesses" because it could not do so "without compromising

its obligations under the Crime Victims' Rights Act, 18 U.S.C. § 3771" ("CVRA" or "Act").

(D.I. 113 at 1)  In the letter, the government invokes its duty under the CVRA to use its "best

efforts to see that crime victims are . . . accorded the rights" set forth in the Act, including the

"right to be treated with fairness and with respect for the victim's dignity and privacy."  (D.I. 113

at 2) (quoting 18 U.S.C. § 3771(a)(8))  The government asserts that "the questioning endured by

Dr. McCracken," from defense counsel and the Court, illustrates that other victims, if called to

the stand, could be "expose[d] . . . to far-reaching credibility attacks and the suggestion that they,

as victims, have somehow acted wrongly," thereby "violat[ing] the government's obligations to

these victims under the CVRA."  (D.I. 113 at 2)

 The Court well understands that the law requires the United States Attorney's Office to

support victims, including by furthering their participation in the prosecution and sentencing

process.  *See* CVRA § 3771(a).  Yet, while a victim is fully entitled to participate, to be heard,

and to be treated with respect and dignity, that does not compel the Court or a jury to accept and

agree with everything a victim contends.[12]  Consistent with due process and federal practice, any

witness called to the stand by a prosecutor to provide evidence to the factfinder as a basis for

---

[12] Although a defendant has no right under the Confrontation Clause or Due Process Clause to cross-examination during sentencing, *see United States v. Green*, 718 F. App'x 141, 143 (3d Cir. 2018), that does not necessarily bar a victim (or a defendant or anyone else) from choosing to testify under oath and subjecting themselves to cross-examination, *see United States v. Vazquez*, 532 F. App'x 277, 279-80 (3d Cir. 2013) (evaluating adequacy of representation and finding it conceivable that defendant's attorney chose to permit defendant's testimony under oath and subject to cross-examination during sentencing). *See also United States v. Brown*, 810 F. App'x 105, 108 (3d Cir. 2020) (permitting defendant to cross-examine victims at trial); *Green*, 389 F. App'x at 148-49 (finding no error when District Court questioned victim as to preferred sentence and then imposed different sentence).

23

resolving a fact dispute is subject to cross-examination. *See United States v. Owens*, 484 U.S. 554, 561 (1988) ("Ordinarily a witness is regarded as subject to cross-examination when he is placed on the stand, under oath, and responds willingly to questions.") (internal quotation marks omitted); *see also United States v. Brown*, 810 F. App'x 105, 108 (3d Cir. 2020) (permitting defendant to cross-examine his victims at trial).

Nothing in the CVRA, nothing cited by the government, and nothing the Court has found in the law obligates or even permits the Court to rely on untested testimony to resolve fact disputes in favor of the government and then rely on those findings to deprive a criminal defendant of her liberty. This is all the more true in the instant case, in which the government relies on Accountant Hoffman, who in turn relied so heavily on the doctors' statements as to what transactions were and were not authorized. (*See infra* Part IV.D.2.C)

Nor can the government have been surprised that Dr. McCracken was subject to questioning by defense counsel and the Court. At the February 11 status teleconference, defense counsel advised the government that at the upcoming hearing "there's going to be some credibility issues with Dr. McCracken as well." (Feb. 11 Tr. at 6)[13] On the same call, the Court told the parties it had completed an initial review of the written submissions relating to sentencing and found they "reveal numerous factual disputes, particularly about loss amount, which will be material to determining the appropriate sentencing guideline; and on which not only do I expect live testimony will be necessary on the assumption that the government still

---

[13] Counsel specifically mentioned that he might seek to question Dr. McCracken on issues relating to certifications she made to the American Board of Obstetrics and Gynecology, a topic called out by the government's letter. (*See* Feb. 11 Tr. at 6) There can have been no surprise to the government that this topic would be explored again at sentencing.

wishes to attempt to meet its burden of proof with respect to the loss amount, but ***I also expect to have questions for whatever witnesses***" testify.  (*Id.* at 3-4 (emphasis added); *see also* Sent. Tr. A at 6 (reminding parties that the Court would be examining witnesses))

There was no objection from the government to the Court's plan to examine witnesses or any reference at all to the CVRA until after two full days of sentencing proceedings had been completed.  The Court ultimately examined, at length, all three of the key witnesses who provided evidence during the sentencing proceedings – Dr. McCracken, Accountant Hoffman, and Ms. Sponaugle – taking advantage of the opportunity to elicit direct, helpful evidence to aid the Court in undertaking the difficult tasks of assessing credibility, resolving fact disputes, and, eventually, arriving at a fair and appropriate sentence.

The government's letter contains the following description of the Court's examination of Dr. McCracken:

> The Court, for its part, asked whether [i] Dr. McCracken believed the circumstances of the defendant's termination were incredibly traumatic for the defendant, and [ii] repeatedly suggested the decision to report the defendant's fraud to the police was premature, and that [iii] the All About Women partners should have tried to "work out the situation" by speaking with the defendant.  The Court also asked Dr. McCracken [iv] whether the partners responded to the defendant's resignation with "anger, sadness, madness and crying," and [v] later asked her to confirm that the practice was made up entirely of women.  The government cannot ask additional victims to face such questioning in light of its obligations under the CVRA.

(D.I. 113 at 2) (internal numbering added)

Any suggestion of impropriety in this selective summary – that the Court was unduly focused on gender and the emotional status of witnesses, that the Court treated Dr. McCracken in a disrespectful manner, and that the government could not risk subjecting additional victims to

the same inappropriate treatment – is unfounded. As the transcript reveals, most of the questions highlighted in the letter were asked as part of the Court's effort to assess the credibility of the *Defendant*, a crucial prerequisite to the Court's resolution of the many relevant factual disputes left unanswered by the jury's general verdict. The Defendant had testified to certain points at trial, and Dr. McCracken was the first fact witness with whom the Court could attempt to confirm or deny aspects of that testimony. Accordingly, as the Court expressly told Dr. McCracken at the beginning of its examination of her, "[s]ome of the things I'm going to ask you are based on what she [i.e., Sponaugle] testified to at trial . . . [a]nd I want to understand as best I can whether you agree or disagree with them." (McCracken Sent. Tr. A at 187; *see also id.* at 186-87 ("I recognize that you and your colleagues are victims here, and I understand from your testimony how you feel. But as you probably understand, I have an important job I have to do. Ultimately, I have to make a decision about the right sentence for Ms. Sponaugle. . . . And so in that regard I want to understand as best as I can what happened and what your perspective is."))

An example of this relates to one of the topics identified in the block quote above from the letter (i.e., what the Court marked as [iv] above). During trial, Ms. Sponaugle was asked if she had "observe[d] any reactions" from the partners when she told them she was resigning from the practice. (Sponaugle Trial Tr. at 1506) Her answer was that there were "lots of reactions. *There was anger, there was sadness, there was, you know, crying and madness,* and I was – I don't know what I was expecting." (*Id.*) (emphasis added) The Court, as part of its effort to understand if Ms. Sponaugle was truthful – in this specific instance and more generally – asked Dr. McCracken about this testimony:

> THE COURT:     Now, she testified that the responses from the partners ranged or included anger, sadness, madness and crying; is that true?

26

THE WITNESS:       I don't recall any – I don't recall any crying.

I'm sure there were a flood of emotions, but I don't recall any, like, responses that I would say would be exaggerated.

(McCracken Sent. Tr. A at 191)  By omitting all context, the government's letter creates the false impression that the undersigned Judge made up the phrase "anger, sadness, madness, and crying" and was idly inquiring into the doctors' emotions.  In fact, the Court was asking the witness about the veracity of the Defendant's testimony and using the Defendant's own words to do so.[14]

The same is true of other quotes the letter seems to suggest made the Court's questions inappropriate.  *Compare* Sponaugle Trial Tr. at 1514 (Defendant testifying "[i]t was incredibly traumatic" to be escorted to her office and told to pack up her belongings) *with* McCracken Sent. Tr. A at 202 (Court asking: "She testified that it was incredibly traumatic, did – do you have a view on whether it was incredibly traumatic to her?");[15] *compare also* Sponaugle Trial Tr. at 1275 ("I also was in charge of all 65 or so employees and managing the day to day that went with managing 65 employees.  And we were all females.  So it was 65 female employees as well, and everybody had, you know, life challenges."); *id.* at 1291 ("[W]e were an office of 60, 65 women.") *with* McCracken Sent. Tr. A at 218 (Court asking: "Ms. Sponaugle testified that all, she said, 65 employees, I think, at the practice were women, but however many employees you had, were they all women?").[16]  As is clear from the record, all the Court was doing here was providing the government's witness the opportunity to challenge the reliability of the

_____

[14] The Court inadvertently switched the Defendant's phrase "crying and madness" and asked about "madness and crying."

[15] This testimony relates to topic [i] in the block quote from the letter, as reproduced earlier.

[16] This testimony relates to topic [v] in the block quote from the letter, as reproduced earlier.

27

Defendant's testimony.

The letter also criticizes the Court for inquiring multiple times about why the partners concluded so quickly (in a matter of days after a 12-year working relationship) that Ms. Sponaugle had committed a crime (topic [ii] in the government's letter, as noted above) and why they did not give her an opportunity to explain herself (topic [iii] above). The Court did so not to accuse the victims of wrongdoing but, rather, to help the Court assess key components of the defense's theory of the case. The defense had long maintained that the doctors in the practice were so upset at Ms. Sponaugle's resignation decision (which came barely more than a week before the practice then decided to terminate her) that they immediately turned on her and, thereafter, denied that they had approved all sorts of generous arrangements which they had, in reality, approved. As defense counsel explained at a sidebar during the trial:

> . . . [M]y position is everything was very smooth until she announced she was leaving. She indicated there was sadness, there was anger, there was surprise.
>
> Part of my theory is going to be there was some anger and there was a rush to judgment based on this anger because she left them in such a position.

(Sponaugle Trial Tr. at 1507-08; *see also* Trial Tr. at 1733 (defense closing argument))

As with so many other issues, the jury was not asked to vote on whether this defense theory had merit; the guilty verdict does not necessarily imply a rejection of it. The jury could have easily concluded both that Ms. Sponaugle occasionally exploited AAW's generosity *and* that the AAW partners intentionally misrepresented the extent of this exploitation.[17] Because of

---

[17] As noted elsewhere, while the Court finds (as it must) that Sponaugle exploited AAW's generosity, the Court does *not* find that the partners intentionally misrepresented the extent of the exploitation. *See, e.g., infra* Part VI.

the way the government charged and tried this case, which left almost all of the factfinding work relating to calculation of the loss amount to the sentencing process, and because so much of the dispute for purposes of sentencing rests in the "gray areas" between clearly authorized and clearly unauthorized expenditures, the Court required a wide-ranging set of sentencing proceedings to obtain the evidence it needed to make very difficult decisions.

It was for these reasons that the Court asked Dr. McCracken how quickly she and the other doctors had decided Ms. Sponaugle had done something wrong and whether they had talked to her about their concerns. (*See, e.g.*, McCracken Sent. Tr. A at 196-98; *see also id.* at 201 (asking whether Defendant was given opportunity to explain herself at termination meeting)) The Court went on to acknowledge that the doctors' reaction had "confused" the Court. (*See id.* at 198) Rather than remain silently confused and risk making a decision based on a misperception or error, the Court used its examination to learn more from the government's hand-picked, first-hand witness. She explained:

> THE WITNESS:    . . . [I]t to us, was so – it was so obvious, there was no other explanation. All the partners were, you know – we just were shocked. We were upset. We were appalled. We were, you know, blaming ourselves.
>
> I was blaming myself for not following my intuition, I think, months before that and getting the data before that. . . .
>
> And we were more concerned about, like, tipping her off and her hiding more or doing other things that we were just like we're going to collect whatever information, we're going to get all our ducks in a row. We had to get our electronic health record personnel to make sure that when we terminated her we could change all the passwords immediately. You know, we were trying to, at that point, protect ourselves.

(*Id.* at 198-99)

The Court returned to this topic near the end of its examination, noting it was "striking to

29

me how much faith and confidence and trust and friendship and interrelated business relationships" existed between the doctors and the Defendant, but "then within a two-week period after she says she's leaving, without talking to her[,] all of you collectively decide or come to understand she's been stealing from [you] maybe all of this time." (*Id.* at 242)  Dr. McCracken's response included a respectful remark that this was "probably not a fair characterization" (*id.* at 242-43) and then the following:

> I don't believe Kim joined our practice with the intent to steal from us.
>
> . . .
>
> [But] I think that psychologically she got to a point where she has justified it in her own mind that this is all okay and that I'm doing that because I deserve it and I'm doing it because, whatever, the partners would want me to have it.
>
> . . . [W]hen I chose to get that information prior to her leaving – like, at that time we were still friends with her.
>
> . . . And so when we did get that log-in information and I sat there in my kitchen with Dr. Chavez and looked at that information, I mean I wanted to vomit.  I was like this cannot be happening, I cannot believe that this is happening.  Because we still – like even at that point, we still were like we trusted her.
>
> . . .
>
> And from our perspective at that point, we wanted to protect ourselves and protect the practice.  And so we felt the best way to do that was gather all of the information that we can then let Kim know that . . . she's terminated because of this information.

(*Id.* at 244-45)

The Court found these answers credible.  The Court is entirely convinced that Dr. McCracken and the other doctors see the events of this case in just the manner she described. But this makes it all the more difficult to fathom why the government believes the Court should

30

not have asked these questions (the answers to which help the government), and how the government can have concluded that the Crime Victims Rights Act would have been violated if the government had called additional victims to provide more evidence (which may have also helped the government).[18]

In all events, the Court assures the victims that, consistent with their rights under the CVRA, their testimony and their views have been – and will continue to be – carefully and respectfully considered by the Court.

## III.    NECESSARY IMPLICATIONS OF THE JURY'S GUILTY VERDICT

"[A] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict." *United States v. Boggi*, 74 F.3d 470, 478-79 (3d Cir. 1996). "When a case involves a general verdict, establishing that the verdict necessarily determined any particular issue is extremely difficult." *United States v. Raia*, 993 F.3d 185, 194 (3d Cir. 2021). "A general verdict does not disclose whether the jury rejected all or only part of [defendant's] testimony." *Id.* at 195. "Whether a fact is 'necessarily implicit in the verdict' is a different inquiry from determining which facts the jury most likely believed." *Id.*

As applied here, the government argues that the jury verdict necessarily implies that the jury found the Defendant committed all of the fraud alleged in the Indictment. (*See* D.I. 105 at 9-12) That is, according to the government, the Court must find all of the following: (i) the Defendant's fraudulent scheme ran for at least six years, from January 2012 through

---

[18] The government has the burden of proof at sentencing and it was for the government to decide who to call to the witness stand and who not to call.  The government's heavy reliance on hearsay – that is, its choice to convey to the Court the other doctors' recollections only by having Dr. McCracken testify as to what those doctors told her – greatly undermined the probative value of the government's evidence.  This reality is described fully below. (*See infra* Part IV.D.3)

31

March 2018; (ii) the Defendant always acted with an intent to defraud and never acted in good faith, with respect to any of the approximately 3,000 credit card charges at issue; and (iii) in execution of that scheme, the Defendant used her AAW credit card for personal expenditures, without authorization, those approximately 3,000 times, resulting in loss attributable to her fraud of around $250,000.[19] (*See, e.g.*, D.I. 105 at 9-12)

The Court agrees with the government that the jury verdict necessarily implies the jury unanimously concluded that Ms. Sponaugle's fraudulent scheme lasted for six years. Based on the Indictment, the verdict form charged Sponaugle with "Wire Fraud from on or about January 23, 2012, through on or about March 12, 2018." (D.I. 87)[20] The jury is presumed to have followed the Court's jury instructions, including the instruction that in order to convict the Defendant the jury had to unanimously agree that she committed all of the essential elements of wire fraud, which expressly includes having a scheme to defraud for the period set out in the Indictment. (*See* Trial Tr. at 1653-81 (jury instructions); D.I. 2 at 2) Accordingly, the jury's verdict necessarily implies that Ms. Sponaugle's fraudulent scheme lasted from about January 2012 through March 12, 2018.

From this, the government argues: "Because the jury found the defendant guilty of a six-year scheme, and necessarily rejected the defendant's good faith arguments, every personal purchase on the defendant's credit card, except those explicitly authorized, are properly included

---

[19] As noted in several places in this Opinion, the government's estimate of the loss amount attributable to fraud has fluctuated over time. (*See, e.g.*, *infra* IV.D.2.a)

[20] The verdict form contained a single question, asking the jury: "As to Count I, charging the Defendant with Wire Fraud from on or about January 23, 2012, through on or about March 12, 2018, in violation of 18 U.S.C. § 1343, we find the Defendant," followed by spaces to enter Guilty or Not Guilty. (D.I. 89)

in the loss amount at sentencing." (D.I. 105 at 10)  Here, the Court disagrees.  While the jury

necessarily found that the scheme existed for six years – that is, the Defendant had figured out by

January 2012 how to put an unauthorized purchase on her AAW credit card and have AAW pay

for it, and she continued to have the capability of doing the same through her last day at AAW in

March 2018 – it does not necessarily follow that the jury also determined that she executed that

scheme every day (or even more than once) or that she maintained a fraudulent intent each and

every day (or even more than one day) over the course of the six-year period.  The verdict does

not necessarily imply that the jury found that Ms. Sponaugle never acted in good faith with

respect to any of the allegedly fraudulent transactions.  Nor does it necessarily imply that the jury

found all of the allegedly fraudulent transactions were actually fraudulent.

