IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Crim. No. 19-103-LPS |
| | : | |
| KIMBERLY SPONAUGLE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

The Court sentenced the Defendant, Kimberly Sponaugle ("Ms. Sponaugle" or "Defendant"), on August 31, 2022, for her conviction for wire fraud, a violation of 18 U.S.C. § 1343. In doing so, the Court first resolved the parties' disputes relating to the amount of restitution Ms. Sponaugle would be ordered to pay her victims, All About Women PA ("AAW") and its six partner-doctors during the Defendant's six-year fraud scheme. In addressing restitution, the Court stated as follows, as reflected in the transcript of the sentencing hearing:

> Under the Mandatory Victim Restitution Act, 18 U.S.C. Section 3663(A)(a)(1), restitution is mandatory to victims of property crimes like wire fraud, which is the crime that brings us here today. The award must include the full amount of each victim's losses, which the statute defines to include in this context los[s] from the fraud as well as lost in[come and] attorneys' fees. The statute also sets out certain time constraints for when request[s] for restitution are to be made and puts the burden of proof on the government to prove by [a] preponderance of the evidence the victim's rights to restitution and to the proper amounts.
>
> Here, apart from the request for compensation for the amount of loss caused by the defendant's criminal conduct, the remainder of the government's request for restitution is untimely. Title 18 United States Code Section 3664(d)(1) provides that the government should provide to the Court a restitution figure 60 days before sentencing. Here the government did not do so until August 23rd, eight days before sentencing. And then the amount requested has fluctuated significantly, even over the past eight days.
>
> The lateness of the request from the government is not excused, in my view, by the unusual circumstances of this case; rather, I think those

1

circumstances make the government's failing all the more glaring. As the defense points out in its letter yesterday, the parties and the Court have talked about sentencing, including the amounts of loss involved[,] since a few days after trial concluded last December, a period of now more than eight months. The government filed its first sentencing memo in January, and there have been several teleconferences and four days of in-court proceedings since then. Yet on no occasion [before] August 23rd did the government even suggest that it was seeking restitution for anything other than the loss amount caused by the fraud.

Notably, the government also opposed the defendant's subpoena for more evidence on August 4th. And it did so, I thought, properly and persuasively because I held that day, not for the first time, that the evidentiary record regarding sentencing was already closed. That same reasoning means that the record should be closed to the government's new evidence as well.

Nonetheless, the Court recognizes it has discretion to excuse the lateness of the government's latest request for restitution. And notwithstanding all of the concerns I have just explained about the timing of the government's request, I am excusing the government's tardiness because[,] ultimately[,] restitution is not about the government, it's not even really about the defendant, it's about fairness to the victims. And there is no indication it's the victim's fault that the government waited way too long to even hint that it intended to seek restitution for lost income and attorneys' fees. So I have considered the untimely request.

In doing so, though, I confront the nature of the government's evidentiary showing, which is not very strong. The government has failed to meet its burden by a preponderance of the evidence to show the specific amount of time and the specific amounts of lost income for each of the doctors. Now, perhaps, as we've discussed, this is because of the evidently rushed nature with which the request and the record on these points was compiled. I have, I believe, no sworn evidence at all. I have e-mails and minimal records, which I don't think very persuasively prove the number of days of work missed by each of the doctors or the amount of income they lost or that the attorneys' fees incurred were necessary to the government's investigation or prosecution.

Also given the . . . limited records that have been provided and their timing, the defendant has been substantially prejudiced by not having an opportunity to challenge the government's evidence on these points. Given how successful the defense was in challenging much of the government's other evidence in connection with sentencing, it seems most likely that a full and fair proceeding relating to restitution would result in lost income and attorney fee numbers far lower than the government's first pass and second pass and maybe third pass estimates, which is what I have.

This conclusion is unfortunately strongly supported by the government's constantly shifting estimates of lost income. We talked about the Dr. McCullough

2

numbers; it is pretty striking that within a period of two hours the lost income figure for Dr. McCullough dropped by more than two-thirds.