The Court instructed the jury that in order to find Ms. Sponaugle guilty of wire fraud, the

jurors all needed to agree that she "acted with the intent to defraud." (Trial Tr. at 1666)  The

Court further instructed the jury that if it found Ms. Sponaugle acted in good faith, including

based on mistake, then she did not act with fraudulent intent and could not be convicted. (*See*

Trial Tr. at 1678)  The government argues that the jury's verdict necessarily rejected her good

faith and mistake arguments, given their inconsistency with the jury's determination that Ms.

Sponaugle "acted with the intent to defraud." (D.I. 105 at 12)

The Court disagrees.  Neither the law nor the Court's instructions to the jury required the

jury to make an "all or nothing," "up or down" conclusion.  Instead, the jury was entirely free to

decide that *some* of the allegedly fraudulent credit card transactions between 2012 and 2018

were fraudulent while *others* were not fraudulent.  Likewise, the jury was free to find that for

some of the allegedly fraudulent transactions the Defendant acted with an intent to defraud while

for others, and perhaps many or even most, she acted with good faith, genuinely believing she

33

was authorized to put the charge on her AAW card (though maybe being mistaken on that point). *See Raia*, 993 F.3d at 195 ("A general verdict does not disclose whether the jury rejected all or only part of [a defendant's] testimony.").[21]

In this regard, it bears emphasis that, as has already been noted, the Court instructed the jury it could convict Ms. Sponaugle based on finding just a single transaction to be fraudulent, a point the government made to the jury in both its closing argument and rebuttal. The Court instructed the jury: "It is sufficient if the government proves beyond a reasonable doubt that *one or more* of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud." (Trial Tr. at 1668) (emphasis added)  Based on this instruction, the government argued to the jury "*you have to agree on one time that she acted on*" her plan. (*Id.* at 1685 (emphasis added); *see also id.* at 1766) (arguing jury need agree only on "one example of her buying something personal and hiding it in QuickBooks"))  The government's post-trial insistence that the jury necessarily found all 2,100 or more transactions to be fraudulent sits uneasily next to its repeated invitations to the jury to convict Ms. Sponaugle based on as little as a single instance of fraud.

The Court further instructed the jury that the loss amount is "not an element of wire fraud" and, hence, the jury did "not need to agree on a total loss amount." (Trial Tr. at 1667)

---

[21] The Court agrees with defense counsel:

> This was a case that dwelled in the gray area between what Sponaugle understood and what the AAW partners understood regarding Sponaugle's authorized use of her corporate credit card over many years in the complete absence of any memorialized and well-defined set of rules governing the use of the card by AAW.

(D.I. 106 at 15)

34

Accordingly, the government argued to the jury that it need not "decide exactly how much money the defendant ultimately stole" or "decide on a final dollar amount" that Defendant wrongfully expended. (*Id.* at 1685, 1764) In light of these instructions and arguments, it cannot be that the jury's verdict necessarily implies any particular loss amount – notwithstanding the government's wholly unpersuasive arguments to the contrary.

For its position, the government relies on *United States v. Ali*, 508 F.3d 136, 141, 151 (3d Cir. 2007), in which the Third Circuit vacated a defendant's sentence and remanded for resentencing after the district court "quarrel[ed with] . . . the duration of the fraudulent scheme and thus the appropriate loss amount associated with that scheme[;]" the district court also departed downward, based on intent, when calculating the loss amount. In the instant case, the Court is not committing similar errors. The Court accepts that the scheme to defraud lasted for six years; the Court is not (at this point) addressing downward departures. More importantly, as explained above, under the circumstances presented here, no particular loss amount follows from a finding as to the length of the scheme.

Here, the Court will, as the law requires, hold the government to its burden and apply the preponderance of the evidence standard to determine the loss amount. In doing so, the Court is giving full effect to the findings that are necessarily implied by the jury's verdict. But for all other facts, the Court is making its own findings based on its own evaluation of whether the government has met its burden of proof by a preponderance of the evidence.

It is impossible to discern from the general verdict which specific act or acts the jury unanimously agreed were executions of the Defendant's six-year scheme. *See Raia*, 993 F.3d at 194. In the Court's view, the jury may well have – and, given how this case was tried, and given the Court's findings throughout this Opinion – determined that as few as one, two, or a handful

35

of fraudulent transactions occurred, at various times during the six-year scheme. Regardless of the number of transactions the jury unanimously found fraudulent, it is impossible to tell from the verdict which one or more specific transactions these were; thus, no credit card purchase was necessarily the one (or among the ones) the jury decided was fraudulent. The Court defers to the jury's findings that the Defendant did not always act in good faith, and that she had a longstanding scheme to defraud which she executed at least one time. But the jury was not instructed, and common sense does not dictate, that the jury made an all-or-nothing determination on good faith, number of fraudulent transactions, or amount of loss attributable to fraud. The verdict is entirely consistent with finding she acted in good faith sometimes (perhaps most of the time) and in bad faith on only a few occasions.

Finally, a word on credibility. The Court asked the parties whether it was permitted to make its own assessment of witness credibility for purposes of sentencing or whether, instead, it is required to make a presumption as to what the jury thought of credibility and then be bound by those presumed findings. Both parties agreed that, in this context, the Court is permitted to make credibility determinations, particularly concerning who to believe in connection with specific transactions that were not litigated before the jury. For instance, the following colloquy occurred with one of the AUSAs:

> COURT:     Do I, as the sentencing judge at an evidentiary proceeding, get to make credibility determinations or is it the government's view that those determinations have already been made by the jury?
>
> AUSA:     Your Honor, of course it's within the Court's purview to make credibility determinations. However, those determinations can't infringe upon factual findings that are necessarily implicit from the jury's verdict. So to the extent that two different witnesses contradicted each other on the subject matter that really goes to the heart of the jury's verdict, I think that

> decision has already been made.  But if Your Honor is discussing,
> for example, specific transactions for which there's documentation
> in that gray area that we were just discussing, I think that is
> certainly an appropriate use of the Court's discretion.

(Feb. 11 Tr. at 12-13)

With respect to credibility, all that is necessarily implied by the verdict is that the jury did not find the entirety of Ms. Sponaugle's testimony to be credible.  On at least one transaction (and potentially, but unknowably, many more), the jury had to have found that she acted with fraudulent intent and not in good faith.  The Court is bound to accept that the jury disbelieved at least some small portion of what Ms. Sponaugle testified.

As with the transactions, however, there is no way to identify the specific point(s) on which the jury determined Ms. Sponaugle was not being truthful.  Accordingly, the Court has found it necessary to make credibility determinations relating to all of the fact witnesses who testified before it, as the parties agreed the Court is free to do.[22]

The Court believes that the jury may have found Ms. Sponaugle credible on many points that were in dispute and may well have found that she committed fraud on only a few occasions.

---

[22] *See also United States v. Moment*, 750 F. App'x 68, 71 (3d Cir. 2018) (rejecting argument that District Court erred in making determination of drug quantity – an issue on which government bore burden – during sentencing, adding "[f]ar from usurping the jury's authority to make credibility determinations, the District Court properly acknowledged different evidentiary standards in different contexts"); *United States v. Merlino*, 349 F.3d 144, 159 (3d Cir. 2003) (explaining that sentencing judge did not have to accept all of witness' testimony for purposes of sentencing; "a court is not bound by testimony simply because it came from a witness the jury believed in some – or, indeed, more than some – respects"); *United States v. Haut*, 107 F.3d 213, 221-23 (3d Cir. 1997) (rejecting District Court's "theory that a trial court is empowered to make credibility determinations 'for sentencing purposes'" when in aid of making downward departure not authorized by Guidelines, but adding that "when the severity of the sentence is calibrated to a fact that was related to the court by an inherently suspect witness [such as an addict-informant], the court can take the credibility of the witness into account at sentencing") (citing *United States v. Miele*, 989 F.2d 659 (3d Cir. 1993)).

37

As explained throughout this Opinion, the Court – having observed Defendant testify at length at trial and then observed her provide additional lengthy testimony during the sentencing proceedings, including under examination from the Court – found Ms. Sponaugle to be highly credible on almost every point now at issue in connection with sentencing. This credibility finding, which the Court is free to make, has impacted the Court's assessment of whether the government has met its burden of proof, particularly with respect to the amount of loss.

Other conclusions concerning what is necessarily implied by the jury's verdict, and what, therefore, the Court must accept as true for purposes of sentencing, are included throughout this Opinion.

## IV. OBJECTIONS TO THE PSR

Only the Defendant objected to the March 3, 2022 version of the PSR. (*See* D.I. 109) Both parties' written arguments relating to the objections, as well as the USPO's views, are contained in the Probation Office's April 25, 2022 revised version of the PSR. (*See* D.I. 115 at 18-33) The Court heard argument on these objections as part of the April 28 sentencing proceedings. Below the Court sets out its rulings and reasoning with respect to the objections.

### A. The Defendant Abused A Position Of Trust

Sentencing Guideline § 3B1.3 provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels." Pursuant to this Guideline, the PSR recommends adding two levels to Defendant's offense level (*see* D.I. 115 at 7), which the government supports (*see id.* at 28-29). Initially, Defendant did not oppose this two-level enhancement. (*See* D.I. 106 at 3) However, by the conclusion of the proceedings relating to sentencing, Defendant objected, although only weakly. (*See, e.g.*, Sent. Tr. D at 134-35)

38

The Guidelines explain that this enhancement applies to a position of public or private trust that is "characterized by professional or managerial discretion" because individuals in such positions "ordinarily are subject to significantly less supervision." SG § 3B1.3 cmt. n.1; *see also United States v. Douglas*, 885 F.3d 124, 133 (3d Cir. 2018) (en banc) ("[W]hen determining if the defendant occupied a position of trust, we will ask whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted."). The enhancement applies only if the position of trust "contributed in some significant way to facilitating the commission or concealment of the offense." SG § 3B1.3 app. n.1. This requirement is met if, for example, the position of trust makes "detection of the offense or the defendant's responsibility for the offense more difficult." *Id.*

The government has established, by well more than a preponderance of the evidence, that Defendant abused her position of private trust – that is, her role as CEO of AAW. Specifically, Ms. Sponaugle was entrusted by the partners of AAW with overseeing and managing all of AAW's finances, including paying the practice's credit card bills and keeping track of each partner's contribution to the profits and expenses of the practice. (McCracken Trial Tr. at 410, 420-21) The doctors, understandably, wanted to focus their time on providing treatment to the thousands of patients who entrusted AAW with their medical care. To ensure the doctors had time to be doctors, they turned all management responsibility over to Defendant. While Defendant consistently received outstanding reviews for her performance as CEO,[23] and the

---

[23] *See* McCracken Trial Tr. at 522-25 ("Q: And would it be fair to say that she commonly and consistently got top marks as far as her routines with outstanding performances? A: At that time, until 2012, yes."); *see also* DX 2; McCullough Trial Tr. at 706; Trial Tr. at 1711-13 (closing argument).

record establishes that she did much to grow and strengthen the practice,[24] Defendant also, at times, exploited her day-to-day control over AAW's finances to charge personal expenditures to her company credit card in excess of the amounts she was authorized to do. Defendant could not have devised and implemented her fraudulent scheme without being in a position of private trust within AAW. Accordingly, Defendant's abuse of her position as CEO significantly facilitated the commission of her offense, warranting application of the two-point enhancement.

The government further argues that Defendant abused her position of trust to conceal her offense. The Court finds that the government failed to prove this contention by the required preponderance of the evidence.[25] It is true that several of AAW's partners testified, at trial and at the sentencing proceedings, that Defendant was the only person at AAW with access to the practice's credit card statements, bank account statements, and internal QuickBooks records. (*See, e.g.*, McCullough Trial Tr. at 730; McCracken Sent. Tr. A at 90) The jury's guilty verdict does not "necessarily imply" that the jury found the government proved concealment beyond a reasonable doubt.[26] Instead, the jury merely had to find that at least one credit card transaction the Defendant charged to AAW was unauthorized (making the false representation that it was

---

[24] During Ms. Sponaugle's tenure, the practice grew from five to 17 providers, to three offices, and to about 60 total staff. (McCullough Trial Tr. 704-05) ("Q: And during the time Kim was at [AAW], is it fair to say that the practice experienced successful growth? A: We did."); Sponaugle Trial Tr. at 1259, 1297)

[25] The weakness of the government's evidence of concealment is discussed more fully later in this Opinion. (*See infra* Part IV.D.7.e)

[26] When instructing the jury, the Court stated that concealment was not an element of the offense, but that "concealment of material facts . . . may constitute false or fraudulent statements" in connection with a "scheme to defraud [that] was carried out by making false or fraudulent representations." (Trial Tr. at 1668)

authorized), whether or not she took steps to conceal such transaction(s).

Nevertheless, for the reasons set out in this section, the Court OVERRULES Defendant's objection and will add the two points for abuse of a position of trust.

**B.    The Government Failed To Prove Defendant Perjured Herself**

Sentencing Guideline § 3C1.1, "Obstructing Or Impeding The Administration Of Justice," provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Applying this Guideline, the Third Circuit has explained that a defendant "who testifies under oath at trial commits perjury within § 3C1.1 if he [1] gives false testimony [2] concerning a material matter [3] with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Napolitan*, 762 F.3d 297, 312 (3d Cir. 2014) (internal quotation marks omitted). "[T]he application of the obstruction of justice enhancement for perjury based on facts implicit in a guilty verdict have involved testimony that all but stated an element of the offense." *Raia*, 993 F.3d at 194, *see also United States v. Gray*, 942 F.3d 627, 630, 632-33 (3d Cir. 2019) (upholding enhancement for perjury where defendant testified he did not have gun and was then convicted of unlawful possession of firearm); *United States v. Johnson*, 320 F.3d 139, 144, 153-53 (3d Cir. 2002) (upholding enhancement where defendant testified that drugs did not belong to him and was then convicted of possession with intent to distribute drugs).

The PSR recommends applying this enhancement based on Ms. Sponaugle's testimony

that she believed "with [her] whole heart" that she could use her company credit card for personal purchases in lieu of her bonus payments. (*See* D.I. 115 at 5) The government joins in the USPO's position and also broadens the bases for application of this enhancement, arguing that Ms. Sponaugle's testimony regarding her personal purchases on the company credit card, her QuickBooks mis-categorizations, and her statements proclaiming her innocence at the sentencing hearings were inconsistent with the jury's verdict. (*See id.* at 21-24) Defendant objects to application of this Guideline on the basis that her testimony was not false, material, and willful and is also not irreconcilably inconsistent with the jury's verdict. (*See id.* at 18-21)

The Court finds that the government did not prove, by the requisite preponderance of the evidence, that this Guideline is applicable. The record, as a whole, does not support the government.

Defendant writes, persuasively in the Court's view:

> an obstruction of justice enhancement should not apply since the verdict cannot be interpreted as a complete rejection of Ms. Sponaugle's testimony given the very general way the offense conduct covering over 2,100 credit card transactions was alleged in the Indictment and since, as per the Court's Final Jury Instructions, a single unauthorized transaction proven beyond a reasonable doubt was sufficient to support a finding of guilty as to the Wire Fraud charge. The jury's verdict cannot be interpreted as a blanket rejection of all of Sponaugle's trial testimony regarding what she claimed was her good faith use of her AAW corporate credit card to offset her quarterly, Christmas, and summer bonuses that she did not take when going through her divorce.

(D.I. 106 at 3-4)

Ms. Sponaugle's testimony that she "believed with [her] whole heart, that . . . [she] could be using the credit card for [her] personal purchases in lieu of receiving bonus money"

42

(Sponaugle Trial Tr. 1312) was not necessarily false testimony.[27] Her statement does not state an element of the offense and does not necessarily conflict with the jury's verdict. Instead, the jury could have believed that she acted in good faith in taking her bonus money through personal credit card expenditures, but found an intent to defraud in relation to the amounts exceeding a reasonable calculation of her bonuses. Additionally, or alternatively, the jury could have found that the only fraud Defendant committed was in the 2012 through October 2014 period, before she stopped taking bonuses (i.e., that she only executed the scheme one or more times, all prior to October 2014, and thereafter maintained the scheme but never executed it). If that was how the jury viewed the evidence, then it would follow that the jury *believed* that Ms. Sponaugle believed, with her whole heart, that she could put personal charges on her credit card instead of taking bonuses for a large portion of her scheme (i.e., after October 2014).

Ms. Sponaugle testified at great length, at both the trial and at the sentencing proceedings. Her testimony stretches over approximately 733 transcript pages. (*See* Sponaugle Trial Tr. at 1222-1322, 1370-1469, 1477-1614; Sponaugle Sent. Tr. B at 155-252; Sponaugle Sent. Tr. C at 6-306) Of this, 167 pages were cross-examination by the government and another 48 were examination by the Court. (*See* Sponaugle Trial Tr. at 1524-1600; Sponaugle Sent. Tr. C at 143-214, 218-38, 244-92) On many, many points, Ms. Sponaugle had credible, plausible, and persuasive explanations. (*See, e.g., infra* § IV.D.2.e) While it is true that on a few occasions

---

[27] As explained in further detail below, the Court finds that Ms. Sponaugle reasonably believed she was authorized to use her AAW credit card to charge approximately $70,000 of personal expenses during the period she was not taking cash bonuses. (*See infra* Part IV.D.5)

she denied all wrongdoing,[28] and in that respect could be found to have denied one or more of the elements of the offense she was found guilty of, the manner in which this case was tried (i.e., the government claimed thousands of fraudulent transactions but told the jury, consistent with the jury instructions, it need only find a single instance of fraud) coupled with the extent (and overall credibility) of her testimony, lead the Court to find that the government failed to prove it is more likely than not that she had a willful intent to provide false testimony.