I have authority to delay the determination of the restitution amount . . . up to 90 days after the final judgment, that would potentially create an opportunity for defendant to take discovery, to challenge the evidence that has been provided with respect to lost income and attorneys' fees. I have the sense that nobody wants me to do that, and I don't think it's the right approach under the totality of circumstances here. My guess is we would need the full 90 days, there would be discovery, there would be briefing, there would probably be another hearing and probably another opinion. I think the prudent course is to instead come up with a number that is grounded in the record and helps us, hopefully today, bring some closure to this case.

So I will be exercising my wide discretion to make a reasonable estimate of loss[1] . . . to reach what is . . . under the circumstances "[a]n expeditious[,] reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim[s]."[2] . . . Accordingly, this is the restitution I'll be ordering.

First, I'm awarding restitution to be split among the six doctor partner victims in the total amount – . . . $92,356.97 [–] which was, as I explained at length in my August 15th opinion, the most reasonable estimate of the amount of money the defendant fraudulently obtained from these victims, as calculated in that opinion and for the reasons explained there. I will detail, when I pronounce the specific sentence, the allocation of these moneys among the victims, but I'm just dividing it by six. Ms. Sponaugle's alternative calculation for [this] amount of the restitution award is not persuasive for reasons I also gave in my opinion and as the government explained in its August 25th sentencing letter.

In terms of lost income, I am giving a number that is, I think, grounded in the record, is fair considering the evidence and the evidentiary failings I've identified, does account for the defendant's lack of opportunity to investigate or challenge the evidence other than at a high level, and reflects the other concerns I've raised, but while reasonably estimating the amount of lost income and helping to move the case towards a conclusion. I do this also because – it's undisputed [and] it's obvious that the doctors have been in court very frequently, and it's obvious from the record that they participated in the investigation and prosecution outside of court and were of great assistance to the government. So there can be no doubt that they lost significant amounts of income, that's really

---

[1] *United States v. Faye*, 728 Fed. Appx. 124 (3d Cir. Apr. 3, 2018) ("District courts have wide discretion to make a reasonable estimate of loss when ordering restitution.").

[2] *United States v. Console*, 13 F.3d 641, 674 (3d Cir. 1993) (internal quotation marks omitted).

3

not [in] dispute; the question is just what is the right amount, particularly without spending 90 more days on this.

So I have come up with numbers, which I'll tell you in just a moment, they basically are in the 40 to 50 percent range of what the . . . government has asked for on behalf of the doctors. I think given all the findings I've made about the reliability of estimates and other numbers in this case, the moving target and all the other concerns, this is fair and this is a better approach than across-the-board, same number for each of the doctors. The doctors, by their own account and it's entirely proven in the record, have spent different amounts of time, lost different amounts of income; and so there's no reason for an across-the-board, same dollar figure.

[In total,] . . . that is about $46,000 of restitution for lost income. I don't believe that is arbitrary, I believe it's well grounded in the record based on the totality of the record, and considering the requirement that I resolve uncertainties in a manner that tries to be fair to the victims.

In terms of attorney fees, I'm not awarding any restitution for attorney fees incurred by AAW. [While] I can accept that some amount of legal advice is no doubt necessary, the evidence I have on what work the attorneys did for AAW, what they billed for, at what rate, what their level of experience was and the necessity of what is depicted in the billing entries is sparse . . . to put it generously, [and] the defense, again, had no opportunity to challenge any of it. It seems that much of it was incurred in connection with a subpoena for materials that turned out to be, in the Court's view, crucial to a fair and just resolution of the sentencing decision, if not trial.

And it may be that AAW was . . . concerned not [only] for its own interest, but [also with] protecting other's HIPAA rights. I'm unclear on this very sparse record why that couldn't have been worked out, much less ex[p]ensively [and] . . . why it couldn't have been resolved by a protective order.

Fundamentally, there's just not proof by a preponderance of the evidence to support any amount of money to AAW for attorneys' fees. And that's all even assuming, which I am willing to assume without deciding, that such an award would be available to a crime victim in this circuit, notwithstanding [cases which] . . . have said recovery of this nature of attorney fees would not be recoverable.[3]

So the total restitution award, if my math is correct, is $92,356.97 plus $46,000 for lost income, which I believe adds up to $138,356.97.