At bottom, the Court is firmly of the view that Defendant's testimony was not intended to "obstruct" or "impede" justice but, rather, to explain her generally reasonable view of events to the factfinders. Her denial of guilt does not amount to perjury. The jury's verdict does not necessarily imply that Defendant perjured herself at trial. The jury necessarily found that Defendant conceived of a scheme to defraud AAW and executed that scheme on at least one occasion. The jury was not required to – and there is no reason to believe it did – make a singular, globally-applicable assessment of the totality of her testimony. Nor did the jury need to find that she lied, so long as the jurors found (as they are presumed to have done) she had an intent to defraud and executed a scheme to defraud on at least one occasion.

For these reasons, the Defendant's objection to enhancement of her offense level based on perjury is SUSTAINED.

## C.   The Government Failed To Prove The Offense "[R]esulted In Substantial Financial Hardship" To Any Victim

Sentencing Guideline § 2B1.1 provides that if the offense "resulted in substantial financial hardship to one or more victims, increase [the offense level] by 2 levels," and if it

---

[28] At the sentencing hearing, Ms. Sponaugle testified "I didn't steal any money," "I was not trying to hide it. I never tried to hide a penny of it," and "I didn't know I was doing a darn thing wrong. I would have never done it." (Sponaugle Sent. Tr. C at 230-35)

"resulted in substantial financial hardship to five or more victims, increase [the offense level] by

4 levels."

> In determining whether the offense resulted in substantial financial hardship to a
> victim, the court shall consider, among other factors, whether the offense resulted
> in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the
> Bankruptcy Code; (iii) suffering substantial loss of a retirement, education, or
> other savings or investment fund; (iv) making substantial changes to his or her
> employment, such as postponing his or her retirement plans; (v) making
> substantial changes to his or her living arrangements, such as relocating to a less
> expensive home; and (vi) suffering substantial harm to his or her ability to obtain
> credit.

SG § 2B1.1 app. n.4(F). "[V]ictim" includes both "individuals" or "partnerships" who sustained

"any part of the actual loss determined." *Id.* at app. n.1. "Actual loss" includes "the reasonably

foreseeable pecuniary harm that resulted from the offense." *Id.* at app. n.3(A)(i). To determine

if one or more victims suffered a "substantial financial hardship," the district court draws

inferences based on a variety of facts to construe the loss "relative to each victim." *United States

v. Poulson*, 871 F.3d 261, 268-69 (3d Cir. 2018).

The government argues that the four-level enhancement applies because AAW and each

of the six AAW partners are victims. (*See* D.I. 115 at 25-27; D.I. 116 at 2-3)[29] The PSR agrees

with the government. Defendant objects, responding that no enhancement is warranted since

AAW is the only victim and even AAW did not suffer substantial financial hardship. (*See* D.I.

115 at 24-25) Based on the record, the Court finds that no enhancement has been proven to

apply because the offense did not result in substantial financial hardship to any potential victim,

regardless of whether AAW is the sole victim or whether the six partners also count as victims

---

[29] There were different numbers of partners at different times; six is the number of partners
AAW had over the course of Sponaugle's fraudulent scheme between 2012 and 2018. (*See* D.I.
115 at 26) (identifying six partners at AAW during Ms. Sponaugle's fraud scheme)

for purposes of this Guideline.

Under the Guidelines, a business entity and its owners can count as separate victims if each sustains part of the actual loss. *See, e.g., United States v. Kennedy*, 554 F.3d 415, 418-23 (3d Cir. 2009) (recognizing that individual beneficiaries of 34 accounts from which defendant stole could potentially each be victims, but finding they were not because each was reimbursed for any loss); *see also United States v. Scarfo*, 2022 WL 2763761, at *50 (3d Cir. July 15, 2022) (rejecting as "spectacularly wrong" argument that shareholders were not victims, where evidence demonstrated that shareholders were deprived of normally expected payments).

Here, the Court need not decide the question of whether AAW *and* its partners count as victims for purposes of SG § 2B1.1 because the enhancement would not apply in either event. Whether AAW alone is the victim or whether the six partners (alone or with AAW) are victims, the enhancement only applies if the offense resulted in "substantial financial hardship to a victim." SG § 2B1.1 app. n.4(F). Determining whether "substantial financial hardship" exists "is subject to the usual – and significant – degree of discretion afforded a district court during sentencing." *United States v. Poulson*, 871 F.3d 261, 268 (3d Cir. 2017); *see also generally Concepcion v. United States*, 597 U.S. __, 142 S. Ct. 2389 (2022). The government failed to prove by a preponderance of the evidence that Ms. Sponaugle's offense resulted in ***substantial*** financial hardship to AAW or to any of its partners.

Dr. McCracken testified that the partners had to decrease their salaries in 2016 and 2017, and subsequently had to stop paying themselves a salary in 2019 – all of which she attributed to Ms. Sponaugle's fraud *and* failure to pay AAW's debts. (McCracken Sent. Tr. A at 19-21) Dr. McCullough provided a letter to the Court (D.I. 127; *see also* McCullough Sent. Tr. D at 8-16) contending that Defendant's fraud destroyed the practice's solvency and deprived her of

46

hundreds of thousands of dollars.  Similarly, at the podium (not under oath and, therefore, not subject to cross-examination), in victim impact statements, Drs. Goshow, Larkin, and Chavez, as well as again McCullough and McCracken, alleged that Ms. Sponaugle's actions caused AAW to nearly collapse and come to the brink of bankruptcy.[30]

While the Court respects that the victims of Ms. Sponaugle's fraud believe that her criminal conduct caused all of this financial harm, the record does not support them.[31]  The government failed to prove that AAW's business troubles were caused by Sponaugle's fraud.[32]

Instead, there is a complete mismatch between the scale of the alleged fraud – even on the government's most ambitious assessment – and the size of AAW.  The greatest amount of fraud the government has ever alleged (as far as the record reveals) was approximately $350,000

---

[30] The Court makes no finding on the doctors' further contention that Ms. Sponaugle's fraudulent conduct impacted the healthcare AAW was able to provide its patients.  (*See generally* Sent. Tr. D at 7-10)  Even if true, this would not constitute "substantial financial hardship" to AAW or the partners.  In saying all this, the Court is not at all minimizing the profound, non-financial impacts of Ms. Sponaugle's fraud.  (*See, e.g.*, McCracken Sent. Tr. A at 240 ("[I]t affected us in ways beyond just the money."); *id.* at 255 ("It's changed how we practice medicine.  It's changed how we trust people.  It's changed how we hire . . . new employees."))  For purposes of the SG § 2B1.1 analysis, however, all that matters is the financial harm.  *See* SG § 2B1.1 app. n.3 (explaining that "loss" is defined in terms of "pecuniary harm," meaning "harm that is monetary or that otherwise is readily measurable in money," and "does not include emotional distress, harm to reputation, or other non-economic harm").

[31] The jury's verdict does not necessarily imply any finding that Defendant's fraud caused any substantial financial hardship, to AAW or any of its partners.

[32] It is not even clear that the government tried to prove that Sponaugle's fraud had a large *financial* impact on AAW (or its partners).  The government expressly represented that it was neither adopting nor endorsing all of the allegations made by AAW, its former partners, or any other victim.  (*See, e.g.*, Sent. Tr. D at 171)  The government's argument for substantial financial hardship appears, instead, to turn on the absolute dollar amount of the loss (with no context for the amount of revenue flowing through AAW), which the government's final position for sentencing was $241,893.89 for AAW as a whole.  (*See* D.I. 116 Ex. 1)

47

over six years.  (*See* Hoffman Sent. Tr. C at 104)  While the Court is not persuaded that that the amount of loss attributable to the fraud is nearly this much (*see infra* Part IV.D.7), even if it were, $350,000 – while obviously a great deal of money – was not a big enough loss to turn AAW from a thriving financial success to a nearly bankrupt calamity.  To be more precise, the government failed to prove by a preponderance of the evidence that an average annual loss from fraud of around $60,000 for each of six years truly threatened to bring down AAW.

Evidence in the record shows that AAW's monthly expenditures were close to $550,000, or roughly $6.6 million each year.  (Sponaugle Sent. Tr. C at 135; *see also* GX2a-q[33])  Annual revenues appear to have been in the $7 million range.  (*See* Trial Tr. at 333; *see also* GX2a-q)  It is difficult to understand how Sponaugle's alleged additional, unauthorized spending of $60,000 for each of six years, when added to the $6.6 million the practice was legitimately expending each year, could have resulted in *any* substantial financial hardship to AAW.  The government certainly did not prove any such impact on AAW.

The argument for application of this enhancement is further undermined by the presence of alternative, plausible explanations for the negative financial performance (at times) of AAW.  Principally, most of the adverse results identified by the doctors followed Ms. Sponaugle's *departure* from the practice.  If the practice suffered financial harm because its longtime CEO left, and because the duties she performed had to be performed by others (who maybe were not as good at these tasks as Defendant was), that harm would not be attributable to fraud.  Similarly, the doctors fault Ms. Sponaugle for leaving large bills unpaid and complain that hundreds of thousands of dollars of invoices were due (or overdue) soon after her March 2018 termination.

---

[33] "GX" citations are to the government's trial and sentencing exhibits.

(*See, e.g.*, McCracken Sent. Tr. A 20-21; McCullough Sent. Tr. D at 11 ("We would ultimately determine that she had left us with approximately $350,000 of unpaid invoices.); Chavez Sent. Tr. D at 18-19; Larkin Sent. Tr. D at 24)  But financial harm that resulted from merely deficient job performance by Ms. Sponaugle would not be attributable to fraud.[34]

There is also a failure of proof with respect to how any losses suffered by the partners individually could have amounted to ***substantial*** financial hardship to any of them.  Assuming it is fair to treat the (at most) $350,000 over six years as loss to each of six partners,[35] nothing in the record supports a finding that the loss of an average of approximately $60,000 by each partner over a period of six years – equal to an average annual loss of around $10,000 per partner – constituted or caused a substantial financial hardship to any of the doctors.  The limited evidence in the record about the doctors' salaries and net profits as partners strongly suggests that a loss of income of $10,000 per year – while a terribly unfortunate loss that no one should have to suffer – was not a substantial financial harm to any of them.  (*See, e.g.*, GX2a-q)  No evidence was presented to the effect that any of the partners suffered the kind of financial harm identified in the note accompanying the Guideline: insolvency or bankruptcy, "substantial loss"

---

[34] Additionally, Ms. Sponaugle testified that AAW's income declined when the providers decided to work fewer hours, particularly after obtaining more flexibility when AAW became independent from ChristanaCare in 2012. (Sponaugle Sent. Tr. C at 126-30, 137-40)  This could explain some of the income issues the doctors experienced even prior to discovering Ms. Sponaugle's fraud.  The Court need not make a finding on this point.

[35] If the Court were to find that AAW suffered a loss of $350,000, the Court could not simultaneously find that the six partners collectively suffered the loss of the same $350,000.  That would be double counting.  *See United States v. Moore*, 315 F. App'x 16, 18 (9th Cir. 2008) ("To avoid double-counting, the individual account owners and the banks who reimbursed them cannot both be victims on the basis of the same stolen funds."); *see also United States v. Nathan*, 188 F.3d 190, 210-11 (3d Cir. 1999) (finding District Court erred by double counting loss to Air Force for cancelled settlement agreement and re-procurement).  Since the government's efforts to support the victim enhancement fail on other grounds, the Court need not reach this issue.

49

in a retirement or other type of savings or investment fund, harm to the ability to obtain credit, or the need to make substantial changes to employment, retirement, or living arrangements. While the note's list is not exhaustive, *see* SG § 2B1.1 (stating that Court "shall consider, among other factors, whether the offense resulted in" the six listed items), no evidence was presented of any similar type of substantial financial harm suffered by any of the doctors that was attributable to Ms. Sponaugle's fraud.[36]

Accordingly, the Defendant's objection to the victim enhancement of SG § 2B1.1 is SUSTAINED.

**D.      The Loss Amount Proven By The Government Is Between $40,000 And $95,000**

The biggest factor in calculating the applicable Guidelines range is the amount of loss attributable to Defendant's fraud. The government's position is that it proved at least $241,893.89 of loss, which would translate into an additional 10 points to Defendant's offense level. The PSR agrees with the government. Defendant's position is that she is responsible for no loss, so no points should be added to her offense level.[37]

---

[36] At trial, the jury saw evidence of each partner's "column," a complex system (designed by Mr. Cetrulo) through which Ms. Sponaugle was to track the partners' quarterly allocated receipts and expenses. (*See, e.g.*, McCracken Trial Tr. at 430-31; McCracken Sent. Tr. A at 62, 65-66; Cetrulo Trial Tr. at 940-42; Sponaugle Trial Tr. at 1438-40) There was some evidence that a mischaracterization in QuickBooks of a Sponaugle unauthorized personal expense could end up, wrongly, as an expenditure from one of the partners' columns, causing a financial loss to that doctor. (*See, e.g.*, Hoffman Trial Tr. at 1045-46; Hoffman Sent. Tr. B at 135-36; Sponaugle Sent. Tr. C at 264, 266-68; GX109) The government did not attempt to prove this type of direct financial loss to individual partners based on specific transactions and does not argue it as a basis to support application of the Guideline. (*See* D.I. 115 at 25-27)

[37] Per the PSR, Ms. Sponaugle contends she made personal expenditures on her AAW credit card of $99,345.44, which should be offset by her unpaid bonuses, which in her view exceeded that amount, resulting in a zero loss. (*See* D.I. 115 at 29)

A great deal of evidence concerning the loss amount was presented at trial and, even moreso, during the evidentiary portions of the sentencing hearings.  For the reasons explained below, the Court has concluded that the amount of loss proven by the government by the requisite preponderance of the evidence is between $40,000 and $95,000.

### 1.      Applicable Legal Principles

The government "bears the initial burden of proving loss by a preponderance of the evidence." *United States v. Lacerda*, 958 F.3d 196, 214 (3d Cir. 2020).  Based on the record, the Court must calculate the loss amount "associated with the crime of conviction and any relevant conduct that was part of the same course of conduct or common scheme or plan." *Id.* (internal quotation marks omitted).  "While this does not have to be an exact figure, it must be a reasonable estimate." *Id*; *see also Ali*, 508 F.3d at 145; U.S.S.G. § 2B1.1 app. n.3(C).

### 2.      The Court Did Not Find Accountant Hoffman's Analysis Persuasive

The government's position on the amount of loss it believes it proved is based largely on FBI Forensic Accountant Michelle Hoffman's analysis.[38]  The Court did not find Ms. Hoffman's analysis persuasive, for reasons that are detailed below.

#### a.      Hoffman's analysis was inconsistent, resulting in lower loss amounts each time she obtained more information

In the Indictment, the government charged Ms. Sponaugle with wire fraud leading to a loss of at least $322,652.  (D.I. 2 at 2)  At trial, the government alleged during its opening and closing statements that the loss amount was "well over a quarter of a million dollars." (Trial Tr.

---

[38] The government also made the legal argument that the full amount of loss it is advocating for sentencing purposes is necessarily implied in the jury's guilty verdict.  (*See, e.g.*, D.I. 105 at 9-12)  As already explained, the Court has rejected that contention.  (*See supra* Part III)

at 309, 1738)  With further review after trial, the government reduced its proposed total loss

amount to $241,893.98, of which $230,160.54 was from unauthorized credit card purchases and

an additional $16,266 was from checks written from AAW's bank account. (*See* D.I. 115 at 6,

29)[39]  Accountant Hoffman conceded that the amount of loss she found had dropped by nearly

$100,000 over the course of the prosecution. (*See* Hoffman Sent. Tr. B at 110; *see also id.* at 121

("[O]bviously my number has gone down tremendously . . . .")) She also admitted that as more

evidence became available to her, the amount of loss she identified continually got smaller. (*See*

*id.* at 106)

    While it is appropriate for the government to refine its analysis over time, and it is to

Accountant Hoffman's credit that she reduced her loss amounts as additional evidence persuaded

her to do so, the constantly shrinking nature of her loss amount ultimately undermined the

Court's confidence in the loss amount the government is currently advocating. ***The government***

***has effectively conceded that it failed to prove*** what Ms. Hoffman expressly testified to before

the jury, and what the AUSAs expressly and repeatedly argued to the jury – that the loss from

Defendant's fraud was "well over a quarter of a million dollars." (Hoffman Trial Tr. at 1082,

---

[39] The government removed from its post-trial loss calculations an additional $4,532.65 for
repayments Sponaugle had made to AAW. (*See* D.I. 115 at 6, 29; *see also* GX3)  Ms. Sponaugle
testified that she repaid AAW $2,000 for mattresses and televisions she put on her AAW credit
card because she did not want those expenditures (for the home she was setting up after
separating from her ex-husband) to appear on her personal credit card statement. (*See* Sponaugle
Trial Tr. at 1426-27; *see also* GX3)  She repaid AAW for this large expense because, she said,
she "didn't want to take that big lump-sum off of my big line item, off my line amount," which
the Court understands to mean she did not want to use that much of her bonus at that point in the
year and for that expense. (Sponaugle Sent. Tr. C at 261)  She also repaid the practice for an
Olive Garden dinner with her ex-husband's aunt, feeling it was inappropriate to charge this to
AAW. (*See* Sponaugle Trial Tr. at 1543-44)  She elaborated that she had put this charge on her
business card because she did not have her personal card with her that day and she had
reimbursed AAW for it because she did not want to use her bonus money towards this expense.
(*Id.* at 1544, *see also* Sponaugle Sent. Tr. C at 262)

1096-97, 1171; Trial Tr. at 309-10, 316, 319 (opening); Trial Tr. at 1682 (closing))  Based on all

that has occurred in this case, it is the Court's expectation that, if more time were devoted to the

loss analysis going forward, and if more evidence could be developed, the loss amount Ms.