---

[3] *See United States v. Papagno*, 639 F.3d 1093, 1095 (D.C. Cir. 2011); *United States v. Yu Xue*, 2021 WL 2433857, at *5 (E.D. Pa. 2021).

4

Later, the Court provided its reasoning for all portions of its sentence, stating, as reflected in the transcript of the sentencing hearing, as follows:

> I have considered the relevant factors the law requires me to consider, which are set out in Title 18 United States Code Section 3553(a). They begin with the sentencing guidelines, which here, based on all my rulings, recommend a sentence of imprisonment of 18 to 24 months. I must, as the law also requires, make an individualized assessment of the sentence based on the facts presented. I'm also ultimately obligated to impose a sentence that is sufficient, but not any greater than necessary to achieve the purposes of sentencing. And I have done my best to do all of this.
>
> Everyone here knows that this sentencing process has gone on a long time; longer, I think, than any other I have been involved with before. All of that extra process and time, which we've all participated in, has been, I think, well warranted for reasons I've tried to explain, most especially in my long August 15th opinion.
>
> In order to do my job as a sentencing judge, I needed help from the parties, a lot of help. I needed evidence, a lot of evidence. The trial record was not nearly . . . sufficient to enable me to make the difficult factual determinations that were necessary in order to craft a reasonable and appropriate sentence for Ms. Sponaugle. And even with all that evidence and all that help and all the time that we put into it, this has been a very, very difficult decision for me to make.
>
> But I have made my decision. I'm not going to delay any longer. I'm not going to make Ms. Sponaugle or the victims or anyone else wait any longer to hear my sentence, so I will, as I indicated before the break, tell you my sentence and then at some length tell you the reasons for my sentence, and then finally I will ask if there's any further objections or issues.
>
> So my sentence is this: I am not sending Ms. Sponaugle to prison. Instead of a period of incarceration, I am placing her on probation for 24 months, six of those months will be with a condition of home confinement. I am also ordering Ms. Sponaugle to perform 250 hours of community service.
>
> I am not ordering a fine. Any money that the defendant can and should pay and that I am ordering her to pay should go to the victims and not to the government. A fine would go to the government. She also has a currently – has a reduced income and a family to support, so a fine is just not warranted.
>
> And I'm ordering, as [I] explained . . . earlier today, restitution in a total amount of $138,356.98, which includes the $92,356.97 in loss as well as the $46,000 of lost income to be broken down in the way I will explain towards the end, but that we've all discussed already. The restitution amount must be paid in

full no later than 60 days from when I enter my judgment of conviction. I will waive interest accruing on the amount of restitution.

I believe my sentence is, as the government insists [is] necessary . . . under the law, . . . a "meaningful" sentence[.] . . . I do not believe it silences anyone or e[vad]es or defies the jury verdict. And I'll attempt to explain why that is.

First, I had to consider, as the law requires, the nature and circumstances of the offense, the need for a sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense.

The nature and circumstances and seriousness of the offense are addressed in detail in the August 15th opinion, but I'll summarize somewhat here. Over a six-year period from January 2012 through March 2018, the defendant abused her position of trust within All About Women, which I may refer to as AAW, an important healthcare provider in New Castle County[,] serving approximately 40,000 women in Delaware, Pennsylvania, New Jersey and Maryland. She abused her position of trust to defraud AAW and six doctor partners of in excess of $92,000. She committed this fraud by putting unauthorized personal charges on her AAW issued credit card[,] [e]xploiting her employers' generosity, the lack of clearcut policies for credit card use within the company, the doctors' trust in her and the fact that she had sole charge over the financial aspects of the practice. Her crimes have had a tremendous impact, particularly for the direct victims, the six doctor partners who were partners during the time of the scheme who together lost over $92,000.

. . . I have not been persuaded that AAW or its partners suffered substantial financial harm, as that term is defined under the guidelines, and while, as I explained in the opinion, the loss amount that the government proved was equal to only a very small percentage of the practice's revenues over the period of the scheme . . . .
    [B]y my calculation, the practice had revenue of about $33 million over the six years of the scheme and the $92,000 of loss is, by my calculation, about . . . 0.28 percent of the revenue. So I was not persuaded that this was substantial financial harm, but, still, $92,000 is $92,000; in absolute terms, that's a real financial loss.