Hoffman would opine to would continue to drop; in other words, the pattern that has been

observed to this point in the process would continue.

All of this has led the Court to conclude that while Ms. Hoffman's most recent analysis

can reasonably be taken as a starting point, her (i.e., the government's) alleged loss amount is, as

discussed below, substantially too high and, considering the totality of the record, unproven.

> **b.** **Hoffman's analysis was not conservative, as it should have been**

Accountant Hoffman told the jury, and the Court, that her analysis of the extent of Ms.

Sponaugle's fraud was "conservative." (Hoffman Trial Tr. at 1082; Hoffman Sent. Tr. C at 286)

She explained that conservative meant giving the Defendant the benefit of the doubt "whenever

there's a benefit of the doubt to be given." (Hoffman Sent. Tr. B at 106, 108)  She added that

"it's always important to be conservative" because "we want to be fair; fair to the victims in

determining an actual loss amount and just fair in general of not overestimating something or

going above and beyond." (*Id.* at 107)

The Court agrees with Accountant Hoffman that a conservative analysis is appropriate

here, for the reasons she gave.  Unfortunately, however, Accountant Hoffman's analysis is not

conservative.  Rather, it is aggressive, in at least the following respects, all of which are further

described in ensuing sections:

(i)     if the doctors said from the start of the investigation that a charge was not
        authorized, and they persisted in that view, then Accountant Hoffman
        almost always treated the charge as not authorized;[40]

(ii)    if the only evidence about a charge (after all these years, and with thousands
        of transactions to evaluate) was the word of the doctors and the conflicting
        testimony of the Defendant, the charge was almost always treated by
        Accountant Hoffman as unauthorized;[41]

(iii)   if there was no written communication (in the form of a text, electronic
        medical record ("EMR"), or email), and no doctor had a specific
        recollection of authorizing a particular charge, it was not authorized;[42]

---

[40] *See, e.g.*, Hoffman Sent. Tr. B at 128 ("And when it was marked unauthorized by the doctors, I
sided with the doctor saying this is not authorized."); *id.* at 129 ("THE COURT: You've sided
with the doctors on that?  THE WITNESS: Yes.  THE COURT: Why?  THE WITNESS: Again,
just when it – in this specific example, a straight-up dispute, it was marked unauthorized from
the very beginning, so I just left it as unauthorized.  THE COURT: Is that conservative?  THE
WITNESS: In this instance, I don't – probably not."); Hoffman Sent. Tr. C at 371 ("Q. You just
had to trust them [i.e., the doctors]?  A. Yes.  It made sense; I questioned them on their process
on how they did it."); *id.* at 382 ("So if everybody else was putting gifts like that on their credit
card, then it would have made sense to me that Ms. Sponaugle was authorized.  But that, in
combination with Dr. McCracken and the other doctors going through the spreadsheet and saying
this was unauthorized, then that – that was the decision point for us making that an unauthorized
purchase, them saying that it's not authorized.").

[41] *See, e.g.*, Hoffman Sent. Tr. B at 113 ("THE COURT: . . .  If you can think of any example
where the doctors continue to maintain that [a] charge was not authorized and Ms. Sponaugle
says it was authorized, any example where it's not considered a loss in your analysis?  THE
WITNESS: I think if we – if I could take a minute to look through some of my notes.  I don't
think it's – there would be the big categories where they would say something was not
authorized.  It would be more in the small cumulative instances, but nothing – I can't think of
something off the top of my head . . . ."); *id.* at 47 (answering, after being asked "[h]ow do you
know they're not authorized" as follows: "Because we asked [the AAW partners].").

[42] *See, e.g.*, Hoffman Sent. Tr. B at 138-39 ("THE COURT: . . .  What if it's a personal charge
and the doctors have no recollection at all about it, should that be treated as a personal charge

54

(iv)    if an item was of a personal, non-business nature, it was treated as not

authorized – rejecting Sponaugle's contention that she and the practice

agreed she could take her post-October 2014 bonuses in the form of

***authorized*** personal charges on her AAW credit card;[43] and

(v)    if an item was shipped to Defendant's home or purchased near Defendant's

home, it was almost certainly not authorized.[44]

Except in very rare instances, Ms. Hoffman did not give Ms. Sponaugle the benefit of the

doubt. This made her analysis not conservative. It also rendered her analysis unpersuasive, as

---

that may in fact have been authorized? THE WITNESS: I think – again going back to personal
charges on a corporate credit card are out of the ordinary and if we, we did our best – again, the
nature of the business, if it – if personal expenses shouldn't have been on a company credit card,
then it would be unauthorized. And if we couldn't find evidence to support that it was
authorized, then it would remain an unauthorized expense.").

[43] *See, e.g.*, Hoffman Sent. Tr. B at 119-20 ("THE COURT: This is where I'm getting lost, I
think, is how could the nature of the purchase tell you anything about whether it was something
that the doctor specifically authorized or not? I understand how it could tell you whether it's
office related versus personal, but part of the defense here is even personal stuff up to some
amount was authorized, so how does ['it is] obviously personal in nature['] tell you it cannot
possibly be authorized? THE WITNESS: I guess I disagree. I did not have that same impression
that personal items up to a certain amount were authorized.").

[44] *See, e.g.*, Hoffman Sent. Tr. C at 372 ("Q. . . . And then you indicated that – for some of the
things such as . . . the home decor and furnishings, things of that nature, that a lot of [weight]
was put into where it was shipped, either it was, I guess, from Amazon and depending on where
it was shipped, whether it was shipped to the practice office or it was shipped to Ms. Sponaugle's
home in Maryland; is that correct? A. The Amazon, that's correct. Q. Oh, for the Amazon one.
So is it fair to say, then, if it was shipped to Ms. Sponaugle's home, it was classified as being a
personal expenditure as opposed to an authorized business expenditure? A. We would look at
the type of item that it was and if we could clearly see that – but I wouldn't say it was – but,
yeah, I guess that would be accurate. I would say the majority of things shipped to her home are
in the unauthorized category.").

further explained below.[45]

### c.  Hoffman relied too heavily on the doctors' views, and gave extra weight to their initial conclusions

In determining which purchases were authorized or not, Accountant Hoffman consulted the doctors at AAW for their recollection and understanding of what was permitted. She largely relied on the doctors' views. (*See, e.g.*, Hoffman Sent. Tr. C at 371 (Hoffman agreeing she "had to trust them," adding that what doctors told her "made sense"); Hoffman Sent. Tr. B at 109 (Hoffman agreeing she relied on "what the victims are saying to us")) She also placed weight on whether the doctors told her from the very beginning of the investigation that the charge was unauthorized. (*See* Hoffman Sent. Tr. B at 128)

Under the circumstances, Hoffman relied too heavily on the doctors' views – and her decision to do so renders her analysis aggressive, not conservative, with respect to the loss calculation. Time and again, the doctors' recollection (or, more often, lack of recollection) turned out to be contradicted by Sponaugle's more clear recollection. (*See generally* McCracken Sent. Tr. A at 241-42) ("THE COURT: Is it possible, in your opinion, that you and your partners don't remember every time that you would have authorized a purchase on the credit card by Ms. Sponaugle?  THE WITNESS: Yes, I'm sure our memory is not 100 percent.  Collectively, I think, we do very well.") On these disputes, there was almost never any documentary evidence to support the doctors' position, while there was on many occasions some "documentary" (to include electronic mail, text messages, and EMRs) corroboration for Ms. Sponaugle's position. In the Court's view, a truly conservative analysis would have given the Defendant the benefit of

---

[45] By contrast, Sponaugle, both at trial and at sentencing, presented a "conservative" analysis of the amount of loss caused by her alleged fraud. (*See infra* Part IV.D.4)

56

the doubt on most or all of these disputes.[46]

The Court's reasons for these conclusions do **not** include any finding that the doctors have ever been intentionally untruthful, at any point during the investigation, prosecution, trial, or sentencing proceedings.  Instead, the Court believes that due to the massive number of transactions, the lengthy amount of time the fraudulent scheme existed, and the time that passed between the events at issue and the testimony of the doctors, their recollections turned out to be mistaken on a not insubstantial number of occasions.  More importantly, under the circumstances, Hoffman's (and the government's) heavy reliance on the doctors' recollections, ***particularly on transactions Ms. Sponaugle expressly contested, often with documentary support***, contributes to the Court's findings that Ms. Hoffman's analysis was not conservative and, consequently, that the government failed to meet its burden of proof by a preponderance of the evidence with respect to much of the alleged loss amount.

---

[46] A related issue is the great weight Accountant Hoffman placed on how the partners treated themselves.  That is, when she saw Sponaugle doing something (i.e., charging something to the practice) that the partners did not do, she was pretty sure that meant what Sponaugle did was not authorized.  (*See, e.g.*, Hoffman Sent. Tr. B at 148) (observing, in course of opining that AAW checks used to pay Sponaugle's taxes were unauthorized, "doctors' taxes were not paid out of the company")  A major part of Sponaugle's defense was that she was treated like a partner, a contention the partners and the government vigorously challenged.  The Court is persuaded that there is some significance to whether something Sponaugle spent AAW money on is something the partners also spent AAW money on; where the Defendant was doing the same thing as the partners it seems more likely that she was authorized to do so.  But this is merely one factor and it is far from dispositive.  There is no reason that one or more of the partners could not have, regularly or occasionally, authorized Sponaugle to do something that the partners themselves did not do.  (*See generally* Hoffman Sent. Tr. B at 149) (acknowledging partners could decide company would pay taxes for some individuals and not for others)  Moreover, Ms. Sponaugle was truly in a "category of one" at AAW: not a partner, but also not an ordinary employee, as she managed the finances of the practice and she, alone, was a business partner of the doctors (and therefore a partial owner of one of the locations in which AAW operated).

The extra emphasis on transactions the doctors found from the start were unauthorized is also unwarranted. The doctors' initial investigation was just that: a first effort to assess whether Ms. Sponaugle had defrauded the practice. It was not a systematic, thorough, professional analysis of the amount of loss. For example, during her initial review of statements of purchases from BJ's, Dr. McCracken did not examine any emails or text messages if it was "obvious" to her that something was "unauthorized." (McCracken Sent. Tr. A at 234-37)  Dr. McCracken also did not examine the office EMRs, an internal messaging system (*see id.* at 237), for any transactions she evaluated, even though these messages could have provided evidence that a particular charge was authorized. The methodology Dr. McCracken employed was entirely appropriate, given the limited purposes for which she was undertaking this effort.[47]  After years of litigation, however, and with the now extensive record of AAW's culture – including the doctors' generosity – and the trust placed in Ms. Sponaugle, it is now clear that, with significant frequency, charges that at first seem "obviously" personal – such as cigars, trips, and purchases made in Maryland – were actually likely authorized; or, at minimum, the government has failed, often, to prove that these transactions were not authorized. (*See infra* § IV.D.2.e)[48]

---

[47] The Court is not suggesting that the doctors had an obligation to be more thorough in their analysis at any time. It was not their job, as victims of criminal activity, to conduct an investigation. Under the circumstances – as busy doctors who were in the process of losing and then terminating their CEO, after discovering they had been victimized by her – the amount of work the doctors did in connection with the investigation is quite extensive, and admirable. The Court's findings are based on the government's failings, not those of the doctors.

[48] Ms. Hoffman further opined that there was no room for Ms. Sponaugle to be confused as to which purchases she was permitted to make and which she was not. (*See* Hoffman Sent. Tr. B at 71)  The Court disagrees. Given especially AAW's culture of generosity and its lack of written policies governing use of the company credit card, there was plenty of room for confusion – or what the parties have also referred to as "gray areas."

### d. Hoffman largely assumed that if a personal transaction was not expressly authorized in writing or by a doctor's specific recollection, it was unauthorized

Hoffman further assumed that if she could not identify a specific, written authorization for a personal transaction, then the transaction was not authorized, unless the doctors specifically told her that the transaction was authorized. (*See, e.g.*, Hoffman Sent. Tr. B at 138-39; *id.* at 59 ("If [the doctors] have no recollection and they say it was not authorized, that was our determination.")) Based on the record before the Court, this is an unfounded assumption.

No one testified that Defendant, as AAW's CEO, had to consult all of the partners (or even one) with respect to every financial decision she made, or even every charge she put on her company credit card. Instead, she had wide discretion and the doctors' trust. (*See* D.I. 105 at 19) (government arguing Sponaugle "had the power to make decisions substantially free from supervision," as she "was trusted and made financial decisions for AAW with little to no supervision") From this it follows that she did not need an express authorization for every financial transaction she undertook. Ms. Hoffman's assumption to the contrary is not grounded in the record.

Moreover, it is quite possible that many or most authorizations given to Ms. Sponaugle were not in writing (email, text message, or EMR). Ms. Sponaugle testified, credibly, that authorization for a personal charge was often given in casual discussion with one or more partner and other authorizations were implicit in the authority delegated to Ms. Sponaugle. (Sponaugle Sent. Tr. B at 241) Ms. Sponaugle's testimony is well-supported by the record and is more persuasive than Hoffman's aggressive assumption that the lack of a paper trail meant a particular transaction was likely fraudulent.

59

### e. Exemplary transactions demonstrating flaws in Hoffman's analysis

The reasons the Court has found Accountant Hoffman's estimate of the loss amount unpersuasive are included throughout this Opinion. The Court now provides selected specific examples which illustrate flaws in her analysis.

### i. Gas station expenses

Accountant Hoffman noticed many days on which Ms. Sponaugle had two different charges at a gas station. (Hoffman Sent. Tr. B at 25) ("[W]e identified numerous duplicate gas purchases on the same day.") She explained that this issue first arose in "the original approach that Stefano Slack and Dr. McCracken and Dr. Chavez came up with," and those individuals "felt gas expenses were authorized" but "there were instances where she was charging purchases at a gas station twice in the same day." (*Id.* at 124) For purposes of determining a loss amount, Ms. Hoffman treated the larger of the two same-day transactions as authorized – recognizing that Ms. Sponaugle was permitted to charge gas on her company credit card – but always treated the smaller of the two same-day transactions as unauthorized. (Hoffman Sent. Tr. A at 291; Hoffman Sent. Tr. B at 124-126) She did so despite having no receipts for these transactions and having no direct evidence as to what Ms. Sponaugle was purchasing at the gas stations. (Hoffman Sent. Tr. A at 291; Hoffman Sent. Tr. B at 125) Instead, Hoffman treated these amounts as unauthorized largely because they had always been treated as unauthorized from the time of AAW's earliest analyses. Hoffman decided to be "consistent" with the doctors' own approach "because it made sense. It was reasonable." (Hoffman Sent. Tr. B at 124)

Moreover, Hoffman could think of no good reason for having two gas station charges on the same day, making it clear to her that at least one of the two same-day transactions had to have been fraudulent. (Hoffman Sent. Tr. A at 125 (noting Defendant "didn't live that far away

from All About Women [such] that she would be needing to fill up multiple times a day");
Hoffman Sent. Tr. B at 402)  Ms. Hoffman speculated that on what might be called "double gas
days," one transaction might be for gas and the second might be for a purchase of food at a
convenience store associated with a gas station.  (Hoffman Sent. Tr. B at 25) ("[T]here was a
pattern of maybe a larger purchase at a gas station and then a smaller [transaction] . . . maybe a
$30 purchase, which one would assume was for gas and then a $10 purchase on the same day,
which . . . one might assume was walking into a convenience store and grabbing coffee or a
breakfast sandwich or something.")  Based on this reasoning, Ms. Sponaugle was tagged with
$1,926 of loss for purposes of sentencing.  (*See id.* at 24-25)

When Ms. Sponaugle was asked about the "double gas" purchase transactions, she had
not just one but two explanations, both of which strike the Court as entirely plausible and
credible.  First, Ms. Sponaugle recalled that there were occasions when her tank would be low on
gas and she would be rushing to work in the morning, so she would stop and put a few gallons of
gas in the tank – to ensure she would get to work on time – and then on the way home, when not
faced with a similar time constraint, she would stop again and fill the tank.  (Sponaugle Sent. Tr.
B at 214)  Second, Ms. Sponaugle recalled putting gas in her car before dropping it off for
service, then driving a loaner car during the day and later filling up the loaner car so she could
return it full.  (*Id.* at 213-14)

The government presented no evidence to contradict Ms. Sponaugle's explanations.  To
the contrary, Ms. Hoffman admitted she did not know whether Ms. Sponaugle's testimony
regarding loaner cars was accurate or not.  (Hoffman Sent. Tr. C at 403)  She had not even talked
to the doctors about this issue.  (*Id.*)

The Court finds that the government did not prove by a preponderance of the evidence

that the gas station purchases made on days when Ms. Sponaugle charged more than one gas station visit to her AAW card were unauthorized.