This case is not just about financial loss, of course. As the government rightly states: "The impact the defendant's actions had on AAW and the community stretched further than financial loss."[4] . . . The nonfinancial impact of the crime was far greater than the financial impact and includes an impact on

---

[4] D.I. 130 at 6.

the rep[u]t[a]tion of the practice, the doctors' loss of trust in other people, and as the government puts it: "Deep emotional stress to the partners."[5] . . .

There has been much discussion and debate as to the cause or causes of the demise of AAW. And with it the cause of any adverse impact on healthcare for around 40,000 women in this region. What is clear is that soon after Ms. Sponaugle's fraud was detected by AAW, AAW was no longer an independent practice. To varying degrees the doctor victims at AAW blame this result on Ms. Sponaugle and largely on her fraudulent conduct. The defendant has other explanations for why AAW failed so soon after she was terminated. I have not found it necessary to make a finding on this dispute. For purposes of sentencing, I think it's enough to say that Ms. Sponaugle shares at least some significant degree of responsibility for what happened to AAW after she was terminated, just as she shares much responsibility for all that occurred, good and bad, at the practice during her long tenure there.

In evaluating the nature and circumstances of the offense and what type of sentence in the very unique context presented by this case will promote respect for the law, it's important to emphasize just how unusual the crime scheme here was. This is a case that, as has been said for some time, largely dwells in the gray area between what was permitted at AAW and what was not permitted. The defendant's motivation seems to have been to give herself a little extra compensation in return for having[,] by all accounts, including the accounts of the victims, for having thrown her entire self, energy and life into helping AAW to thrive[.] [S]he sacrificed a lot for the practice and she created a great deal of value for her employers, and she seems to have convinced herself that she was entitled to take a bit more for herself than her employers had agreed to give her.

This is not a typical fraud case where, say, a Practice Manager or Chief Financial Officer occasionally or regularly skims certain amounts of money from her company's accounts or where she fails to pay the company's taxes and pockets that money for herself. In such cases which, in my experience, are sadly typical, there would not be one minute where a defendant in that position could have thought it was permissible or even remotely justifiable. Here some of the doctors allege that the defendant left AAW bills unpaid so she could steal money that would otherwise have been used to pay those bills on behalf of the practice, but the government failed to prove such a connection and it didn't even, I think, try to do so. Here then in contrast to a typical fraud case, Ms. Sponaugle is a criminal because she did something her bosses told her that she could do, but she did it to a significantly greater extent than they told her she could do it. She was allowed, at times, to charge personal expenses to AAW and at other times not allowed. The crime here was doing it too often. That strikes me as a

---

[5] *Id.*

7

materially different type of crime than we usually see, or at least that I usually see in Federal fraud cases. And my sentence reflects that fundamentally different nature and circumstances of the offense.

Another factor that makes Ms. Sponaugle's crime unusual and stand out is that Ms. Sponaugle undisputedly did a good job for the practice. There is evidence that the practice grew in terms of number of providers, number of employees, revenue, profit, and in other aspects over the course of her tenure as Practice Manager. It appears that when she started with AAW it had something on the order of $800,000 in debt, which she helped to retire. It did not own its own office locations, which it did by the time she was terminated. Her evaluations were exemplary. And all of this is to her credit and is factored into my sentencing decision.

It does not, however, of course excuse her criminal conduct. No matter how much money she helped the practice legitimately make, that does not create a license for her to use unlawful means to enrich herself at the expense of the practice and its partners. But it does distinguish this case from all other fraud cases that I have seen.

These realities, in combination with everything else I have said and written about the offense conduct here, mean to me that the nature and circumstances of the offense just do not justify a sentence that includes prison time.

I disagree strongly with the government's insistence that a noncustodial sentence fails to reflect the seriousness of Ms. Sponaugle's criminal conduct. I think the seriousness of the crime here is accurately reflected in the totality of this serious sentence I am imposing. Even if the defendant does not think this is a serious sentence and she thinks it shows she was a victim and not a criminal, and she thinks the community will view her as such, I don't think that. And I think few reasonable observers, if truly familiar with what occurred here, would reach that conclusion.