### ii. BJ's/Target/Walmart

Ms. Hoffman made assumptions about days on which she found multiple transactions at BJ's, Target, and Walmart. It was Ms. Hoffman's opinion that when Ms. Sponaugle went to one of these stores more than once in the same day, at least some of the charges she made in the store must be unauthorized and fraudulent. (Hoffman Sent. Tr. C at 390) If she saw an office-related item purchased from one of these stores and on the same day saw non-office-related items purchased from the same store, she assumed that the non-office-related item could not have been authorized. (*Id.*)

Relatedly, it appears that sometimes Ms. Hoffman found both business-related and personal items on the same BJ's, Target, or Walmart receipt, and when she did so she generally assumed the personal items were unauthorized. At the same time, however, she also conceded that in some such instances Ms. Sponaugle had probably inadvertently placed the personal items in the wrong pile at the store and, therefore, likely did not have an intent to defraud with respect to these purchases. (Hoffman Sent. Tr. C at 390-91) ("Q: Not an intent to try to fraudulently purchase something that you weren't entitled to purchase? A: Probably not.")

If Ms. Hoffman were to have taken a truly (and appropriately) conservative approach, she would have given Ms. Sponaugle the benefit of the doubt and not treated any of these purchases as unauthorized. The Court finds that the government did not prove by a preponderance of the evidence that the purchases from BJ's, Target, and Walmart were unauthorized.

### iii. Breast cancer walk

AAW was an active participant in the annual Komen Breast Cancer Walk in Philadelphia.

(Sponaugle Trial Tr. at 1306-08; Sponaugle Sent. Tr. B at 181-83)  Ms. Sponaugle led the practice's efforts in connection with this event.  She arranged to rent a bus in which to transport practitioners (and sometimes their daughters) as well as employees and patients of the practice. She also purchased, served, and cleaned up large quantities of food and refreshments on the bus. She ordered t-shirts for the participants.  (Hoffman Sent. Tr. B at 127)  Ms. Sponaugle, and often her daughter, also registered for and participated in the walk.  Ms. Sponaugle placed all of these expenditures on her AAW credit card.  (Sponaugle Trial Tr. at 1308; Sponaugle Sent. Tr. B at 182; Hoffman Sent. Tr. B at 127-28)

Because the doctors with whom the FBI was working acknowledged that almost all of these expenses were authorized, Accountant Hoffman treated nearly all of them as authorized.  In Hoffman's view, "it makes sense for an OB/GYN office to support breast cancer awareness." (Hoffman Sent. Tr. B at 127)[49]

But she did not deem all of the expenses associated with the breast cancer event to be authorized.  Instead, she concluded that $91.80 out of approximately $1,000 of expenditures were unauthorized.  (*Id.* at 126-28)  Specifically, she excluded registration charges which she concluded were "clearly a personal signup for four individuals" and, particularly, were for (at least) Sponaugle and her daughter.  (*Id.* at 12, 126-28)  Ms. Hoffman found that "none of the other doctors or practitioners were charging their personal signups for this walk on the [credit] card."  (*Id.* at 12-13)  Accordingly, Hoffman concluded "it wasn't the culture of the practice" to pay for the registrations.  (*Id.* at 128)

Sponaugle testified, however, that she was authorized to have the practice pay for her

---

[49] Ms. Hoffman generally relied on her "own experience" as to "what would be reasonable in an office setting" or a "doctor's office setting."  (Hoffman Sent. Tr. B at 108)

registration and her daughter's.  (Sponaugle Sent. Tr. B at 183)  She asserted that when she

registered an AAW provider and the provider's child, the practice would pay.  (*Id.* ("I would pay

for all the providers, we would pay for the provider if they went and their children."); *see also id.*

at 179-80 (noting that signups for other years had been marked as authorized))  She added that

she had to discuss the registrations with, for example, Dr. McCullough because "I had to get the

information from her daughter to register her daughter and herself."  (*Id.* at 184)  Sponaugle also

introduced photographs of herself and Dr. McCullough (among others) at a breast cancer walk.

(Def. Sent. Ex. 28-16, 28-17)

Thus, the record reveals a dispute of fact as to whether Ms. Sponaugle was authorized to

charge the cost of her and her daughter registering to participate in a breast cancer walk in which

Ms. Sponaugle was organizing the practice's involvement.  On this dispute, the government

presented no evidence to contradict Ms. Sponaugle's testimony – other than the word of

Accountant Hoffman.  Ms. Hoffman made clear that "when it [i.e., the registration expenses] was

marked unauthorized by the doctors, I sided with the doctors saying this is not authorized."

(Hoffman Sent. Tr. B at 128)  Ms. Hoffman completely rejected the possibility of innocent

misunderstandings (*see id.* at 122) ("I don't believe there was a confusion. . . .  I don't believe

there was confusion on Ms. Sponaugle's part for what she was doing."), yet another reason her

conclusions were neither conservative nor persuasive.  The Court finds the government did not

prove by a preponderance of the evidence that the payment of the registration fees was

unauthorized.

### iv.    Gifts from the practice purchased by Sponaugle

Ms. Hoffman treated as unauthorized, and therefore as loss attributable to fraud, $587.42

charged on Ms. Sponaugle's AAW credit card for purchases of food while she was on trips, such

as candy, cookies, and popcorn. (Hoffman Sent. Tr. B at 21)  For instance, when Ms. Sponaugle went to Hershey Park, she would bring back chocolates for the office. (Sponaugle Sent. Tr. B at 194; Sponaugle Sent. Tr. C at 272)  It appears to be undisputed that the purchased items at issue ended up in the office and were made available to all AAW employees to enjoy.

Ms. Sponaugle testified, credibly, that she put these purchases on her AAW credit card because she was authorized to buy snacks and gifts for the practice. (Sponaugle Trial Tr. at 1296; Sponaugle Sent. Tr. B at 194)  She considered these purchases to be a gift from the practice to all employees, and her acquisition of them on behalf of the practice was part of her duty to keep the office stocked with snacks. (Sponaugle Sent. Tr. C at 272-73)[50]  In other words, these were perks provided by AAW (at the expense of its doctor-partners) to its employees, and Ms. Sponaugle was merely the mechanism of provision – she made the purchase and brought the goodies to the office, charging the expense to AAW.

To Ms. Hoffman, however, these purchases were unauthorized and should be treated as loss for sentencing purposes.  In her view, instead of being work treats provided by AAW to its employees, these were personal gifts from Ms. Sponaugle to her coworkers. (Hoffman Sent. Tr. B at 21, 131-34)  Ms. Hoffman suggested that Ms. Sponaugle was taking credit for generously providing these items and that employees perceived them as gifts from her personally and not the practice, all "[b]ecause they were purchases made . . . while she was on a specific vacation." (Hoffman Sent. Tr. B at 132)  Ms. Hoffman reached this conclusion based on what the doctors told her and "on the whole, . . . life experience, common sense . . . [w]hen it's a personal gift

---

[50] Similarly, Ms. Sponaugle identified instances in which she purchased gift cards on her AAW credit card for use as gifts from AAW, such as for a wedding or different office events. (Sponaugle Trial Tr. at 1315, 1408)

65

from yourself, I don't believe the practice should pay for it." (*Id.* at 133)  Ms. Hoffman also found added significance in the fact that the doctors had said from the beginning of the investigation that these transactions were not authorized, stating: "again, if the doctors say it is unauthorized from the get-go, that tells me that they didn't feel she should be buying this type of stuff on her company credit card." (*Id.* at 132)

This distinction – between a gift to staff from AAW, procured by its CEO and properly paid for by the practice, and an expression of Ms. Sponaugle's personal generosity toward her coworkers, and therefore an expense for which she should personally bear the cost – is subtle, at best.  This was not a matter Ms. Sponaugle ever talked to the doctors about.  (Sponaugle Sent. Tr. C at 272-77)  Nor did any doctor testify about it.  Given everything in the record about the culture of AAW and Ms. Sponaugle's role in the practice, it was entirely reasonable for her to believe she could make these sorts of purchases at the expense of AAW.  At a minimum, a conservative, persuasive loss analysis would not treat these expenditures as unauthorized.  The government failed to meet its burden to prove by a preponderance of the evidence that these purchases should count as loss attributable to fraud.

### v.   Cigars

Ms. Hoffman identified cigar purchases made on Ms. Sponaugle's AAW credit card as unauthorized, based on statements like Dr. McCracken's that "we do not buy cigars for our patients or their husbands." (McCracken Trial Tr. at 494)  Ms. Sponaugle, however, did not purchase cigars for patients or their husbands.  Instead, she testified, credibly, that her then-husband helped install a security clock at one of the AAW offices, and thereafter the doctors told her to buy him some cigars as "a token of appreciation." (Sponaugle Trial Tr. at 1304)  In another instance, one of the doctors consulted Ms. Sponaugle's then-husband about cigars and

66

decided an extra one should be purchased for the then-husband to thank him.  (*Id.* at 1305)
When asked about these occurrences, the doctors did not remember them, but they also had no
documentary or other evidence to contradict Ms. Sponaugle's recollection.  (McCullough Trial
Tr. at 683, 852)

Ms. Sponaugle's testimony and recollection on these points were more credible than
those of the doctors.[51]  Ms. Hoffman offered no persuasive reason for accepting the word of the
doctors over the word of Ms. Sponaugle on the issue of cigars, stating "in this specific example,
a straight-up dispute, it was marked unauthorized from the very beginning, so I just left it as
unauthorized."  (Hoffman Sent. Tr. B at 129)  When asked whether that was conservative, even
Dr. Hoffman admitted "[i]n this instance, I don't – probably not."  (*Id.*)

A truly conservative analysis would give Ms. Sponaugle the benefit of the doubt on
disputes like these.  Ms. Hoffman's contrary approach is not conservative, and not persuasive.
The Court finds that the government did not prove by a preponderance of the evidence that the
cigar purchases were fraudulent.

### vi.    Parking

Ms. Hoffman initially identified parking charges in Wilmington as unauthorized.
(Hoffman Trial Tr. at 1153)  At trial, Ms. Hoffman told the jury that these charges would have
been treated as authorized if they were incurred in connection with Ms. Sponaugle traveling to a
Wilmington courthouse to assist with a medical malpractice trial, but Ms. Hoffman counted

---

[51] This should not be surprising.  The long ago purchases were of far more consequence in Ms.
Sponaugle's life than in the lives of the busy doctors, whose involvement in the transactions
typically consisted of (at most) a fleeting moment of conversation or a message or email.  Ms.
Sponaugle, by contrast, not only had the interaction with the doctor but then also made the
purchase, entered it into QuickBooks, and distributed the items purchased (here, the cigars to her
husband).  In the Court's view, she is far more likely than the doctors to remember the practice
buying her husband (now ex-husband) a thank-you cigar.

some parking charges as fraudulent because the doctors marked them as unauthorized.  (*Id.* at

1153-54)  Then Ms. Sponaugle testified at trial that the charges identified by Hoffman were, in

fact, incurred in connection with a trial.  (Sponaugle Trial Tr. at 1389-91)  Thereafter, at the

sentencing proceedings, Ms. Hoffman modified her analysis and began to treat certain Colonial

Parking expenses as authorized – but still she considered other miscellaneous parking expenses

(at different times and places) to be not authorized.  (Hoffman Sent. Tr. C at 346-47)  Ms.

Sponaugle then testified again and explained that these other Wilmington parking charges would

also have been related to work, incurred either in connection with meeting with AAW's lawyers

or other work events.  (Sponaugle Sent. Tr. B at 210)  When, still later in the proceedings, Ms.

Hoffman was asked about these remaining "unauthorized" parking charges, she stated that she

had taken the doctors at their word on this point, without any further investigation; she

apparently did not think any additional analysis was necessary, given that only "a very small

amount" of money was involved.  (Hoffman Sent. Tr. C at 377-78)

Again, the Court found Ms. Sponaugle's explanation of the parking charges to be

credible.  Other than the doctors' say-so, the government offered no evidence to counter her

testimony.  Given the state of the record, a conservative analysis would not have treated these

parking charges as unauthorized.  The government has failed to prove by a preponderance of the

evidence that these charges should be included in the loss amount.

### vii.    Home security system

Ms. Sponaugle testified that when, after separating from her then-husband, she moved

into a new home, the doctors discussed paying for installing a security system at that home, and

eventually decided to gift the security system to her.  (Sponaugle Sent. Tr. C at 98, 222-24; *see*

*also* Sponaugle Trial Tr. at 1286)  Ms. Sponaugle recalled talking to Dr. McCullough about the

office buying the security system. (*Id.*) She also introduced into evidence a text message in which Dr. McCullough wrote to Dr. McCracken: "2 thoughts. She wants security . . . installed at new house? No idea what they run, but could we pay for install?" (Def. Sent. Ex. 34 at A-0293) Dr. McCracken did not recall this discussion. (McCracken Trial Tr. at 622) Having nothing more than Dr. McCracken's lack of recollection, Ms. Hoffman decided the doctors must not have approved the purchase, and treated the security system charge as unauthorized. (Hoffman Sent. Tr. C at 373-74)

The Court found Ms. Sponaugle credible on this point. Her testimony was at least partially corroborated by the text message between the two doctors. By contrast, the government could point to no documentary evidence on its side and its witness, Dr. McCracken, did not (understandably) recall approving this transaction all these years later.[52] The Court finds that the government did not meet its burden and, hence, the Court will not include these amounts in its loss calculation.

### viii.    Non-Delaware purchases or deliveries

Accountant Hoffman further assumed that "the majority of things shipped to [Sponaugle's] home" was unauthorized. (Hoffman Sent. Tr. C at 372) She treated nearly all purchases and deliveries not made to the office as loss attributable to fraud. (Hoffman Trial Tr. at 1137) Hoffman had to admit, however, that in reviewing, for example, Amazon purchases shipped to Ms. Sponaugle's Maryland home, Hoffman often did not have any additional

---

[52] Again, this should not be surprising. The purchase of a security system for her own home, at a difficult time in her personal life, was undoubtedly far more important – and memorable – to Ms. Sponaugle than it was to the doctors, who were being characteristically generous to and supportive of their CEO but could have easily forgotten this particular purchase.

documentation (beyond the charges themselves) to enable her to verify whether a purchase was authorized.  (Hoffman Sent. Tr. C at 372)

Ms. Sponaugle testified, credibly, that she would buy things in bulk for the practice, including when they were on sale or she was in a BJ's, and she would make these purchases at all different times, including during weekends at home in Maryland.  (Sponaugle Trial Tr. at 1310-11)  Similarly, Ms. Sponaugle testified that "lots of things were shipped to my home for work."  (Sponaugle Sent. Tr. C at 191)  The government presented no persuasive evidence to the contrary, only Ms. Hoffman's unsupported speculation.

The Court finds that the government did not prove by a preponderance of the evidence that the purchases made outside of Delaware, or purchases shipped to Ms. Sponaugle's Maryland home, were fraudulent.

### ix.    Additional unproven categories

The Court could go on.  There are numerous other categories Ms. Hoffman deemed to be unauthorized expenses that the Court does not believe the government proved, by a preponderance of evidence, were unauthorized (or unauthorized to the extent the government contends).[53]  This already-lengthy Opinion would stretch far longer were the Court to describe,

---

[53] *Compare, e.g.*, "Travel – Hotel after Xmas Party (not approved by owners)" (D.I. 116 Ex. 1 at 2) *with* McCullough Trial Tr. at 821-22 (testifying Defendant stayed overnight after cleaning up after party and McCullough would have authorized paying for hotel stay if she had been asked); "Travel/Vacation – CES Wedding NY" (D.I. 116 Ex. 1 at 2) *with* Sponaugle Trial Tr. at 1409-11 (Defendant explaining she attended wedding as representative of AAW as a "business duty," since the doctors "pretty much told me, why don't you, you know, go on behalf of us, if you can go"); "Travel/Vacation – Phoenix trip extra-curricular with companion on trip" (D.I. 116 Ex. 1 at 2) *with* Sponaugle Trial Tr. at 1591-92 ("Every time you go on a conference, normally they allow one kind of offsite show or excursion or something like that, yes. . . . It was always allowed.  I took [my ex-husband] Sonny on two or three conferences.  They, you know, did so."); "Travel/Vacation – Sponaugle friend Carla Sayers b-day Mexico trip" (D.I. 116 Ex. 1 at 2) *with* Sponaugle Sent. Tr. B at 121-23 & Def. Sent. Ex. 39 (Defendant explaining she put half of

70

in detail, its concerns with additional categories.  Rather than doing so, the Court will take an

additional 25% deduction off of Ms. Hoffman's maximum loss amount, as explained later in this

Opinion.  (*See infra* Part IV.D.7.d)

### 3.    The Government's Showing Is Further Weakened By Its Heavy Reliance On Hearsay

The government's effort to prove its proposed loss amount was further undermined by its

heavy reliance on hearsay.  The government chose to call only one first-hand fact witness, Dr.