I also believe my sentence includes significant punitive components and reflects that the defendant has been meaningfully punished and will be by my sentence. The investigation, the prosecution and the sentence together provide just punishment for Ms. Sponaugle's offense. She is being confined in her home, except for work, medical appointments, religious activities and any exceptions expressly approved by the probation office[.] Effectively, this eliminates whatever social life she might otherwise enjoy. I think that's a particularly apt component of her sentence, given how upset the doctor victims have noted that they are about social activities that she enjoyed at their expense. And the recent complaints, at least from Dr. McCullough, about [champagne] parties the defendant has apparently attended[.] [T]here will be none of that for at least six months.

She's being financially punished. Although restitution is measured by the loss to the victims and it is principally for the purpose of compensating the victims, I believe that in order to pay the hefty restitution amount that I'm ordering within the time frame I'm ordering, two months, 60 days she's likely either going to have to liquidate her 401(k), which given her age will mean having to pay financial penalties and a big tax bill, or she's going to have to sel[l] her home or take out a line of credit on her home at a time when interest rates are not that great and many home values are declining.

She is being punished by the condition of probation that prevents her from having access to personal identifying information or her employer's financial assets. This condition is primarily to protect others and ensure she doesn't have an opportunity to commit a future crime, but it also has a truly punitive component. This condition, along with the fact of her conviction, will greatly reduce the defendant's job prospects. And will particularly reduce and maybe even eliminate her ability to get a job that makes the best use of her skills and experience [and] which, not incidentally, would likely have maximized her earnings. Such opportunities will not be available to her for at least two years.

She's being ordered to perform community service for 250 hours; that's the equivalent of more than six weeks of full-time service over the next two years. This has punitive aspects; in that, while Ms. Sponaugle admirably already volunteers a great deal, the service I am ordering is not by her choice and it can only be performed at a site approved by the Probation Office, which might limit her options. It's also . . . a very significant amount of time. I'm not going to dictate to the Probation Office where they have this community service incur, but I would encourage the Probation Office to consider looking for an opportunity where the defendant could serve in some capacity to help promote women's health in some aspect as partial remediation of the harmful effects of her crime.

All of these punitive aspects of my sentence are in addition to the punishments she has already experienced, the collateral consequences that we've heard about today, which include losing her job at Christiana Spine, having the greatly reduced job prospects because of the investigation and the conviction and the impact on her rep[u]t[a]tion. The fact that she will go through the rest of her life as a convicted Federal felon. And the fear and stress that she has lived with for years that she would have to go to prison. A fear which, by the way, she will have to continue to live with if the government appeals or if she were to violate any of my conditions of probation. The violation of conditions of probation could end the defendant right back here in court and possibly with some sort of additional sanction.

There are also less tangible but nonetheless real punitive impacts of this case for the defendant, including the ridicule her children [have had] to suffer, having to watch as her fiance and her husband and her closest friends had to come into court and stand in a public forum and essentially beg a Federal Judge for her

9

freedom. Having to read her kid[s'] letters to me asking the same thing. Today, herself, she felt it necessary to exercise her right to stand up in this public courtroom in front of the prosecutors and everyone assembled and plead for mercy. She's had to see some of the ugliest details of her personal life made public in an adversarial process. All of these are consequences and they add to the punitive component of my sentence.

I just emphasize, however, all of these things are the defendant's own fault. She is suffering these punishments and receiving this sentence because of her decision to commit a serious crime.

I am . . . imposing a noncustodial sentence on Ms. Sponaugle, but it's not because she did nothing wrong. It's not because she is a victim and not a criminal, it's because the totality of sentencing factors make this the fairest and most reasonable sentence on the whole. And the point I'm trying to make here is that in my view the government is wrong to overlook the fact that despite not being sent to prison, the defendant is being, has been and will as a result of my sentence be punished.

Before I turn to the next factor, I just want to add that my focus here is on the defendant, because she's the person I'm sentencing and that's my job under the law today . . . to sentence the defendant. But I don't mean in any way to detract from the suffering that the defendant caused to the victims, many of whom are here today and have been here throughout the case. I'm not at all minimizing that. I have fully considered that. I ha[d] more to say about that in connection with the restitution decision earlier today, which is more victim-focused, but my job right now is to really focus on the defendant and the right sentence for her. So I've considered all of that.