McCracken, as part of the sentencing proceedings.[54]  Instead of calling multiple doctors to

testify, the government elected to have Dr. McCracken testify that she spoke to the other doctors

– including on many of the points Ms. Sponaugle had raised at trial and in connection with

sentencing – and to have Dr. McCracken tell the Court what the other doctors could and could

not recall.[55]

It is permissible to rely on hearsay in a sentencing proceeding.  *See, e.g.*, Fed. R. Evid.

1101(d)(3) (providing that Rules of Evidence do not apply at sentencing).  Nevertheless, as the

Court warned the government (*see* Feb. 11 Tr. at 9), hearsay is generally less probative and

persuasive than direct evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("Out-

of-court statements . . . lack the conventional indicia of reliability: they are usually not made

---

Sayers' deposit on AAW credit card, then received check for that amount from Sayers – which is Exhibit 39 – and then deposited it along with other checks into AAW bank account).

[54] While several other AAW doctors testified at trial, that was before Ms. Sponaugle's defense was in the record, so these witnesses often did not provide evidence directly responsive to the fact disputes raised by the Defendant's testimony.  While multiple AAW doctors provided victim impact statements, these statements were not sworn testimony on which the Court can rely in resolving fact disputes.

[55] The government's decision not to call more witnesses is the subject of the U.S. Attorney Office's letter of March 31, which was discussed in detail above.  (*See supra* Part II.E)

under oath; . . . not subject to cross-examination; and [the declarant] is not available in order that his demeanor and credibility may be assessed . . . ."). Among other deficiencies, it is impossible to assess the credibility of the out-of-court declarant when her statement is admitted through hearsay.

An illustrative example of the weakness of hearsay testimony was Dr. McCracken's testimony that none of the partners thought Ms. Sponaugle was going to get a large deferred bonus, an issue she spoke to the other partners about in preparation for her sentencing testimony. (McCracken Sent. Tr. A at 233-34)  Yet the record is plainly shows that at least Dr. McCullough *did* believe that Sponaugle would get a big deferred bonus.  (*See, e.g.*, McCullough Trial Tr. at 664-65, 721-24)  When shown a message Dr. McCullough had sent Defendant in 2016, in which Dr. McCullough clearly expressed the view that Sponaugle's bonuses were deferred (and not waived forever), Dr. McCracken responded: "I personally do not agree with the wording of the e-mail, but I can't comment on what she [Dr. McCullough] was thinking at that time." (McCracken Sent. Tr. A at 262; *see also id.* at 265 ("[T]hat is not my understanding and in speaking with Dr. McCullough and the partners that was not any of our understanding."))  It may be that Dr. McCullough did not share her true views with Dr. McCracken, or that Dr. McCracken is somehow mistaken about what Dr. McCullough told her.  The point is, however, that in connection with sentencing, there was no one other than Dr. McCracken to ask about this topic. The government's evidence would likely be far more probative if it did not consist of so much hearsay.

### 4.   Ms. Sponaugle *Did* Offer A Conservative Analysis Of Loss

Making Ms. Hoffman's failure to conduct a conservative analysis all the more striking is that the Defendant, Ms. Sponaugle, did offer a conservative analysis of loss.  That is, Ms.

Sponaugle provided a loss analysis that ***gave the benefit of the doubt to the government***; she resolved doubts against her own interests.  To be clear, while Ms. Sponaugle denied any wrongdoing, and contends that AAW owes her money,[56] she also, in the alternative, thoroughly analyzed Ms. Hoffman's loss analysis.  In doing so, Sponaugle frequently agreed that for purposes calculating the applicable loss she could accept treating a transaction as unauthorized if she could not be sure that it was authorized.  (*See, e.g.*, Sponaugle Sent. Tr. C at 284-86)

For example, the government pointed to a purchase at a Coach store on April 25, 2014. (*See* Sponaugle Trial Tr. at 1533)  Ms. Sponaugle could not recall if it was for a gift for a staff member, which would have been authorized, or a personal purchase, which would have been unauthorized; thus, in her annotation of the government's spreadsheet, Sponaugle did not "classify it as a business expense, even though it likely was." (Sponaugle Trial Tr. at 1533-35, 1609)  Sponaugle also identified a $177 purchase at CoCo Cove on May 29, 2014 that she thought was an authorized trip that the doctors had told her to take, but she kept it as an unauthorized purchase in her analysis because she could not be sure.  (*Id.* at 1533-34)  Ms. Sponaugle testified that an August 18, 2014 purchase at Dick's Sporting Goods was likely authorized because she had made several purchases at Dick's for work events (e.g., outdoor games for when she hosted a party for AAW's employees), but since she could not remember what she bought on this exact date she was would treat the purchase as unauthorized.  (*Id.*) Similarly, Ms. Sponaugle testified that purchases at JCPenney ($132 on August 18, 2014) and

---

[56] In a sentencing memorandum, the defense argues that $169,372 of the Defendant's credit card purchases between 2012 and 2018 were authorized. (*See* D.I. 106 Ex. A)  The defense then subtracted that from the FBI's total loss amount ($239,075 at the time), resulting in a total of $69,702 in unauthorized purchases. (*Id.*)  Defendant then identified $105,000 worth of bonuses not taken during her tenure at AAW to argue that AAW owes her $35,297. (*Id.*)

Kohl's ($179 on October 28, 2014) could have been gifts for staff or practitioners but, being

unsure, she treated them "conservatively not as approved." (*Id.* at 1534-35)

### 5. Ms. Sponaugle Reasonably Believed She Was Permitted To Use Her AAW Credit Card For Personal Purchases Of Up To $20,000 Annually – A Total Of $70,000 – After She Stopped Taking Bonuses

The Court finds that Ms. Sponaugle reasonably believed she was authorized to spend up

to approximately $20,000 per year, during the pendency of her divorce proceedings, from

October 2014 to March 2018, when she was not taking cash bonuses.[57] The government failed to

prove, by a preponderance of the evidence, the contrary.

Ms. Sponaugle's testimony on this point was clear and credible. (*See, e.g.*, Sponaugle

Trial Tr. at 1283-84, 1604-05; Sponaugle Sent. Tr. C at 245-51 (stating that bonuses in this

period "were taken as the credit card use," as doctors "told me to take it as I need it")) By

contrast, the doctors' testimony on the topic of Ms. Sponaugle's bonuses was inconsistent. Dr.

McCracken testified that Ms. Sponaugle had opted to *forgo* her bonus payments entirely,

believing that Ms. Sponaugle voluntarily took a pay cut of approximately $20,000 annually, in

exchange for more flexible work hours and work-at-home arrangements. (McCracken Trial Tr.

at 527) No documentary evidence was presented to support Dr. McCracken's understanding.

Dr. McCullough, however, testified that Ms. Sponaugle had only *deferred* receiving her bonuses

until after the divorce proceedings were completed. (McCullough Trial Tr. at 664-65, 721-24)

Dr. McCullough's recollection was supported, in part, by email messages she wrote Ms.

---

[57] Because the jury was not required to make any finding as to an amount of loss, the guilty verdict does not necessarily imply that the jury rejected Ms. Sponaugle's testimony about being permitted to take her bonus amounts in the form of charging personal expenditures on her AAW credit card.

74

Sponaugle in June 2016, asking when she would "finally take all the bonuses you have deferred" and noting she would be receiving "a whopper of a back bonus."  (GX72; *see also* GX73 (McCullough asking Sponaugle "when can you finally take your bonuses that you have deferred for all these years.  Time for you to . . . sit on a beach, order a margarita.")）

It is undisputed that conversations occurred between the Defendant and the doctors about what to do with Sponaugle's bonuses in light of the advice she claimed to have received from a family law attorney. (*See, e.g.*, McCracken Trial Tr. at 434-35 ("So Kim came to us when she was going through a separation and divorce and said she was advised by her divorce lawyer that she really couldn't show any additional income because then it meant she would owe him child support instead of being even or him owing her."); *id.* at 511)  There is also no dispute that the doctors agreed to help the Defendant. (*See, e.g.*, D.I. 73 at 7-8) (government pretrial memorandum stating that "[t]he partners, wanting to find other ways to support the defendant, *authorized* specific, one-time personal purchases on the defendant's credit card") (emphasis added)  The disputes are only in the details of what was agreed to and, in particular, the extent of the personal charges Ms. Sponaugle was authorized to put on her AAW credit card in the 2014 to 2018 period.  For the reasons provided in this section and throughout the Opinion, the Court finds that the parties agreed that Ms. Sponaugle could charge up to $20,000 annually on her AAW credit card, with the resulting bills to be paid at the expense of AAW.

When Ms. Sponaugle's marriage was falling apart, a family law attorney she consulted encouraged her to stop taking cash bonuses lest she be required to make child support payments to her soon-to-be ex-husband (who she expected would squander the money on himself and not use it for their children).  She shared the details of this challenging situation with her employers – who were also her close friends – and, she credibly testified, they responded in their

75

characteristically generous and supportive manner, by agreeing she could take her bonuses in an

alternate form.  (Sponaugle Trial Tr. at 1604 ("I had specifically had a conversation with [the

doctors] after meeting with my attorney . . . to ask if they were okay with that; and . . . to come

up with an alternative plan."); Sponaugle Sent. Tr. C at 247 ("And when I went back to the

office, I told [the doctors] that [my attorney] . . . recommended that I stop taking the bonuses and

to take them alternatively.  And [the doctors] told me absolutely, you know, take it as you need

it.")) The agreement, she continued, was that she could take her bonuses (which had formerly

been provided in cash) in the form of putting personal charges on her AAW credit card.  (*See*

*generally* McCullough Trial Tr. at 641-42 ("There would be times when I specifically would be

the one to reach out to her and say, in lieu of a bonus, if you can't take cash, would you prefer to

do something else; for example, a trip."); *see also* D.I. 118 (summarizing Dr. McCullough

testimony and messages relating to bonuses))  From that point on, it was reasonable for Ms.

Sponaugle to understand that she was authorized to make approximately $20,000 of personal

purchases on her AAW credit card annually.  (Sponaugle Trial Tr. at 1283-84, 1604-05)[58]

Consistent with this understanding, when, in March 2018, without warning, Ms. Sponaugle was

---

[58] A $20,000 annual bonus was the number used most consistently at trial.  In his closing
argument to the jury, defense counsel made a brief allusion to adding summer and Christmas
bonuses, which would bring the amount Ms. Sponaugle was due (and, therefore, could have
reasonably believed she could have put on the AAW credit cards) closer to $30,000 a year, for a
total of "$90 to $100,000."  (Trial Tr. at 1742)  Defense counsel's initial sentencing
memorandum argues that Sponaugle was entitled to $105,000 in bonuses (*see* D.I. 106 Ex. A),
and Ms. Sponaugle testified in support of this same amount at the sentencing hearing (*see*
Sponaugle Sent. Tr. C at 46-48).  For the reasons stated in this section, however, the Court finds
that the best estimate of the total bonuses which Ms. Sponaugle reasonably believed she could
have charged to her AAW credit card is approximately $70,000 altogether.

told she was being terminated, she asked about the "$60,000, at least," that she was owed. (Sponaugle Trial Tr. at 1515; *see also* Termination Video at 4:38)[59]

Ms. Sponaugle had received bonuses of $33,000, $10,000, $20,000, and $20,000 in 2011, 2012, 2013, and 2014, respectively.  (McCracken Trial Tr. at 520)  Thus, her average annual bonus in the period leading up to October 2014 was approximately $20,000.  (*Id.* at 521)  For the 3 ½ year period from October 2014 through March 2018, that is equivalent to an anticipated bonus of $70,000.

The government and its witnesses agree that from at least 2011 through 2014, Ms. Sponaugle's bonus structure was that she would be provided a quarterly $5,000 bonus (for a total of $20,000 per year), as long as AAW had a net income that quarter.  (McCracken Trial Tr. at 520; McCullough Trial Tr. at 714; Hoffman Trial Tr. at 1090-91; *see also* Sponaugle Trial Tr. at 1267-68)  Ms. Hoffman determined that from 2015 to 2017, AAW had only five quarters in which it earned a profit, making Ms. Sponaugle's potential bonus over that period only, at most, $25,000.  (Hoffman Trial Tr. at 1096)  However, Dr. McCracken testified that for many quarters in which AAW earned no net income, the practice still gave Ms. Sponaugle her bonus – even in

---

[59] The Termination Video of the March 2018 meeting at which AAW's lawyer confronted Sponaugle with the allegation of fraud shows the attorney saying the following to her:

> The purpose of this meeting is to inform you that your employment with All About Women is being terminated effective immediately.  And the reason for the termination is that it has come to our attention that you have used the company's credit card without authorization multiple times to run up tens of thousands of dollars of expenses for personal [indecipherable].

As the attorney speaks, Ms. Sponaugle repeatedly says "okay."  (Termination Video at 2:45-3:09; *see also* Sponaugle Sent. Tr. C at 216)  She explained in Court: "I didn't even know what to say.  I was completely flabbergasted. . . .  And I was just like okay.  Like, you're asking me to not do this and not do that, okay, okay."  (Sent. Tr. C at 289)

quarters in which the partners themselves did not take bonuses. (McCracken Trial Tr. at 440-41; *see also* Hoffman Trial Tr. at 1095, 1159; GX95 (showing Sponaugle bonuses in Q4 2012, Q4 2013, and Q3 2014 despite AAW having negative net income in those quarters); Sponaugle Trial Tr. at 1270; *see generally* Smith Trial Tr. at 873-74 (stating that she herself received her bonuses about "90 percent of the time")) Thus, the Court finds that Ms. Sponaugle reasonably believed that she was entitled to take the equivalent of $5,000 quarterly bonuses for the period October 2014 through March 2018, which is essentially 3 ½ years, or 14 quarters, for a total of $70,000.[60]

Under these unusual circumstances, and given the culture of AAW and Ms. Sponaugle's role in the practice and her relationship with its partners, the Court is persuaded that Ms. Sponaugle reasonably believed she was authorized to make $20,000 worth of purchases based on her annual bonus structure. In the years prior to her divorce, Ms. Sponaugle's total gross earnings were close to $130,000 annually. (*See* Sponaugle Tr. at 1272-73) Ms. Sponaugle's performance reviews were outstanding. (McCracken Trial Tr. at 522) There is no evidence that the practice sought to reduce her income in or around 2014 through 2018. Instead, it was Ms. Sponaugle who decided to stop taking cash bonuses, based on advice from her divorce attorney.

---

[60] Dr. McCracken also testified that "we often gave a summer and Christmas bonus . . . to all of our work staff," including Ms. Sponaugle. (McCracken Trial Tr. at 519; *see also* Sponaugle Trial Tr. at 1265, 1269-70, 1613; Smith Trial Tr. at 871-74) Ms. Sponaugle testified that her Christmas and summer bonuses were each around $5,000 (Sponaugle Tr. at 1272), but Ms. Hoffman and Dr. McCracken testified that summer and Christmas bonuses were often closer to $1,000 or $2,000 (Hoffman Trial Tr. at 1105; McCracken Sent. Tr. A at 18). Dr. McCracken testified that two of Ms. Sponaugle's four quarterly bonuses were considered her summer and Christmas bonuses. (McCracken Sent. Tr. A at 177) Given the lack of clarity as to Ms. Sponaugle's eligibility for and practice of receiving summer and Christmas bonuses, and whether they were in addition to her four quarterly bonuses, and given that there was only one year in which Ms. Sponaugle received an overall bonus of more than $20,000, the Court concludes that the most appropriate, supported number to use for her bonuses is $20,000 annually.

(*See* Sponaugle Trial Tr. at 1283)  That attorney, according to Ms. Sponaugle, told her to take the bonuses in some other way.  (*See id.* at 1284)  The Court believes the partners, undoubtedly thinking they were helping Ms. Sponaugle in a difficult time – and likely thinking they were acting in the best interests of AAW, which at the time was to all appearances benefiting from Ms. Sponaugle's continued efforts as its CEO – agreed to this arrangement.

The Court recognizes that its conclusion may seem at odds with common sense.  For most employers, it would be unimaginable for the partners to agree that a non-partner employee could forego cash bonuses, so that they would not show up on her income statements – thereby strengthening her case in an ongoing divorce proceeding – and instead take an equivalent amount of money by charging personal expenses to an employer-issued credit card.  But at All About Women, at the time Ms. Sponaugle was CEO, the culture was extraordinarily generous, there were no written policies against such an agreement, and the partners seemed genuinely to care for Ms. Sponaugle and to want to help her through a very challenging time in her personal life.

Therefore, the Court will treat $70,000 of charges Ms. Sponaugle put on her AAW credit card between October 2014 and March 2018 as bonuses and, therefore, authorized – and not as loss attributable to fraud for purposes of sentencing.[61]  The government failed to prove its contrary interpretation of the record by the required preponderance of the evidence.

---

[61] To the Court's knowledge, no one associated with this case has been charged with a tax-related offense, and the forthcoming sentencing for wire fraud presents no occasion for the Court to determine whether anyone could or should be so charged.  In the course of the sentencing proceedings, evidence emerged that appeared to show that Ms. Sponaugle did not report on her income tax returns the $70,000 of bonuses taken in the form of authorized credit card charges.  (Sponaugle Sent. Tr. C at 253 ("The Court: I take it you did not pay taxes on that; is that right?  Ms. Sponaugle: No, I did not claim it because I didn't know I was supposed to claim it."); *see also* D.I. 73 at 9)  It is unclear whether she was acting on advice of counsel in this respect.  That Ms. Sponaugle's explanation of her conduct might potentially create tax liabilities and other potential legal ramifications, only heightens her credibility in the Court's view.  The Court does

### 6.     The Government Failed To Prove That Any Check Payments Were Unauthorized

At trial, only a single government witness, Kathy Storm, testified about checks written by Ms. Sponaugle on an AAW checking account that were allegedly personal in nature.  (Storm Trial Tr. at 990-91)  After trial, for the first time the government identified specific checks and specific amounts that it now contends should be included in the loss amount for purposes of sentencing.  (D.I. 105 at 17-18; *see also* Feb. 11 Tr. at 28 (AUSA: "All that the jury heard about those checks was . . . an example of a check. . . But we didn't discuss it at length because it's relevant conduct for sentencing."))