I have next considered, as the law requires, the need that my sentence adequately deter the defendant and others like her and protect the public. Ms. Sponaugle has no criminal history, not even an arrest. This is her first and only interaction with the criminal justice system. All else being equal, this experience should deter her more effectively than it would be expected to deter someone who had already been through the process and then committed another crime. She has been on pretrial supervision for three years and has been in full compliance with all conditions. The recent speeding incident, I don't take to be noncompliance with her pretrial release. At no point has the government, to its credit, sought her detention nor has it urged the Court to move more quickly toward finality in order to take a dangerous criminal out of the community. She has shown that she is entirely amen[]able to complying with the law and being supervised in the community without needing a term of incarceration.

I'm persuaded, based on all I have learned about Ms. Sponaugle, that she does not need a prison sentence to be deterred from ever committing another crime again in the future. Therefore, the interest[s] of specific deterrence and

10

protecting the public from Kimberly Sponaugle do not warrant a custodial sentence.

The government writes: "Only a custodial sentence will force her to accept the seriousness of her conduct and deter her from defrauding others if given a chance."[6] . . . [H]aving heard the same argument today from the prosecutor, I just disagree. In fact, I have never been more confident that a defendant I am sentencing will not recidivate.

It is in this context that I want to address the parties' dispute about Ms. Sponaugle's purported lack of remorse, as it is in the context of specific deterrence and protection of the public that remorse and acceptance of responsibility become relevant. I think I can and should consider the defendant's lack of remorse as the cases cited by the government in its letter brief yesterday fully support. But under the circumstances here, I am not persuaded by the government that the defendant's seeming remorse[less]ness warrants or even strongly supports a custodial sentence.

The government describes the defendant as "utterly remorseless about her actions."[7] Adding that she "refuses to recognize the harm she caused the owners of AAW."[8] Claiming that she "repeatedly shows disrespect for the jury, the law and the legal process."[9] . . . I do not see it this way.

The defendant had an absolute constitutional right to contest the charges and that right does not dissipate with a guilty verdict. She is entitled to appeal. Even if she loses her appeal, she will be free to think for the rest of her life that she was wrongly convicted. She has that right and I cannot change her mind on those points. The government is wrong then when it argues that "The only way to force the defendant to reckon with her own conduct" is a term of incarceration.[10] . . . I see absolutely no reason to think that a 24-month prison sentence is necessary to make Ms. Sponaugle recognize she is guilty. Given what I have learned about her over the course of these proceedings, I don't think she will ever believe she is guilty and that is her right.

It's not quite the same thing, but I don't imagine that the government agree[s] with how I see the case, even though I'm a neutral observer, I wrote a detailed opinion and now I'm giving a lengthy analysis today. It does not show

---

[6] *Id.* at 16.

[7] *Id.* at 2.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 5.

11

disrespect for the Court or for the legal process for the government to continue to believe that it uncovered a massive fraud and a dangerous felon who should be in prison for several years. I expect the government will continue to believe in its case. The government, too, may take an appeal. None of this disrespects the process or the Court.

Anyway, what is important to me about the defendant's attitude is whether it indicates she is a risk of recidivating. Sometimes when a defendant doesn't admit she engaged in wrongdoing it raises a concern that she is more likely to commit another crime. I don't see that at all with Ms. Sponaugle. The cases cited by the government in its letter brief of yesterday support the Court's view that here the princip[al] importance of remorse or lack of it is in connection with assessing the risk of recidivism. And here, for the reasons I have tried to explain, I do not see a risk of recidivism.

I also want to briefly address the interest of general deterrence and protecting the public from white collar fraud generally[.] [T]his interest too does not favor incarcerating Ms. Sponaugle.