There is no dispute that these checks are relevant conduct.  *See* SG § 1B1.3 cmt. 5(B)(i) (defining "common scheme or plan" as acts "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*"); *see also United States v. Siddons*, 660 F.3d 699, 704 (3d Cir. 2011) (stating that loss amount "encompasses all relevant conduct that was part of the same course of conduct or common scheme or plan") (internal quotation marks omitted).  The issue is whether the government has proved by a preponderance of the evidence that the checks Ms. Sponaugle wrote were not authorized by the practice.  The Court finds that the government has not met its burden.

The government alleges that Ms. Sponaugle wrote a total of $16,266 of unauthorized checks from 2012 to 2018 to: the Comptroller of Maryland for her 2016 and 2017 taxes; the Internal Revenue Service for her 2017 taxes; a friend, Erika Beard, for Hershey Park tickets; Julie Wolfe, for housekeeping services; and LNZ Consulting, for personal coaching.  (D.I. 116

---

not believe Ms. Sponaugle would falsely make such statements considering the problematic consequences that could follow.

Ex. 1)  While the government proved that Ms. Sponaugle wrote these checks, and did so on an

AAW business checking account (points that are not in dispute), it failed to prove that she was

not authorized to do so.

 As with the credit card transactions, the government relies essentially entirely on the

doctors as to what they remember as being authorized,[62] without documentary corroboration of

the supposedly unauthorized character of the checks.  It points, as well, to Ms. Hoffman's

analysis, which is not based on any deep investigation into the nature of these checks; instead,

Ms. Hoffman relied on the doctors' statements and their own personal conduct without

contacting third parties.  (Hoffman Sent. Tr. B at 66-67 ("Q: Did anyone interview Julie Wolf?

A: No."); id. at 70 ("Q: We have a dispute as to whether it's authorized or unauthorized . . . and

the tiebreaker wasn't reach out to [the recipient of the check]?  A: No, the doctors were very

clear that they never authorized [these checks]."); id. at 147 ("[K]eeping consistent with the

nature of the practice . . . [the other partners'] taxes were not being paid out of the practice."); id.

at 148 ("[T]ypically in a partnership like this, they would pay for all of the taxes of the

doctors."))  For the same reasons already given, the Court is not persuaded by the doctors' lack

of recollection with respect to the checks or by Ms. Hoffman's analysis on this point.

 For example, Ms. Sponaugle testified credibly that she used an AAW check on March 31,

2016 to pay $395 for Hershey Park tickets, acquiring the tickets in order to have them available

to provide as awards to AAW employees of the month, a task within the scope of her duties.

(Sponaugle Sent. Tr. B at 190-92; see also GX204)  The government presented no direct

---

[62] See supra Part IV.D.2.c; see also Hoffman Sent. Tr. B at 49 ("I relied on Kathy Storm and Dr.
McCracken and Dr. Chavez to go through and identify any checks that looked out of place.").

evidence to contradict Ms. Sponaugle's testimony.  Dr. McCracken could not remember if

Hershey Park tickets were ever made available to the staff.  (McCracken Sent. Tr. A at 156-57)

Ms. Hoffman could not remember if the FBI had ever asked the doctors whether they authorized

purchasing Hershey Park tickets.  (Hoffman Sent. Tr. B at 62-63)  In the Court's view, the

government failed to prove this was an unauthorized transaction.  It is not included in the Court's

loss calculation.

The government also failed to prove that the checks written to Julie Wolfe and LNZ

Consulting were unauthorized.  (Hoffman Sent. Tr. B at 43, 64-66; Sponaugle Sent. Tr. B at 69-

72, 184-90; McCracken Sent. Tr. A at 139-43, 215-16 ("I just know that we all used that

housekeeper personally at some point, and we paid for it out of our personal money.  And that is

not something that the practice – that I or the partners ever recall discussing.")  Ms. Sponaugle

testified that Ms. Wolfe's cleaning services were a gift from the practice to her (Sponaugle Sent.

Tr. B at 186), testimony that was corroborated by Mr. Kilmon, a private investigator, who

interviewed Ms. Wolfe (*see* Kilmon Sent. Tr. C at 323-37).[63]  By contrast, the government offers

Dr. McCracken's denial, her hearsay testimony that none of the doctors authorized AAW to pay

for cleaning services for Ms. Sponaugle, and Ms. Hoffman's analysis.  Given the totality of the

record, and all the conclusions the Court has drawn throughout this Opinion, the Court finds the

government did not prove by a preponderance of the evidence that the checks written by Ms.

Sponaugle to Julie Wolfe were unauthorized.

Similarly, Ms. Sponaugle testified that Dr. McCullough had authorized her to obtain

---

[63] Mr. Kilmon's testimony about Ms. Wolfe's statements was hearsay, and less probative than
non-hearsay. *See supra* Part IV.D.3.  It does, however, provide some limited additional support
to Ms. Sponaugle's testimony.

counseling services from Dr. Lani Zlupko (i.e., LNZ Consulting), in light of her pending divorce proceedings. (Sponaugle Sent. Tr. B at 188) Ms. Sponaugle had documentary evidence to support her contentions, including an email from Dr. McCullough to Ms. Sponaugle stating "[p]lease call [Dr. Zlupko] for me. She will help you. Counseling to have Sonny [Ms. Sponaugle's ex-husband] not get it is not productive. Lani is about you and all of the transitions to come." (Def. Sent. Ex. 13 at 1; *see also* DX20 (Zlupko internal records show client as AAW); McCracken Sent. Tr. A at 139) At sentencing, Dr. McCracken, on behalf of all the doctors, testified that none of them authorized counseling, or agreed to pay for it; she characterized Dr. McCullough's email as just "a referral from Dr. McCullough to call Lani" because Dr. McCullough thought Zlupko's services "would be helpful." (*Id.* at 140) Dr. McCullough was not asked at trial about whether she intended to convey to Ms. Sponaugle merely that Dr. Zlupko would be helpful or ***also*** that Ms. Sponaugle was so important to the practice, and under such stress due to her deteriorating marriage, that AAW would pay for Dr. Zlupko's services. Dr. McCullough did not testify at the sentencing hearing. Ms. Hoffman did not ask Dr. Zlupko what she knew about whether the practice was supposed to pay for the services she provided to Ms. Sponaugle; she also failed to identify any evidence to corroborate what the doctors told her. (Hoffman Sent. Tr. B at 69-75) When weighing all of this evidence, in light of the entire record, the Court finds that the government failed to prove by a preponderance of the evidence that the checks Ms. Sponaugle wrote to Ms. Zlupko were unauthorized.

Ms. Sponaugle testified that, starting in 2016, she was required to pay quarterly tax returns for income she received in connection with her partnership in ISIS Med.[64] The tax return

---

[64] ISIS Med is a medical technology-based company named after an ancient goddess; it was, initially, equally owned by Drs. McCullough, Goshow, Larkin, and McCracken, as well as Ms.

83

associated with this income was sent to Ms. Sponaugle by Ralph Cetrulo, who was both her

personal accountant and AAW's accountant, and the return appeared to her to be the business'

tax return.  (McCracken Sent. Tr. A at 231; Sponaugle Sent. Tr. B at 196-98)  Cetrulo had

regularly prepared the practice's tax returns and sent them to Ms. Sponaugle, and she had

regularly then paid the practice's taxes with an AAW check.  (*Id.* at 196-98)  She had never had

to file or pay quarterly taxes for herself before but had always paid quarterly taxes for AAW, so

when Cetrulo sent her the paperwork (including payment coupons) for quarterly taxes she "just

assumed that I had to pay these out of the business, so that's what I did."  (Sponaugle Sent. Tr. B

at 197)  Because she had never before been a partner in a partnership, and had never seen tax

documents quite like those Cetrulo was sending to her, she did not understand they were for

taxes she owed personally.  (*Id.*)  Under these circumstances – none of which were disproven by

the government[65] – the Court finds that Ms. Sponaugle had a good faith belief that the tax-related

checks she was writing were properly written on AAW's account because she reasonably

thought she was paying AAW's taxes and not her own.  At minimum, a truly conservative

analysis of loss would not include these checks (or any of the other checks in Ms. Hoffman's

analysis) as fraudulent.

     Thus, again, the government failed to prove by a preponderance of the evidence that any

of the check payments were unauthorized.  None will be included in the Court's calculation of

---

Sponaugle.  (McCracken Trial Tr. at 419)  ISIS Med also owned a portion of AAW's real estate
ventures, including All About Women Real Estate.  (*Id.* at 420)

[65] Ms. Hoffman acknowledged that she did not consider the partnership income as being the
basis for the tax payments Ms. Sponaugle made using an AAW check; she assumed the check
payments for taxes were unauthorized only because Ralph Cetrulo said so.  (Hoffman Sent. Tr. B
at 147-48)

the loss amount.

### 7.    Calculation Of The Loss Amount

Having found Accountant Hoffman's loss calculation analysis aggressive, rather than conservative; flawed in other respects, as described above; and largely unpersuasive, the Court must now make a determination as to the amount of loss proven by the government.  Based on a thorough consideration of the entire record, and for reasons described throughout this Opinion, the Court finds that the government has proven, by a preponderance of the evidence, that the loss amount attributable to execution of Ms. Sponaugle's fraudulent scheme is at least $40,000 but no more than $95,000.  The Court reaches this conclusion through the following steps (and supported by the analysis throughout this Opinion): (i) taking Ms. Hoffman's final loss calculation as a starting point; (ii) subtracting from Ms. Hoffman's calculation the categories of allegedly fraudulent transactions that the government failed to prove were unauthorized, arriving at a maximum amount of fraudulent loss of $123,142.62; and (iii) further reducing Ms. Hoffman's loss calculation by 25% to account for at least some of the undoubted additional impact of her unsupported assumptions.  This results in a total loss amount of no more than approximately $92,356.97.

### a.    Starting point: Ms. Hoffman's final loss calculation

Although the Court has explained, at length, why it finds Ms. Hoffman's loss analysis to be flawed and unpersuasive, the Court has not deemed it to entirely lack merit.  It is certainly the most comprehensive analysis in the record.  It is also the only analysis conducted by a professional forensic accountant.  The Court does not believe it is plagued by bias or bad faith in any manner.  Also, the way the case was tried to the jury – and largely the way the subsequent sentencing proceedings were conducted – essentially treated Ms. Hoffman's analysis as a starting

point.  The Court finds it reasonable and appropriate to do so as well.

### b.    Specific adjustments to Ms. Hoffman's analysis

### i.    Early period: January 2012 through October 2014

In her final analysis, Ms. Hoffman identified $35,085.63 of "unauthorized, personal

expenses paid for with the defendant's business credit card or checks written from the AAW

checking account before she stopped taking bonuses in October 2014." (D.I. 116 at 1 & Ex. 1)

Of this amount, $32,664.63 is for what the government contends are fraudulent credit card

transactions.  (*Id.*)  The remaining $2,421 is for checks (minus reimbursements from Sponaugle

to the practice).  (*Id.*)

As is evident from this Opinion, Ms. Hoffman's credit card loss amount includes many

transactions the Court has found the government failed to prove, by the required preponderance

of the evidence, were actually not authorized.  Accordingly, the Court is subtracting from Ms.

Hoffman's calculations the following categories[66] and the following amounts of loss Ms.

Hoffman found associated with those categories of credit card transactions for the 2012-2014

period:

| | |
|---|---|
| BJ's Wholesale – Household Items | $421.00 |
| BJ's Wholesale – Misc. Retail Purchases | $71.00 |
| Breast Cancer Walk sign up (Sponaugle personal – no employees charged AAW) | $91.80 |
| Cigars | $29.99 |
| Food – Candy/Cookies/Popcorn, etc. – personal gifts from Sponaugle from various trips (not authorized by owners) | $283.00 |

---

[66] All numbers and categories used in the calculations in this section and the next are taken from
the government's submission at D.I. 116 Ex. 1.  The descriptions given for each of the categories
were provided by Ms. Hoffman.

86

| | |
|---|---|
| Gas/Convenience Stores – Double charges on same day | $386.97 |
| Groceries – BJ's Wholesale | $1,460.00 |
| Home Decor / Furnishings – (misc. purchases by Sponaugle in Maryland & Pennsylvania) | $305.28 |
| Home Decor/ Furnishings – Amazon (shipped to Sponaugle residence) | $126.51 |
| Home Decor/ Furnishings – BJ's Wholesale (purchased by Sponaugle) | $107.00 |
| Target – personal statement shows purchases on same day | $896.55 |
| Walmart – personal statement has personal purchases on same day | $2,589.58 |
| Parking – Newark / Wilmington / Philadelphia | $99.00 |
| Repair & Maintenance – Lowes / Home Depot (personal statement shows personal purchase on same day) | $40.40 |

**TOTAL   $6,890.08**

The Court's subtractions total $6,890.08.  When subtracted from Ms. Hoffman's loss of $32,664.63, this yields a pre-October 2014 maximum proven loss amount due to fraudulent credit card transactions of $25,774.55.[67]

For the reasons explained above, the Court has found that the government did not prove that any of the checks Ms. Sponaugle wrote on the AAW checking account were fraudulent.

_____

[67] The government identified $888.74 worth of purchases for the 2012-2014 period which Ms. Sponaugle admitted were "likely personal."  (D.I. 105 at 14)  This conclusion appears to be based on Ms. Sponaugle's conservative analysis of a government-created Excel spreadsheet of her credit card charges.  (*See* D.I. 105 Ex. A at line 91 (purchases at China Star, PetSmart, Pizza Tower, Burger King, and Sushi House marked by Ms. Sponaugle as "likely personal"); *see also* Sponaugle Trial Tr. at 1533 (admitting that April 23, 2012 purchase at PetSmart was not business expense))  Reviewing this exhibit, the Court can only identify six purchases that Ms. Sponaugle noted as "likely personal," totaling $321.61.  It is not clear what additional $567.13 of unauthorized purchases the government believes Ms. Sponaugle conceded.

87

Therefore, the amount of loss based on checks written in the 2012-2014 period is zero.

Altogether, then, the Court's estimate of the amount of loss attributable to Ms. Sponaugle's fraud for the period of January 2012 through October 2014 is no more than $25,774.55.

### ii.  Later period: October 2014 through March 2018

In her final analysis, Ms. Hoffman identified $206,808.56 of fraudulent "expenses after the defendant stopped taking bonuses." (D.I. 116 at 1 & Ex. 1)  Of this amount, $197,495.91 were, according to the government, in the form of unauthorized credit card charges. (*See id.*)

As explained above, the Court has found that the most reasonable and appropriate loss analysis – one which is conservative and grounded in the entirety of the record, based on what is necessarily implied by the jury's finding of guilt beyond a reasonable doubt and what the government proved by a preponderance of the evidence (considering the totality of evidence presented at trial and sentencing) – should ***not*** treat as loss the $70,000 in cash bonus payments that Sponaugle did not receive during this period of October 2014 through March 2018, when her separation and divorce proceedings were pending.  The government failed to prove by a preponderance of the evidence that Ms. Sponaugle was not authorized to take the $70,000 of bonuses owed to her during this period in the form of personal expenditures placed on her AAW credit card.

Additionally, and as already explained in connection with the early period, Ms. Hoffman's credit card loss amounts include expenditures that the Court has found the government failed to prove were unauthorized, by the required preponderance of the evidence.  Accordingly, the Court is subtracting from Ms. Hoffman's calculations the following categories and the following amounts of loss Ms. Hoffman found associated with those

88

categories for the later period:

| | |
|---|---|
| BJ's Wholesale – Household Items | $3,241.00 |
| BJ's Wholesale – Misc. Retail Purchases | $550.00 |
| Cigars | $157.92 |
| Food – Candy/Cookies/Popcorn, etc. – personal gifts from Sponaugle from various trips (not authorized by owners) | $304.42 |
| Gas/Convenience Stores – Double charges on same day | $1,539.92 |
| Groceries – BJ's Wholesale | $12,859.00 |
| Home Decor / Furnishings – (misc. purchases by Sponaugle in Maryland & Pennsylvania) | $2,824.79 |
| Home Decor / Furnishings – Groupon (misc. purchases by Sponaugle) | $659.50 |
| Home Decor/ Furnishings – Amazon (shipped to Sponaugle residence) | $6009.96 |
| Home Decor/ Furnishings – BJ's Wholesale (purchased by Sponaugle) | $1,420.00 |
| Home Security System | $399.99 |
| Parking – Newark / Wilmington / Philadelphia | $15.65 |
| Target – personal statement shows purchases on same day | $145.69 |
| **TOTAL** | **$30,127.84** |

The Court's subtractions total $30,127.84. Starting with Ms. Hoffman's loss amount of $197,495.91 and subtracting the $70,000 for bonuses and further subtracting the $30,127.84 identified above, the Court arrives at a maximum proven loss amount based on fraudulent credit card transactions for the post-October 2014 period of $97,368.07.