As I've already explained in connection with the nature and circumstances of the offense, and as I think would be evident to anyone with the slightest familiarity with the facts of this case and how it has been litigated, this is just not the typical fraud case. That Ms. Sponaugle, Practice Manager for 12 years at AAW, a practice with no written policies on [proper use of] business credit cards, a practice where generosity was so prevalent that the defendant was repeatedly permitted to charge personal items on her business credit card and where she was sent on expensive family vacations at the expense of the business, that she who on some indeterminate number of occasions, most likely totaling around $92,000 of loss, that this particular defendant is not being sent to prison will not, I think, fail to discourage others from committing fraud offenses. Also, anyone familiar with this case will understand that the defendant is not getting away with her crime. I've already explained how she is being punished and the severe collateral consequences. And I think that all furthers the interest more than significantly of general deterrence as well.

I've had to consider under the law also the personal characteristics of the defendant. She's 44 years old. She was born in Maryland and raised there and lived there most of her life. She grew up in what she describes as a close-[k]nit family, raised by her two parents along with an older sister. Both her parents worked, and she says taught her the meaning of hard work. Her parents have remained supportive of her throughout the criminal process, attending the trial and the sentencing proceedings; they're here today. Her father spoke at length on behalf of her at one of the sentencing hearings. Her parents now live with her and she's helping to take care of their physical health while all of them are pooling their financial resources.

The defendant is currently engaged to be married to Mr. Henderson, who is also here and has attended many of the proceedings and spoke on her behalf at a sentencing hearing. Ms. Sponaugle has been married twice before, once when she was young for about three years and then again from 2004 to 2017 to Mr. Sponaugle with whom she has and now shares custody of two kids, Jessica, age 17, and Pearce, age 15.

The defendant is well educated. She graduated from high school in Maryland, then earned a Bachelors of Science degree in Medical Technology from the University of Maryland School of Medicine and [later] an MBA in Healthcare Management in 2007. She has worked, essentially, her entire adult life. By all accounts, she's a hard worker. And even though her workplace at AAW was also the scene of her crime and the victim of her crime, she [i]s also, as I've already pointed out, clearly very effective at her job as well.

Again, none of that excuses her criminal conduct, but they are facts. Like every defendant, she is more than just the crime that she committed, and I'm obligated under the law to sentence the whole person before me as I understand her to be.

She continues to work hard, but with very limited job opportunities, given her fraudulent conduct and her conviction. She currently works in a warehouse as a forklift operator and part time on a cleanup crew for a caterer, all at a severely reduced income compared to what she's used to.

Her physical and mental health are apparently good.

It is clear that the defendant is viewed as the glue that holds her extended family together and also is a valued member of her community. She's heavily involved in volunteer work, including helping people suffering from homelessness. The Court received an outpouring of character references that is almost unprecedented in all the cases I have handled over 12 years. Twenty character letters. Previously we heard from six character witnesses at trial and eight character witnesses who gave statements as part of the sentence proceedings. There's some overlap here between these groups, the testimony and the letters, but I think the overlap simply illustrates the strength of the writer's views and their confidence in Ms. Sponaugle.

I'm going to describe just a few of these letters, focusing on those from people that I really did not expect to be in the defendant's corner at this point.

One of those is her ex-husband, Mr. Sponaugle's letter, who describes how well AAW treated the defendant during her employment; how he was told on many occasions by all the partners that she was an invaluable asset; how she made herself available to the practice 24/7; and how "Kim helps anyone and everyone, myself included. All anyone has to do is ask." . . . I think it's probably striking

for anyone to get such a support from an ex-spouse, but here it is even more striking as Mr. Sponaugle says in his letter that he learned, ev[idently] only through this litigation, that the defendant turned down cash bonuses for years, specifically to ensure that he . . . did not receive child support from her. This evidently angered him, but yet still he took the time to write to the Court to help with the difficult sentencing decision I had to face.

Also especially powerful are the letters from Gregory McKee, the attorney for AAW who interacted with the defendant extensively in her role as Practice Manager in conjunction with negligence litigation that the practice experienced. His relationship as counsel to the practice appears to continue to this day. He wrote to the Court twice, most recently in April, months after Ms. Sponaugle had been convicted.