For the reasons explained above, the Court has found that the government did not prove that any of the checks Ms. Sponaugle wrote on the AAW checking account were fraudulent. Therefore, the amount of loss based on checks written in the 2014-2018 period is zero.

89

Altogether, then, the Court's estimate of the amount of loss attributable to Ms. Sponaugle's fraud for the period of October 2014 through March 2018 is no more than $97,368.07.

### c.   Total maximum loss amount based on Ms. Hoffman's analysis as a starting point

By using Ms. Hoffman's loss calculation as a starting point, the Court finds that the maximum total loss attributable to Ms. Sponaugle's fraud for the entire period of the fraudulent scheme – from on or about January 23, 2012 through March 12, 2018 – is $123,142.62 (i.e., the sum of $25,774.55 and $97,368.07).

### d.   The Court will reduce the total maximum loss by 25 percent

The Court will not repeat all the flawed and unsupported assumptions built into Ms. Hoffman's analysis. (*See supra* § IV.D.2)  The Court has partially accounted for those flaws in the categorical reductions from Ms. Hoffman's loss amount explained above.  Nonetheless, the Court is certain that the subtractions it has made are insufficient to fully correct for all that it has found unpersuasive in the FBI's forensic accounting in this case.

Based on its experience presiding over this case, the Court is confident that if it required the parties to devote more time to the task of analyzing the thousands of entries in Ms. Hoffman's chart, even Ms. Hoffman and the government would come to agree that many additional transactions they are presently contending are fraudulent cannot, in actuality, be proven fraudulent.  The Court is further confident that if it could devote even more time and resources of its own to this endeavor then, again, it would identify many more transactions included in the government's loss amount that simply have not been proven to be fraudulent. The Court firmly believes that if it had the time to fully apply its findings, as set out in this Opinion, to each line of Ms. Hoffman's chart, it would find many, many of those transactions are

ones the government cannot prove, by a preponderance of the evidence, are fraudulent. Alternatively, if the Court undertook the massive task of constructing a loss amount from scratch, transaction by transaction, without using Ms. Hoffman's calculation as a starting point, the Court strongly believes the loss amount it would arrive at (starting from something close to zero) would be no more than $95,000.

The Court is not required to determine the loss amount with exactitude. *See Lacerda*, 958 F.3d at 214; *Ali*, 508 F.3d at 145; U.S.S.G. § 2B1.1 app. n.3(C) ("The court need only make a reasonable estimate of the loss."). Nor is the Court required to indefinitely devote the majority of its efforts to this single case. Nor, the Court suspects, do either of the parties wish for sentencing to be delayed any further while more efforts are put into determining the correct loss amount.[68] Rather, it is in the interests of justice, and judicial economy, that the Court make its best determination as to loss amount, sentence the Defendant, and put this case in a posture in which at least a large measure of finality will result – at which point one or both parties may also seek review from the Court of Appeals.

Given all of the foregoing, the Court deems it reasonable, appropriate, expedient, and well-supported by the abundant record and the detailed analysis throughout this Opinion, to reduce the maximum loss amount using Ms. Hoffman's calculation as the starting point ($123,142.62) by 25 percent. While even larger reductions would be well-supported by the record, the 25 percent reduction is appropriately "conservative."[69] Accordingly, the maximum total loss amount proven by the government is $92,356.97.

---

[68] As Accountant Hoffman said of the FBI, "we don't have the resources or time to review every single receipt." (Hoffman Sent. Tr. B at 107)

[69] Some corroboration for the 25 percent figure and its conservative nature is found in the comparison between the credit card loss amount alleged in the Indictment ($322,652) and the

91

**e.   Additional evidence corroborates a loss of no more than $95,000**

For purposes of determining the applicable Sentencing Guideline range, it is not

necessary to be absolutely precise in the calculation of the loss amount.[70]  Instead, the Court

needs only to identify the correct ***range*** of loss, and then identify the Guideline corresponding to

that range.  The analysis the Court has conducted, which yields a maximum total loss of

$92,356.97, falls into the range set out by SG § 2B1.1(b)(1): more than $40,000 but not more

than $95,000.  Additional evidence corroborates the Court's conclusion that the amount of loss

attributable to Ms. Sponaugle's fraud is within this range.

Sponaugle testified that her "conservative" review of Ms. Hoffman's tally of

unauthorized credit card expenses implies a loss amount of no more than around $99,000.  (*See*

Sponaugle Sent. Tr. C at 284-85) ("If I did not feel like it was a business expense or I didn't

know, I would just not put anything in there [to indicate expenditure was authorized]; therefore,

if you add them all up, that's going to be $99,000.")  At an earlier point in the sentencing

proceedings, defense counsel submitted a memo contending, again based on the Defendant's

conservative review of the government's loss memorandum, "the difference between what the

government alleges was unauthorized and what she contends was authorized or was not proven

to be unauthorized is $69,702."  (D.I. 106 at 2-3) (internal emphasis omitted)  Similarly, the

---

corresponding amount in Ms. Hoffman's final analysis ($230,161), which is a difference of
$92,491 – a 29 percent reduction from the Indictment amount ($92,491 divided by $230,161).

[70] More precision is required in order to determine the amount of restitution owed to the victims.
*See* 18 U.S.C. § 3663A; SG § 5E1.1(a) ("In the case of an identifiable victim, the court shall –
enter a restitution order for the full amount of the victim's loss, if such an order is authorized
under . . . [18 U.S.C. § 3663A].").  The parties should, based on their review of this Opinion and
the law, provide their views on the appropriate amount of restitution the Court should order in
their forthcoming sentencing memoranda.

government has argued that even if one believes all that Ms. Sponaugle has said that still supports a loss finding of around $139,271.13 – an amount which is closer to the Court's finding than it is to the government's position on loss. (*See* D.I. 105 at 12-15 (arguing that Defendant did not contest this amount of personal, unauthorized purchases); *see also* D.I. 107 at 13 (government arguing "defendant's admission that [certain] purchases were personal is uncontroverted evidence as to $100,000 of personal purchases on her credit card")) These numbers are generally supportive of the Court's conclusion on loss amount.

Moreover, reviewing the situation holistically, including AAW's culture, the friendships that developed among the Defendant and the doctors, and the trust AAW placed in the Defendant, it seems that what happened here is that at some point Ms. Sponaugle began to take somewhat more than she was entitled to, but not an overwhelming amount more. She abused the trust placed in her, and was sloppier with QuickBooks than she should have been, and also failed (in the later period of her fraudulent scheme) to keep track of the amounts she was charging to her credit card and taking in lieu of bonuses. (*See, e.g.*, Sponaugle Sent. Tr. C at 251) ("That was one of my weaknesses. I never kept a log to show what I spent.") She also failed to keep the partners informed about what she was doing. (*See, e.g.*, Sponaugle Sent. Tr. C at 248-50) (testifying that partners did not tell her expressly to take bonuses on credit card and admitting "clearly they didn't know that I was putting it all on the card") All of this manifested itself in fraud; criminal conduct that was hard for anyone around her to detect.

Nonetheless, the record does not support the government's implicit theory that Ms. Sponaugle developed an elaborate, ingenious scheme to defraud AAW and carefully cover her tracks. She took advantage of a culture in which the doctor-partners constantly told her not to worry about particular purchases, encouraged her to take trips and treat herself well (sometimes

at the *explicit* expense of the practice), and in which it was her role to keep the offices well-stocked with supplies and employee incentives, to run programs to encourage a good working environment, and to make AAW a strong contributor to the community.  There were no clear policies about what Ms. Sponaugle could and could not place on her AAW credit card and, at times, she got greedy and exploited the blurry lines.

At several points, the government's loss theory is predicated on an unstated – and wholly unpersuasive – assumption that Ms. Sponaugle acted carefully and with premeditation to execute a well-crafted and massive fraudulent scheme.  The government relies heavily on what it characterizes as mislabeled QuickBooks entries.  For example, horse nail polish was categorized as "auto expense" and her 40th birthday trip was categorized as staff education.  (*See* Hoffman Trial Tr. at 315, 1045-46)  Ms. Sponaugle explained – with substantial credibility, in the Court's view – that the QuickBooks system (including at least many of its labels) had been set up before she arrived at AAW, and the system often defaulted to pulling up the same label as a given type of expenditure had been classified under a previous time; and she received no real training in QuickBooks and did not fully understand how it worked.  (Sponaugle Trial Tr. at 1247, 1486-87; *see also* Hoffman Sent. Tr. B at 145)  The government suggests she hid unauthorized purchases in various QuickBooks columns, to conceal her large amount of fraud, when the reality seems to be that she was unorthodox and somewhat careless in how she did her categorization.[71]

---

[71] Ms. Sponaugle further explained that she placed purchases into various QuickBooks categories as placeholders when a credit card payment was due, and before she had the final credit card statements, which were needed to correctly categorize some items.  (Sponaugle Trial Tr. at 1452-53, 1491-92)  Later, when she had the statements in hand and could confirm what any previously unknown purchases actually were, she would reclassify some items into other QuickBooks categories.  (*Id.* at 1491-92, 1495-98, 1563-64)

Similarly, the government implies that Ms. Sponaugle had meticulous insight into the distinction between an audit and a reconciliation, a contention that is not borne out by the evidence.[72]

The government's evidence of concealment was weak. While the government insisted that Ms. Sponaugle prevented the doctors from accessing AAW's credit card and bank account statements, the government did not prove these allegations. It is beyond dispute that all of these records belong to AAW; it is implausible that a phone call (or maybe two or three calls, or at worst a visit to a branch office) from one or more of the doctor-partners to these financial

---

[72] The government also made much of the fact that there were no "audits" of AAW between 2012 and 2018, when the partners thought that the practice was being audited. (*See* McCracken Trial Tr. at 415-18; McCullough Trial Tr. at 688) Ms. Sponaugle thought that she had the oversight the partners wanted. (Sponaugle Trial Tr. at 1243, 1563) ("I again believed that if there was something in error, that my accountant would be overseeing it and [would] tell me that there was an error.") She explained:

> . . . I thought I was being looked at [by the accountants] every month.
>
> . . .
>
> . . . When I took over the books in '05 or '06, I told them I didn't want to do it. I had no experience doing it. And the only way I would ever do it is if somebody oversaw me every month, and they are like no problem. And it never changed. I never got a different paper saying we're going to change what we're doing or we're not going to do this part or we're not going to do that part. I never received that.

(Sponaugle Sent. Tr. C at 277-78)

The accounting witnesses explained the differences between an "audit" and mere "reconciliation" and testified that AAW was only subject to monthly bank reconciliations. (Cetrulo Trial Tr. at 886-89; Storm Trial Tr. at 975-78) A reconciliation ensures that a company's general ledger matches up with the bank statement, while an audit is an investigation of a company's operations. (*See id.*) The government presented no evidence that Ms. Sponaugle, or the average lay person, understood this distinction, much less that Ms. Sponaugle fiendishly exploited these differences to further her fraudulent aims.

institutions would not have resulted in the practice being given access to its own accounts. (*See generally* Sponaugle Trial Tr. at 1500; McCracken Sent. Tr. A at 190-95) Furthermore, the record supports a conclusion that on the only occasion when a doctor asked Ms. Sponaugle for access to financial records – in March 2018, shortly after Defendant gave notice she would be resigning from her position – Ms. Sponaugle pulled the records together and left them in the office of the requesting partner, Dr. McCracken. (Sponaugle Trial Tr. at 1499; McCracken Sent. Tr. A at 192-95; *see also* GX62 & GX63 (text messages on March 3-5, 2018 between Dr. McCracken and Sponaugle showing Sponaugle helping provide access)) While Dr. McCracken testified that she never received the records (McCracken Trial Tr. at 456-57), she could not dismiss the possibility that Ms. Sponaugle left the records in her office – as Ms. Sponaugle said she did, and as contemporaneous text messages from Ms. Sponaugle to Dr. McCracken seems to corroborate (*see* GX62 ("I pulled all ur cc receipts. I will make sure you hav them mon."); *see also* Def. Sent. Ex. 32 (February 9, 2018 text message from Defendant to Dr. McCracken saying she had put credit card receipts on doctor's desk)). The government's assumption seems to be that Ms. Sponaugle was so clever that she *pretended* to leave the records for Dr. McCracken and then *covered her tracks* with these (false) text messages. Nothing in the record supports viewing Ms. Sponaugle as this type of hardened, seasoned criminal.

The government's portrayal of Ms. Sponaugle as a massive fraudster is further undermined by several other undisputed facts. In the Court's view, an individual who had spent years carefully hiding widespread fraud would likely not have taken another job in the very same building as the "scene of her crime." Nor would such a person likely have freely offered her consulting services to the victim of her massive crime for months following her resignation. (Sponaugle Trial Tr. at 1511) Nor does it strike the Court as plausible that if Ms. Sponaugle

committed nearly as much fraud as the government contends, that she would also have (i) immediately asked about the $60,000 of bonuses she was owed when, without warning, she was terminated; (ii) hired an employment attorney to try to get back from the practice monies she claimed she was owed; and (iii) reached out, on her own and through her attorney, to try to get the doctors to talk to her about what they thought she did wrong. (Sponaugle Trial Tr. at 1515; Allen Trial Tr. at 1619-20)

All of this, in the Court's view, corroborates the Court's conclusion that the government failed to prove a loss amount exceeding $95,000.

## V.   SENTENCING GUIDELINES COMPUTATION

Based on the Court's rulings above, the Sentencing Guidelines calculation is as follows:

<u>Offense Level</u>:                                **15**

       *Base offense level*:                                 *7*

       The guideline for a violation of 18 U.S.C. Section 1343 is USSG § 2B1.1. The base offense level is 7 when the statute of conviction is referenced to this guideline and the offense of conviction has a maximum term of imprisonment of 20 years or more.  USSG § 2B1.1(a)(1).

       *Specific offense characteristic (loss amount)*:          *+6*
       Pursuant to USSG § 2B1.1(b)(1)(D), a six-point enhancement applies when the loss amount is more than $40,000 and not more than $95,000.

       *Victim related adjustment*:                          *0*
       The government failed to prove that AAW or any of its partners suffered a substantial financial hardship attributable to the Defendant's fraud.

       *Adjustment for role in the offense*:                    *+2*
       The defendant abused a position of private trust.  USSG § 3B1.3.

       *Adjustment for obstruction of justice*:                 *0*
       The government failed to prove by a preponderance of the evidence that the defendant committed perjury.

<u>Criminal History Category</u>                     I
It is undisputed that Ms. Sponaugle has no criminal history.

<u>Sentencing Guidelines Range</u>:                 18 – 24 months

## VI.    CONCLUSION

Much litigation stems from competing perspectives on the same set of facts.  Individuals'
perceptions of the same realities may often, and easily, differ.  Individuals' motivations
sometimes also skew their understanding of what they have observed.  Human memory, too, is
far from infallible.

For these and similar reasons, the undersigned Judge believes that the victims in this case
genuinely and sincerely think that Ms. Sponaugle defrauded them out of hundreds of thousands
of dollars.[73]  The Court also believes that the FBI investigators and the United States Attorney's
Office prosecutors likewise think that the evidence establishes a large-scale, long-running
fraudulent scheme, at least approaching what the victims subjectively experienced.[74]  But the
Court further believes – and finds, based on the extensive record, including its own assessments
of credibility during the lengthy sentencing proceedings, at which each of the main testifying
witnesses was examined at length by the government, by defense counsel, and by the Court –
that the Defendant did not intend any enormous amount of fraud.  The Court believes the
Defendant knew she was exploiting her generous employers for something more than she was

---

[73] The Court believes that when the doctors at AAW looked at the credit card statements in the
days immediately after Ms. Sponaugle tendered her resignation, they quickly concluded – in
good faith – that they had been duped, that they had allowed her to control the financial activities
of the practice without supervision for a dozen years, and that she had abused that trust by
defrauding them.  The doctors quickly decided, for reasons they believed were just and
necessary, to go to the police, to hire a lawyer, and to terminate Ms. Sponaugle, all to remove a
threat as efficiently and quickly as possible, putting aside – as they must have deemed prudent –
any personal affection for, and any friendship, business, and financial relationships they had with
Ms. Sponaugle.

[74] The Court believes that the Delaware State Police, FBI, and USAO saw in this case a once
thriving female-owned-and-operated OB-GYN practice that had been gruesomely victimized by
its own trusted CEO.  This looked to them, at all pertinent times, like a massive, long-running
fraud, perpetrated by a criminal who needed to be stopped.

entitled to, likely justifying to herself that she deserved it, given how much she did for the practice, how much she sacrificed in her personal life, and how much money she helped AAW make. The undersigned Judge believes this is what the jury found as well.

Defrauding a crucial health-care provider of up to $95,000 over six years is a serious crime. Ms. Sponaugle is not innocent; she is a convicted federal felon and will be sentenced as such. She will also live the remainder of her life with that stain on her reputation. But the government did not come close to proving that Ms. Sponaugle defrauded AAW of hundreds of thousands of dollars or that her criminal conduct (as opposed to her departure from the practice) was a significant factor in the fate AAW suffered after her departure.

The Court will have all of this, as well as whatever additional arguments the parties wish to present, in mind as it makes the remaining difficult decision in this case as to what is the appropriate sentence for Ms. Sponaugle for the offense for which she was convicted.