Mr. McKee writes to the Court, notwithstanding his ongoing relationship with his client, AAW: "I have personally been able to achieve a great amount of success for AAW over the years and I am certain this is due in no small part to the honesty, integrity and work eth[]ic of Ms. Sponaugle. I can think of no other person whom I have recommended with a higher degree of confidence than Ms. Sponaugle." Here's another one: "I can honestly say I have not encountered another person who has advocated for the healthcare providers or who was as involved in the cases as well she was." Another quote: "While I have found each member of the practice to be exemplary, I have also found Ms. Sponaugle to be equally exemplary in her performance." And just one more from him: "As a practicing attorney for 24 years, I can state that I have not seen an individual who invested as much [of] her personal time and emotional energy into lawsuits involving [other] people."

These to me are striking testimonials as to the defendant's character and I have factored them appropriately into my sentence.

I want to reiterate once again that I have also carefully considered the views of the victims. Again, my focus today under the law, though, has to be on the defendant.

There are a few other concerns with sentencing that I had to take into account and I will try to address them somewhat briefly. I need to avoid any unwarranted sentencing disparities with my sentence and here I believe there are none. I think this case proves the tru[ism] that every criminal case is unique. As I said, the defendant's criminal conduct largely dwells in a gray area, given the nature of the work environment in which Ms. Sponaugle operated and the fact that she was, with at least some great frequency, authorized to do exactly what was also at times the precise criminal conduct for which she was convicted and for which she is being sentenced. I think my sentence is entirely reasonable and fair and reflects a careful and thorough consideration of the various sentencing factors under the utterly atypical circumstances presented.

The government helpfully identifies 17 other financial crime cases prosecuted in this District in the last nine years with loss amounts of below $250,000. And a comparison to these case strongly supports the Court's sentence and proves that here there is no unwarranted disparity, with emphasis on unwarranted.

Three of the 17 cases resulted in noncustodial sentences, proving that my sentence today is far from an outlier.

The loss here of around $92,000 is significantly lower than the average loss involved in the 17 cases selected by the government, which, by my calculation, was on the average of around $151,000, which, again, suggests that my sentence should properly be toward the low end of sentences of the government's cited cases.

I believe 16 of the 17 cases selected by the government were guilty pleas, so they are not at all comparable on the question that the government emphasizes and cites them for, which is acceptance of responsibility.

This case dwells in the gray area and I have no reason to believe that any of the others do. Certainly one case that I know that was listed that went to trial, *United States v. Davis*, which I presided over did not dwell anywhere near a gray area.

So the reality is in my view that any sentence in the guidelines or below it would not result in an unwarranted sentencing disparity. I think the government's footnote amply proves that and I think it supports that my sentence, too, is not an unwarranted sentencing disparity or does not create any such disparity.

I've had to consider the interest of rehabilitation and alternatives to incarceration and the defendant's motion for a downward variance. I have considered all of these and for reasons I have already explained, I think alternatives to incarceration are available and that they fully promote the interest of . . . rehabilitation of the defendant and all the other interest[s] of sentencing. For all the reasons I have stated, I believe the downward variance to the noncustodial sentence I am imposing is warranted.

As always I've considered Attachment A.

I said at the beginning of my pronouncement of sentencing today that I am obligated under the law to impose a sentence that is sufficient, but not greater than necessary to achieve the purposes of sentencing. That's a very important principle of the Federal sentencing. I sa[id] it at every sentencing I've done in this District over 12 years, [and] it is of crucial importance in this case.

15

      Every sentencing decision entails some degree of risk.  The Court makes judgments as best it can as to who the person is before it, what has brought her to this point, and usually when I'm sentencing a defendant, it is the worst day of their life and they are being held accountable for the worst thing they've done in their life.

      The Court has to make predictions as to who the defendant is and is likely to develop into, taking account of all the factors it can, including the expected impact of whatever sentence is imposed.  As part of that process, the Court is required under the law to err – when it has doubts, to err on the side of leniency; that is the meaning of a sentence that is sufficient, but not any greater than truly necessary.

      Thereafter, the Court formally pronounced and imposed sentence, consistent with what it had described above would be its sentencing decision.

September 6, 2022  
Wilmington, Delaware

                                      HONORABLE LEONARD P. STARK  
                                      UNITED STATES DISTRICT COURT